No. 24-10031

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

TRACY TURNER,

> *Plaintiff-Appellant,*

v.

BNSF RAILWAY COMPANY,

> *Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Texas, Fort Worth Division
(Case No. 4:23-cv-681)
The Honorable Mark T. Pittman

_____

## APPELLANT'S BRIEF

_____

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Colin Reeves
  *Counsel of Record*
APOLLO LAW LLC
1000 Dean Street
Suite 101
Brooklyn, NY 11238
colin@apollo-law.com
(646) 363-6763

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

1.    *Tracy Turner v. BNSF Railway Company*, No. 24-10031.

2.    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Tracy Turner
  Plaintiff-Appellant

- BNSF Railway Company
  Defendant-Appellee

- Colin Reeves, APOLLO LAW LLC
  Counsel for Turner on appeal

- Adam W. Hansen, APOLLO LAW LLC
  Counsel for Turner on appeal

- Nicholas D. Thompson, CASEY JONES LAW LLC
  Counsel for Turner in the district court

- Kathryn Averwater, CASEY JONES LAW LLC
  Counsel for Turner in the district court

- Scotty MacLean III, MACLEAN LAW FIRM PC
  Counsel for Turner in the district court

- Bryan P. Neal, HOLLAND & KNIGHT LLP
  Counsel for BNSF Railway Company on appeal and in the district court

- Stephen F. Fink, HOLLAND & KNIGHT LLP
  Counsel for BNSF Railway Company on appeal

s/ Colin Reeves
Colin Reeves
*Attorney of Record for Plaintiff-Appellant Tracy Turner*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Tracy Turner requests oral argument in this case, which presents two important issues about the relationship between the employment provisions of the Americans with Disabilities Act ("ADA") and the certification requirements that the Federal Railroad Administration promulgated in regulations under the Federal Railroad Safety Act. The first issue is whether those regulations preclude Turner's ADA lawsuit against his employer, Appellee BNSF Railway Company. The second is whether employers can use a certification test of their own creation that violates the ADA to disqualify an employee, and then argue that this disqualification categorically puts the employee outside the coverage of the ADA.

Oral argument will allow the parties to present their arguments for the benefit of the Court and allow the Court to ask questions and clarify the parties' contentions.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................ i

STATEMENT REGARDING ORAL ARGUMENT ................................... iii

TABLE OF CONTENTS ............................................................. iv

TABLE OF AUTHORITIES ........................................................ vii

STATEMENT OF JURISDICTION ............................................... 1

STATEMENT OF THE ISSUES ................................................... 1

INTRODUCTION .................................................................... 1

STATEMENT OF THE CASE .................................................... 4

I.    LEGAL BACKGROUND ................................................... 4

      A.    The ADA Prohibits Discrimination Against Disabled
            Employees ........................................................... 4

      B.    The FRA's Regulations Provide Railroads With Broad
            Discretion to Design and Implement Certification Tests ....... 6

            (1)    The FRSA regulates certification programs and
                   provides whistleblower protections ........................... 7

                   (a)    Certification programs ............................ 7

                   (b)    Whistleblower protections ....................... 8

                   (c)    Conductor certification ........................... 9

            (2)    The FRSA gives each railroad substantial
                   discretion to design and implement its certification
                   procedures .................................................. 10

            (3)    FRA regulations require railroads to test
                   employees color vision as part of their certification
                   programs but give railroads great discretion to
                   decide how to do so ....................................... 11

(4)     Employees may appeal adverse certification decisions to the FRA, but the scope of the agency's review is narrowly circumscribed ................................ 15

II.    FACTUAL BACKGROUND ........................................................... 19

    A.    The Parties ............................................................................ 19

    B.    BNSF Refuses to Recertify Turner After He Fails BNSF's Discriminatory Color-Vision Field Test ................... 19

III.   PROCEDURAL HISTORY ............................................................ 21

SUMMARY OF THE ARGUMENT ..................................................... 22

ARGUMENT ........................................................................................ 23

I.     STANDARD OF REVIEW ............................................................ 23

II.    THE FRA's REGULATIONS DO NOT PRECLUDE TURNER'S ADA CLAIMS ............................................................ 24

    A.    Properly Analyzing Whether One Federal Law Precludes Another Requires Carefully Examining the Text, Structure, and History of the Two Laws .................... 24

    B.    The Text, Structure, and History of the ADA and the FRSA Show that the FRA's Regulations Do Not Preclude Turner's ADA Claims ............................................. 26

    C.    The District Court Erred in Concluding that the FRA's Regulations Preclude Turner's ADA Claims ........................ 36

III.   TURNER HAS PLAUSIBLY ALLEGED THAT HE IS QUALIFIED ................................................................................. 42

    A.    ADA Plaintiffs Are Qualified When Their Employer Uses a Discriminatory Qualification Standard of Its Own Devising to Screen Them Out and They Are Otherwise Qualified to Do Their Job ..................................... 43

B.   Turner is Qualified Because the Color-Vision Testing Protocol BNSF Created and Used to Screen Him Out Is Discriminatory and Turner Is Otherwise Qualified to Work as a Conductor ................................................................ 45

C.   The District Court Erred in Concluding that Turner Is Not Qualified ......................................................................... 49

D.   Federal Regulations Did Not Require BNSF to Use the Color-Vision Field Test that It Used to Screen Out Turner ........................................................................................ 55

CONCLUSION ........................................................................................ 57

CERTIFICATE OF SERVICE ................................................................ 58

CERTIFICATE OF COMPLIANCE ....................................................... 59

# TABLE OF AUTHORITIES

## CASES

*Abdallah v. Mesa Air Grp., Inc.,*
   83 F.4th 1006 (5th Cir. 2023)........................................... 41

*Albertson's, Inc. v. Kirkingburg,*
   527 U.S. 555 (1999) ...........................................30, 36-37, 45, 55-56

*All. for Hippocratic Med. v. Food & Drug Admin.,*
   2023 WL 2913725 (5th Cir. Apr. 12, 2023) ...................................54

*Bates v. United Parcel Servs.,*
   511 F.3d 974 (9th Cir. 2007) (en banc) ....................................43-45

*Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.,*
   313 F.3d 899 (5th Cir. 2002) ....................................................23-24

*Cannon v. Jacobs Field Servs. N. Am., Inc.,*
   813 F.3d 586 (5th Cir. 2016) .................................................... 30, 43

*Carpenter v. Mineta,*
   432 F.3d 1029 (9th Cir. 2005) ...........................................8, 10, 16-18

*Cleveland v. Pol'y Mgmt. Sys. Corp.,*
   526 U.S. 795 (1999) ...........................................................54

*Colasanti v. City of Portland,*
   2023 WL 6850235 (D. Or. Oct. 17, 2023)........................... 49

*Consol. Rail Corp. v. United Transp. Union,*
   947 F. Supp. 168 (E.D. Pa. 1996)....................................... 8

*Deanda v. Becerra,*
   96 F.4th 96 F.4th 750 (5th Cir. 2024)............................................ 41

*Doe v. MySpace, Inc.,*
   528 F.3d 413 (5th Cir. 2008) .......................................................23

*EEOC v. Union Pac. R.R. Co.,*
    No. 23-cv-03030 (D. Minn.) ............................................................. 35

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) .................................................................... 41-42

*Harris v. P.A.M. Transp., Inc.,*
    339 F.3d 635 (8th Cir. 2003) ........................................................ 50

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,*
    534 U.S. 124 (2001) ..................................................................... 31

*Melendez v. Morrow Cnty. Sch. Dist.,*
    2009 WL 4015426 (D. Or. Nov. 19, 2009).................................... 49

*Miller v. Whirlpool Corp.,*
    807 F. Supp. 2d 684 (N.D. Ohio 2011)......................................... 55

*Mills v. Union Pac. R.R. Co.,*
    2024 WL 185246 (D. Idaho Jan. 16, 2024) ......................................
    .................................................. 12-13, 20, 35-36, 40-41, 46-48, 50, 56

*Mlsna v. Union Pac. R.R. Co.,*
    975 F.3d 629 (7th Cir. 2020) ........................................................ 26

*Norman v. Missouri Pac. R.R.,*
    414 F.2d 73 (8th Cir. 1969) ....................................................... 34-35

*Peters v. Union Pacific R.R. Co.,*
    80 F.3d 257 (8th Cir. 1996) .......................................................... 39

*POM Wonderful LLC v. Coca-Cola Co.,*
    573 U.S. 102 (2014) ...................... 4, 22, 24-28, 31-32, 35, 38-39, 41

*Prewitt v. U.S. Postal Serv.,*
    662 F.2d 292 (5th Cir. 1981) .............................................. 44, 48, 57

*Rohr v. Salt River Project Agric. Improvement & Power Dist.,*
    555 F.3d 850 (9th Cir. 2009) ............................................... 43, 46-49

*Tennessee v. Lane*,
   541 U.S. 509 (2004) ........................................................... 4

*United States v. 0.073 Acres of Land, More or Less, Situate in Pars. of Orleans & Jefferson*,
   705 F.3d 540 (5th Cir. 2013) ......................................23-24

*Vann-Foreman v. Ill. Cent. R.R. Co.*,
   2022 WL 180749 (N.D. Ill. Jan. 20, 2022) ................................35-36

*Walker v. Union Pac. R.R. Co.*,
   2023 WL 10354310 (D. Or. Dec. 18, 2023) ................................... 35

*Weeks v. Union Pacific R.R Co.*,
   2017 WL 1740123 (E.D. Cal. May 4, 2017) ..............................39-40

*Williams v. J.B. Hunt Transportation, Inc.*,
   826 F.3d 806 (5th Cir. 2016) ...............................................37, 49-54

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................ 27

## STATUTES, RULES, AND REGULATIONS

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) ................................................................................... 5

Federal Railroad Safety Act of 1970, Pub. L. No. 91-458, § 101, 84 Stat. 971 .................................................................................. 6

Federal Railroad Safety Authorization Act of 1980 ("FRSA Act of 1980"), Pub. L. No. 96-423 ...................................................................... 7

Pub. L. No. 110-432, div. A, title IV, § 402(a), Oct. 16, 2008, 122 Stat. 4884 ................................................................................. 9

Rail Safety Improvement Act of 2008 ("RSIA"), Pub. L. No. 110-432 ...... 7

Rehabilitation Act of 1973, 29 U.S.C. § 794 ............................................ 44

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1331 ..................................................................................... 1

29 C.F.R. § 1630, App'x § 1630.10 ................................................... 5-6, 48

29 C.F.R. § 1630.2 ................................................................................. 5

29 C.F.R. § 1630.15 .......................................................... 6, 30, 36, 45, 55

42 U.S.C. § 1981a .................................................................................. 6

42 U.S.C. § 2000e-5 ............................................................................... 6

42 U.S.C. § 12101 .............................................................................. 1, 5

42 U.S.C. § 12111 ..................................................................... 5, 43, 49, 51

42 U.S.C. § 12112 ........................................................... 1, 5-6, 26, 44

42 U.S.C. § 12213 .................................................................................. 1

42 U.S.C. § 12116 .................................................................................. 5

42 U.S.C. § 12117 .................................................................................. 6

49 C.F.R. App'x B to Part 240 ..................................................... 10-11, 13

49 C.F.R. App'x E to Part 240 ..................................................... 10-11, 34

49 C.F.R. App'x B to Part 242 ..................................................... 10-13, 52

49 C.F.R. Part 240 ........................................................................... 10

49 C.F.R. Part 242 ........................................................................... 10

49 C.F.R. § 1.89 .................................................................. 8-9

49 C.F.R. § 27.19 ................................................................. 29

49 C.F.R. § 240.1 ............................................................ 10, 29

49 C.F.R. § 240.5 ............................................................ 15, 29

49 C.F.R. § 240.101 .............................................................. 10

49 C.F.R. § 240.121 .................................................... 10, 12, 14

49 C.F.R. § 240.125 .............................................................. 10

49 C.F.R. § 240.126 .............................................................. 10

49 C.F.R. § 240.127 .............................................................. 10

49 C.F.R. § 240.128 .............................................................. 10

49 C.F.R. § 240.129 .............................................................. 10

49 C.F.R. § 240.201 .............................................................. 11

49 C.F.R. § 240.203 .............................................................. 11

49 C.F.R. § 240.217 .............................................................. 11

49 C.F.R. § 240.401 ........................................................... 15-16

49 C.F.R. § 240.403 .............................................................. 16

49 C.F.R. § 240.405 .............................................................. 16

49 C.F.R. § 240.407 .............................................................. 16

49 C.F.R. § 240.408 .............................................................. 16

49 C.F.R. § 240.409 ........................................................................ 16

49 C.F.R. § 240.411 ..................................................................... 16-17

49 C.F.R. § 242.1 ..................................................................... 10, 29

49 C.F.R. § 242.5 ..................................................................... 15, 29

49 C.F.R. § 242.101 ........................................................................ 10

49 C.F.R. § 242.109 ........................................................................ 11

49 C.F.R. § 242.117 ......................................... 10, 12-14, 20, 51-52

49 C.F.R. § 242.121 ........................................................................ 10

49 C.F.R. § 242.122 ........................................................................ 10

49 C.F.R. § 242.123 ........................................................................ 10

49 C.F.R. § 242.201 ........................................................................ 11

49 C.F.R. § 242.501 ..................................................................... 15-16

49 C.F.R. § 242.503 ........................................................................ 16

49 C.F.R. § 242.505 ..................................................................... 16, 53

49 C.F.R. § 242.507 ........................................................................ 16

49 C.F.R. § 242.508 ........................................................................ 16

49 C.F.R. § 242.509 ..................................................................... 16-17

49 C.F.R. § 242.511 ..................................................................... 16, 17

49 C.F.R. § 391.41 ........................................................................ 49

49 C.F.R. § 391.47 ............................................................................ 49, 53

49 U.S.C. § 12114 ................................................................................. 27

49 U.S.C. § 20101 ................................................................................... 6

49 U.S.C. § 20106 .................................................................. 7, 28, 38-39

49 U.S.C. § 20109 ........................................................................ 9, 28-29

49 U.S.C. § 20131 ................................................................................... 7

49 U.S.C. § 20135 ................................................................................... 8

49 U.S.C. § 20163 ................................................................................... 9

## OTHER AUTHORITIES

*Best Practices for Designing Field Tests for Locomotive Engineers or Conductors* ("*Best Practices*"), 80 Fed. Reg. 73122, 73126 (Nov. 24, 2015) .............................................................................. 13-15, 27, 51-52

David E. Bernstein, *Licensing Laws: A Historical Example of the Use of Government Regulatory Power Against African-Americans*, 31 San Diego L. Rev. 89 (1994) .......................................................................... 34

*Guidance Explaining the Federal Railroad Administration's Dispute Resolution Procedures for Locomotive Engineer and Conductor Certification FAQs* (Feb. 24, 2022), https://railroads.dot.gov/elibrary/guidance-explaining-federal-railroad-administrations-dispute-resolution-procedures ..................................... 18

Paul S. Appelbaum, *Step Up to the Bar: Avoiding Discrimination in Professional Licensure*, 66 *Psychiatric Servs.* 340 (April 2015) ............. 34

*The Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearing Before the H. Comm. on Transp. & Infrastructure*, 110th Cong. 139 (2007) ................................................. 8

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this case arose under the ADA, 42 U.S.C. §§ 12101-12213. ROA.6-13.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court granted judgment on the pleadings on December 22, 2023, and entered final judgment the same day. ROA.164-65. Appellant filed a notice of appeal on January 12, 2024. ROA.166. This appeal is from a final judgment disposing of all parties' claims.

## STATEMENT OF THE ISSUES

1.    Did the district court err by concluding that Federal Railroad Administration regulations preclude Tracy Turner's ADA lawsuit against his employer, BNSF Railway Company?

2.    Did the district court err by concluding that Turner is not qualified under the ADA?

## INTRODUCTION

This case concerns the intersection of two statutes. The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Regulations promulgated by the Federal Railroad Administration ("FRA") under the Federal Railroad Safety Act ("FRSA") provide railroad companies with wide discretion to create and implement procedures for certifying employees to work as train conductors.

1

Tracy Turner worked as a conductor for BNSF for 15 years. Turner suffers from a color-vision deficiency, but that deficiency does not affect his ability to drive trains safely. BNSF refused to recertify Turner as a conductor and effectively terminated him after he failed BNSF's color-vision field test, which BNSF designed and administered using the ample discretion that the FRA provides railroads to create certification assessments. BNSF's bespoke test did not match what Turner needs to see to work safely; nor did BNSF provide Turner with a testing accommodation even though the FRA permits that and the ADA requires it.

Turner sued under the ADA, alleging that BNSF's testing procedure discriminated against him based on his disability. The district court granted judgment on the pleadings, concluding that the FRA's certification regulations preclude Turner's ADA claims, and that Turner is not qualified under the ADA because he did not pass BNSF's chosen color-vision assessment. Both rulings are incorrect.

First, the FRA's regulations do not preclude Turner's ADA claims. Determining whether one federal law precludes another requires carefully examining the text, structure, and history of the two laws. Conducting that analysis shows that nothing in the FRSA or its implementing regulations bars disability claims under the ADA. Rather, the two statutory regimes work in harmony: the FRSA empowering railroads to use discretion to test employees for purposes of certification;

2

the ADA ensuring that employers—railroads among them—exercise that discretion in a non-discriminatory manner.

Second, Turner is qualified under the ADA. When an employer disqualifies an employee from his job based on the employer's discriminatory qualification standard, that employee is qualified under the ADA so long as he meets all other job-related requirements and can perform his job's essential functions with or without an accommodation. Turner easily satisfies that rule here. The only reason Turner is not working as a conductor today is because he did not pass BNSF's discriminatory certification test. And while failing an objectively defined, government-mandated test may render an employee unqualified under the ADA, failing an *employer's* exam (as Turner did here) does not render an employee unqualified. Other provisions of the ADA—most notably the business-necessity defense—govern whether an employer's own qualification standard is lawful.

The district court's rulings, if allowed to stand, would have serious and startling ramifications for railroad employees, effectively immunizing BNSF and other railroads from liability for discrimination. The court's preclusion analysis covers *all* railroad employees alleging that their employer discriminated against them during the certification-testing process, not just those lodging claims under the ADA or about their employer's color-vision testing requirements. The district court's analysis of the qualified issue is just as sweeping. Under that analysis,

3

any railroad employee who is disqualified from his job because of a discriminatory certification test that the company created and administered is categorically excluded from the ADA's protections.

This is not the law. Railroads may not use the discretion they have to devise certification assessments to pick tests that discriminate against employees. When such discrimination is challenged in a lawsuit like Turner's, BNSF and other railroads must defend their actions in court and on the merits.

The district court's judgment should be reversed.

**STATEMENT OF THE CASE**

## I.    LEGAL BACKGROUND.

Two bodies of law play a starring role in this case: (1) the ADA, and (2) the FRSA and regulations promulgated under it by the FRA. Because the case "concerns the intersection and complementarity of…[these] two federal laws[, a] proper beginning point is a description of the statutes." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014).

### A.    The ADA Prohibits Discrimination Against Disabled Employees.

The ADA "was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). The ADA's stated "purpose" is "to provide a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress amended the ADA with the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), to reaffirm the strength of this mandate. The Equal Employment Opportunity Commission ("EEOC") has authority to issue regulations for the ADA's employment provisions. *See* 42 U.S.C. §§ 12111(1) & 12116.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." *Id.* § 12112(a). Discrimination includes failing to make reasonable accommodations for disabled employees. *Id.* § 12112(b)(5). It also includes using qualification standards, employment tests, or other selection criteria that screen out, or tend to screen out, disabled employees, unless the standard is job-related and consistent with business necessity. *Id.* § 12112(b)(6). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform" his job's "essential functions." *Id.* § 12111(8). Qualification standards are "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet" for the job. 29 C.F.R. § 1630.2(q). "The purpose of [the] provision" prohibiting employers from using qualification standards to disqualify disabled employees unless the standards are job-related and consistent with business necessity "is to ensure that there is a fit between job criteria and an…employee's…actual

ability to do the job." 29 C.F.R. § 1630, App'x § 1630.10(a). Disabled employees, in other words, should not be "excluded from job opportunities unless they are actually unable to do the job." *Id.* "This provision is applicable to all types of selection criteria, including safety requirements, vision…requirements, …and employment tests"—even those that only "unintentionally screen out" disabled employees. *Id.*

The ADA provides employers with several defenses. They can defend their use of discriminatory qualification standards by proving that they are "job-related and consistent with business-necessity," and that they cannot be met with a reasonable accommodation. *Id.* §§ 12113(a), 12112(b)(6). They may also assert that their actions are mandated by federal law. *See* 29 C.F.R. § 1630.15(e).

Before filing an ADA lawsuit, employees must first exhaust their administrative remedies by filing a charge with the EEOC. *See* 42 U.S.C. §§ 12117(a), 2000e-5. After receiving a right-to-sue letter from the EEOC, plaintiffs may then seek damages and equitable relief by filing a lawsuit. *See* 42 U.S.C. §§ 12117(a), 2000e-5(f)-(g), 1981a.

## B. The FRA's Regulations Provide Railroads With Broad Discretion to Design and Implement Certification Tests.

Congress passed the FRSA in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *see* Federal Railroad Safety Act of 1970, Pub. L. No. 91-458, § 101, 84 Stat. 971, 971. Congress has amended the

FRSA several times, including with the Federal Railroad Safety Authorization Act of 1980 ("FRSA Act of 1980"), Pub. L. No. 96-423, and the Rail Safety Improvement Act of 2008 ("RSIA"), Pub. L. No. 110-432. With these amendments, the FRSA regulates many aspects of railroad operations to improve safety for both the public and railroad employees. *See* 49 U.S.C. §§ 20131-20171. Congress has delegated authority to the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety" to accomplish this goal. *Id.* § 20103.

The FRSA contains a general preemption provision, which states that "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1). The provision, by its express terms, applies only to certain *state* laws and *state* causes of action related to railroad safety or security. *See id.* § 20106(a)-(c).

**(1) The FRSA regulates certification programs and provides whistleblower protections.**

Two components of the FRSA's laws and regulations are especially relevant here. The first of these are certification programs for train engineers and conductors. The second are whistleblower provisions protecting railroad employees from retaliation.

**(a) *Certification programs.***

Start with the certification programs. Congress directed the Department of Transportation ("DOT") to "establish a program requiring

the licensing or certification" of locomotive engineers. 49 U.S.C. § 20135. The DOT delegated the authority to establish regulations for these programs to the FRA. *See* 49 C.F.R. § 1.89. "In 1991 the [FRA]…issued a final rule regarding the training and certification of engineers." *Carpenter v. Mineta*, 432 F.3d 1029, 1031 (9th Cir. 2005).

### *(b)   Whistleblower protections.*

Turn now to the FRSA's whistleblower provision. The FRSA did not include whistleblower protections when it was originally enacted in 1970. Congress added these protections in 1980 after "it came to Congress' attention that railroad workers who complained about safety conditions often suffered harassment, retaliation, and even dismissal." *Consol. Rail Corp. v. United Transp. Union*, 947 F. Supp. 168, 171 (E.D. Pa. 1996). Whistleblowing complaints made under this provision were subject to mandatory arbitration under the Railway Labor Act. FRSA Act of 1980, Pub. Law No. 96-423, § 10, sec. 212(c)(1).

The protections added in 1980 did not stem the tide of harassment and retaliation that railroad whistleblowers faced. Having learned from the FRA Administrator in 2007 that retaliation against railroad workers remained rampant,[1] Congress substantially revised the FRSA's whistleblower provision when it passed the RSIA the following year.

---

[1] *The Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearing Before the H. Comm. on Transp. & Infrastructure*, 110th Cong. 139, 140 (2007) (Testimony of FRA Administrator Joseph H. Boardman).

8

Those amendments permit FRSA whistleblowers to file suit in federal court. *See* 49 U.S.C. § 20109(d). Protected activities that may give rise to a claim include complaints about conduct that employees reasonably believe violates "any Federal law, rule or regulation relating to railroad safety." *Id.* § 20109(a)(1).

And key here, the amended whistleblower provision expressly does not preclude federal law or preempt state law, or otherwise abridge employees' rights under state or federal law. The whistleblower provision makes this plain: "Nothing in this section preempts or diminishes any other safeguards against discrimination...provided by Federal or State law." *Id.* § 20109(g). The following sub-section then provides that "[n]othing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law." *Id.* § 20109(h).

### *(c)    Conductor certification.*

With the RSIA, Congress also for the first time required train conductors to be certified. As it had done for engineers, Congress directed the DOT to "prescribe regulations to establish a program requiring the certification of train conductors." *See* Pub. L. No. 110-432, div. A, title IV, § 402(a), Oct. 16, 2008, 122 Stat. 4884 (codified at 49 U.S.C. § 20163(a)). The DOT again delegated the authority to establish these regulations to the FRA. *See* 49 C.F.R. § 1.89(a)-(b). The certification requirements the FRA developed for conductors are nearly identical to those that it

established for engineers. *See* 49 C.F.R. Part 240 (engineers); 49 C.F.R. Part 242 (conductors).

These parts prescribe "minimum Federal safety standards for the eligibility, training, testing, certification and monitoring of" engineers and conductors." 49 C.F.R. §§ 240.1(b), 242.1(b). Because "[t]he FRA does not actively participate in engineer [or conductor] testing or certification," it falls to each railroad both to design its own certification program and to determine whether its employees meet the requirements that it establishes. *See Carpenter*, 432 F.3d at 1031; 49 C.F.R. §§ 240.101, 242.101. Each company must create a certification program with several components, 49 C.F.R. §§ 240.101(c), 242.101(a), including procedures for testing employees' hearing and visual acuity, knowledge, skills, and operational performance, *see id.* §§ 240.121, 125-29 & 242.117, 121-23.

### (2)   The FRSA gives each railroad substantial discretion to design and implement its certification procedures.

The regulations explicitly provide each railroad with substantial "discretion" and "latitude" in "designing" and implementing "its [certification] program." *See* 49 C.F.R. App'x B & App'x E to Part 240, App'x B to Part 242. As the regulations explain, "[r]ather than establish rigid requirements for each element of the program, FRA has given railroads discretion to select the design of their individual programs within a specified context for each element." *Id.* App'x B to Part 240 & App'x B to Part 242. The regulations make this point repeatedly,

10

explaining dozens of times that each railroad has discretion and latitude in selecting and applying its certification policies and procedures. *See id.* App'x B to Part 240 (explaining nearly 20 times that railroads have this "discretion" and "latitude"); *id.* App'x B to Part 242 (explaining same thing 12 times). The "FRA has afforded railroads this discretion to allow individual railroad companies latitude to tailor their testing procedures to the specific operational realities" that they face. *Id.* App'x E to Part 240.

Railroad employees may not serve as engineers or conductors without being certified to work in those positions. *Id.* §§ 240.201(d), 242.201(c)(1). To be certified (or recertified), employees must pass the gantlet of certification tests and standards that their company has adopted. *See id.* §§ 240.203, 242.109. After a company first certifies an employee to work as an engineer or conductor, it must recertify him every 3 years. *See id.* §§ 240.201(b)-(c), 217(c).

> **(3)    FRA regulations require railroads to test employees' color vision as part of their certification programs but give railroads great discretion to decide how to do so.**

The visual-acuity requirements that BNSF selected and applied to Turner when it refused to recertify him as a conductor in 2020 are what are at issue in this case. As part of the certification process, each railroad must test its conductors' and engineers' visual acuity, including their "ability to recognize and distinguish between the colors of railroad

11

signals." *Id.* §§ 240.121(c)(3), 242.117(h)(3). The purpose of this testing is to determine whether engineers and conductors have sufficient color-vision capacity to safely operate a train. *See id.* §§ 240.121(e), 242.117(j).

Consistent with the FRA's overall approach to certification, the color-vision-testing regulations provide each railroad with significant discretion for determining whether engineers and conductors have adequate color vision. The FRA offers guidelines for railroads to use when designing and implementing their color-vision testing protocol, while giving each railroad substantial leeway to create its own testing procedure. *See, e.g.*, *id.* App'x F to Part 240 & App'x D to Part 242; *id.* App'x B to Part 242 (permitting each "railroad to select the [color-vision testing] procedures it will employ").

That discretion is apparent at each step of the three-step color-vision testing process that a railroad may adopt. Railroads must first give employees "an initial test," which may be any of 12 "acceptable" scientific color-vision tests. *Id.* App'x F, §§ (2)-(3), to Part 240 & App'x D, §§ (2)-(3), to Part 242. "If a conductor [or engineer] passes the test, he or she is recertified." *Mills v. Union Pac. R.R. Co.*, 2024 WL 185246, at *1 (D. Idaho Jan. 16, 2024); *see* 49 C.F.R. § 242.117(c).

An employee who does not pass this test is entitled to at least one retest. 49 C.F.R. §§ 240.121(e), 242.117(j). "Significantly, the federal regulations *do not* prescribe a follow-up test" that railroads must use. *Mills*, 2024 WL 185246, at *4. "Rather, the regulations establish a

framework for railroad companies to employ in further evaluating whether their conductors can safely operate trains." *Id.* "Within this framework, railroad companies have significant discretion in selecting and implementing follow-up testing procedures." *Id.* Companies may provide a field test or other practical color testing; they may offer another scientific test; or they may even refer employees to an ophthalmologist. 49 C.F.R. App'x F, § (4), to Part 240 & App'x D, § (4), to Part 242. Passing this secondary test suffices for recertification. *See Mills*, 2024 WL 185246, at *1; 49 C.F.R. § 242.117(c).

But even when a railroad deems an employee to have failed its secondary color-vision testing, it can still certify him to work as a conductor or engineer so long as sufficient evidence shows that he can safely do the job. *See* 49 C.F.R. App'x B to Part 240 & App'x B to Part 242 (providing each "railroad latitude" to make this decision); *id.* § 242.117(c)(2)(i), (j). Providing railroads with this latitude "is especially necessary to address situations where locomotive engineers and conductors have a history of safe performance that would normally suggest that they have the ability to safely perform their duties." *Best Practices for Designing Field Tests for Locomotive Engineers or Conductors* ("*Best Practices*"), 80 Fed. Reg. 73122, 73126 (Nov. 24, 2015).

The FRA's interpretive guidance for color-vision testing reaffirms these principles. That guidance reiterates the "FRA's longstanding view…that there are some people who, despite not meeting the vision

13

threshold in 49 CFR 240.121(c) and 242.117(h), have sufficient residual visual capacity to safely perform as a locomotive engineer or conductor." *Id.* at 73123. The guidance confirms that each railroad has the "discretion" to choose how to conduct secondary color-vision testing for such employees. *Id.* at 73124. The only limit on that discretion is that the test the company provides must be "a valid, reliable, and comparable test for assessing whether a person who fails the initial vision test can safely perform as a locomotive engineer or conductor." *Id.*

Most railroads do their secondary testing with a field test. *Id.* The FRA's field-testing guidelines "are broadly drafted to allow each railroad to develop field testing procedures that will work for its own operational environment and to consider the unique medical circumstances of each examinee tested." *Id.* at 73126. The guidelines grant "each railroad the discretion" to permit chromatic lenses to be worn during the test. *Id.* at 73125. They also recognize that "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." *Id.* at 73125, 73127. That makes sense. The point of the testing, after all, is to determine "whether the employee can safely perform his or her duties." *Id.* at 73127. But the railroad signals that engineers and conductors may encounter while working vary widely by company, territory, shift, and position. *See id.* at 73124-25, 73127. Indeed, many trainmen work in unsignalled "dark territory" or in other positions where color signals are limited or non-existent. *See id.* at 73124-

14

25, 73127. That is why no "system-wide," one-size-fits-all test is advisable. *Id.* at 73127. The test for each employee should instead "be administered to replicate actual operating conditions that the examinee will encounter" when working. *Id.* at 73127. The FRA leaves it to each railroad to decide how to do this.

### (4) Employees may appeal adverse certification decisions to the FRA, but the scope of the agency's review is narrowly circumscribed.

When a railroad refuses to certify or recertify an employee, the employee "may petition the [FRA] to review the railroad's decision" if he "believes that [the] railroad incorrectly determined that he…failed to meet the certification requirements." 49 C.F.R. §§ 240.401(a), 242.501(a). The FRA's dispute-resolution procedures apply to any employee who has been denied (re)certification, not just those who have been disqualified in connection with color-vision testing. These procedures are voluntary, *see id.* ("may petition"), and neither they nor the FRA's certification regulations more generally "abridge any additional rights or remedies not inconsistent with this part that are available…under a collective bargaining agreement, the Railway Labor Act, or (with respect to employment at will) at common law with respect to removal from service or other adverse action taken as a consequence of this part." *Id.* §§ 240.5(d), 242.5(d).

15

The regulations provide for a "limited three-level dispute resolution mechanism." *Carpenter*, 432 F.3d at 1031-32. The FRA "has delegated initial responsibility for adjudicating such disputes to the Operating Crew Review Board ["OCRB"]." 49 C.F.R. §§ 240.401(b), 242.501(b). The employee must explain in his petition to the OCRB how the "railroad acted improperly." *Id.* §§ 240.403(b)(3), 242.503(b)(3). After the OCRB grants or denies the petition, the losing party may request a hearing before "a presiding officer." *Id.* §§ 240.407-09, 242.507-09. From there, "[a]n adverse decision of a presiding officer may be appealed to the FRA Administrator." *Id.* §§ 240.411, 242.511.

The scope of the FRA's review is narrowly circumscribed. The OCRB considers only three issues "[b]ased on the record" before it. *Id.* §§ 240.405(f), 242.505(f). First, whether substantial evidence supports the railroad's decision. *Id.* §§ 240.405(h), 242.505(h). Second, whether the railroad made a procedural error, and whether that error caused the employee substantial harm. *Id.* §§ 240.405(i), 242.505(i). Third, whether the railroad's legal interpretations of the certification regulations are correct. *Id.* §§ 240.405(j), 242.505(j). Based on its review of these three issues, the OCRB decides only "whether the denial…of recertification was improper under this part (*i.e.*, based on an incorrect determination that the person failed to meet the certification requirements of this part)." *Id.* §§ 240.405(k), 242.505(k). "The [OCRB] will not otherwise consider the propriety of a railroad's decision." *Id.*

16

The hearing officer and the FRA Administrator similarly decide only whether the railroad correctly denied recertification. Although the hearing officer may receive evidence and argument, the officer determines only whether the railroad's certification decision "was correct" or "incorrect" under the regulations. *Id.* §§ 240.409(q), 242.509(q); *see Carpenter*, 432 F.3d at 1033. On appeal, "[t]he Administrator may remand, vacate, affirm, reverse, alter or modify the decision of the presiding officer." 49 C.F.R. §§ 240.411(3), 242.511(e).

The relief that the FRA may grant an employee who has been incorrectly denied certification is similarly circumscribed. The Ninth Circuit's *Carpenter* decision is instructive on this point. There, Carpenter asked the FRA to order BNSF to retest him or certify him after he failed a certification test. 432 F.3d at 1031-32. The hearing officer "conclude[ed] that he had no authority under the Part 240 regulations to order the remedial relief requested or to consider the adequacy of [BNSF's] certification program." *Id.* at 1032. The FRA Administrator affirmed that decision. *Id.* So did the Ninth Circuit, holding that "no remedial relief is available in this limited dispute resolution proceeding." *See id.* at 1032-35. The court also held that the FRA did not err in refusing to consider certain arguments that Carpenter made about the certification process, since those arguments were not strictly relevant to whether BNSF correctly denied him certification. *See id.* at 1035-36.

The FRA has not changed its view about the limitations on its remedial authority since *Carpenter* was decided. Administrative guidance that it recently issued affirms that "[t]he decision-making power of the Board is limited to determining whether the denial or revocation decision was improper pursuant to the Federal regulations."[2]

> The Board is only empowered to make determinations concerning railroad certification decisions under this regulation. The Board is not empowered to mitigate any other consequences of the railroad's decision to deny…certification. The contractual consequences, if any, of those determinations must be resolved under dispute resolution mechanisms that do not directly involve FRA. For example, FRA cannot order a railroad to alter its seniority rosters or make an award of back pay to accommodate a finding that a railroad wrongfully denied certification.[3]

In short, the FRA's regulations and its longstanding interpretation of those regulations confirm that the scope of its review and authority to grant relief are severely limited.

---

[2] *Guidance Explaining the Federal Railroad Administration's Dispute Resolution Procedures for Locomotive Engineer and Conductor Certification FAQs* (Feb. 24, 2022), at 7, https://railroads.dot.gov/elibrary/guidance-explaining-federal-railroad-administrations-dispute-resolution-procedures.

[3] *Id.*

## II.    FACTUAL BACKGROUND.

### A.    The Parties.

Tracy Turner worked for BNSF as a train conductor from 2005, when it hired him, until 2020, when it refused to recertify him for that position. ROA.9-10 §§ 18, 22-27; ROA.109.

BNSF is a railroad carrier that operates primarily in the Midwestern and Western United States. *See* ROA.7 ¶ 6.

### B.    BNSF Refuses to Recertify Turner After He Fails BNSF's Discriminatory Color-Vision Field Test.

Like one in twelve men, Turner was born with a genetic condition that affects his perception of red and green. ROA.9 ¶ 19; ROA.121. Turner's color-vision deficiency will not get worse over time. ROA.9 ¶ 20. BNSF knew that Turner was color-vision deficient when it hired him. ROA.9 ¶ 21.

Turner always did his job as a conductor safely despite his deficiency. He had no trouble distinguishing colored railroad signals, never misreading a single one in the 15 years he drove a train for BNSF. ROA.7 ¶ 2. Turner also passed BNSF's color-vision field test and was certified by BNSF to work as a conductor every year it tested him until 2020. ROA.9 ¶ 22.

In 2020 BNSF again ran Turner through the gantlet of tests it had devised for recertifying conductors. Using the wide discretion that the FRA's regulations provide BNSF to select and administer tests, for the color-vision part of the recertification process BNSF first had Turner take

the Ishihara 14-plate test, ROA.8 ¶ 10, one of the 12 initial scientific tests that the FRA accepts. 49 C.F.R. App'x F, §§ (2)-(3), to Part 240 & App'x D, §§ (2)-(3), to Part 242. Because the Ishihara test "is very sensitive to color-vision deficiency," *Mills*, 2024 WL 185246, at *1, Turner failed the test, ROA.121, 123.

Turner then exercised his right to take a secondary test. *See* 49 C.F.R. § 242.117(j). For this test, BNSF made Turner take a field test that BNSF created and administered. ROA.10 ¶ 23. That test was much harder than what Turner experienced when working as a conductor, bearing little resemblance to what he actually saw on the job and needed to see to work safely. ROA.7 ¶ 3; ROA.19 ¶¶ 23-24. Worse yet, BNSF prohibited Turner from wearing chromatic lenses while taking the test, which would have helped him distinguish the colors of the signals being displayed. ROA.10 ¶ 25.

Unsurprisingly, Turner failed the test. ROA.10 ¶ 26. BNSF then refused to recertify Turner to work as a conductor, basing that decision solely on Turner's flawed color-vision test results. ROA.7 ¶ 3; ROA.10 ¶ 27. Turner did not petition the FRA to review BNSF's decision. ROA.155.

Nothing had changed in Turner's color vision since the last time he had taken and passed BNSF's color-vision field test. ROA.7 ¶ 3. Had BNSF used a test that actually reflected what Turner needed to see as a conductor, he would have passed it this time, too. ROA.10 ¶ 28. Not just

20

that. Had BNSF considered Turner's history of safely doing his job and the years' worth of evidence showing that he could distinguish between railroad signals despite being color-vision deficient, it would have recertified him. ROA.7 ¶ 3; ROA.10 ¶ 29. BNSF did not do either, prohibiting him from working as a conductor and effectively terminating him. ROA.10 ¶ 27.

## III.  PROCEDURAL HISTORY.

Turner lodged a disability-discrimination charge with the EEOC, exhausting his administrative remedies. *See* ROA.107-09. After he received a right-to-sue letter, Turner filed a complaint in the district court, alleging that BNSF discriminated against him in violation of the ADA. ROA.6-13. Turner contended that BNSF violated the ADA by discriminating against him based on his disability when it refused to recertify him and withheld him from service, failed to accommodate him, and used a discriminatory field test to screen him out from his job. ROA.7 ¶¶ 3-4; ROA.11 ¶¶ 38-40.

BNSF moved for judgment on the pleadings, arguing that the FRA's regulations precluded Turner's ADA claims, and that Turner's claims failed in any event because he was not a qualified individual under the ADA. ROA.96.

The district court granted BNSF's motion on both grounds. ROA.158-64. Mischaracterizing Turner's complaint as merely "challeng[ing] the sufficiency of BNSF's secondary field test" under the

FRA's regulations and failing to engage in the rigorous textual analysis required when deciding whether one federal law precludes another, the district court held that Turner's ADA claims were precluded by the FRA's regulations. ROA.161-63. Turner's recourse, the court held, was through the FRA's dispute-resolution process, not an ADA claim in federal court, making BNSF immune from suit under the ADA. *Id.*

The district court then concluded that Turner's ADA claims also failed because he was not qualified under the ADA for two reasons: (1) BNSF refused to recertify Turner when he did not satisfy BNSF's color-vision testing criteria, and (2) Turner did not petition the FRA to review that decision. ROA.163-64.

## SUMMARY OF THE ARGUMENT

The district court erred in granting judgment on the pleadings.

The court erred first in concluding that the FRA's regulations preclude Turner's ADA claims. When considering whether one federal law precludes another, courts must analyze the text, structure, and history of the two statutes to determine whether Congress intended one law to bar suits brought under the other law. The district court failed to conduct the required analysis. But performing that analysis demonstrates that the FRA's regulations do not preclude Turner's claims. "Nothing in the text, history, or structure of the [ADA] or the [FRSA] shows the congressional purpose or design to forbid" ADA lawsuits like Turner's. *POM Wonderful*, 573 U.S. at 106.

The district court erred a second time in concluding that Turner is not qualified. The court incorrectly analogized the case to those in which ADA plaintiffs were not qualified because (1) they did not meet an objective medical standard that the government required those employees to satisfy and (2) they did not use a regulatory appeals process that could resolve whether they satisfied this requirement. But this is not that kind of case. Turner contends that *BNSF's*—not the government's—color-vision testing procedures are discriminatory. These contentions are beyond the scope of what the FRA can review or remedy through its dispute-resolution process. Turner meets all the requirements of being a conductor other than the discriminatory certification-testing standards that BNSF selected, making him qualified under the ADA.

## **ARGUMENT**

## I.   **STANDARD OF REVIEW.**

"This Court reviews a district court's grant of judgment on the pleadings…*de novo*." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). A motion for judgment on the pleadings "is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Id.* Under that standard, the Court must accept all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See United States v. 0.073 Acres of Land, More or Less, Situate in Pars. of Orleans & Jefferson*, 705 F.3d 540, 543 (5th Cir. 2013). "[J]udgment on the pleadings

is appropriate only if there are no disputed issues of material fact and only questions of law remain." *Id.* (quoting *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.,* 313 F.3d 899, 904 (5th Cir. 2002)). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Id.* (quoting *Brittan Commc'ns Int'l Corp.*, 313 F.3d at 904)).

## II.   THE FRA's REGULATIONS DO NOT PRECLUDE TURNER'S ADA CLAIMS.

Determining whether one federal law precludes another requires carefully examining the text, structure, and history of the two laws. The district court did not perform that rigorous analysis. Focusing on the text, structure, and history of the ADA and the FRSA shows that the FRA's regulations do not preclude Turner's ADA claims.

### A.   Properly Analyzing Whether One Federal Law Precludes Another Requires Carefully Examining the Text, Structure, and History of the Two Laws.

The Supreme Court articulated the framework for analyzing whether one federal law precludes another in *POM Wonderful*. That case concerned whether the Federal Food, Drug, and Cosmetic Act ("FDCA") and regulations promulgated under it by the Food and Drug Administration ("FDA") preclude Lanham Act claims. 573 U.S. at 105-06. The Lanham Act "creates a cause of action for unfair competition through misleading…labeling." *Id.* at 107. "The FDCA," in turn, "prohibits the misbranding of food and drink," which includes misleading labeling. *Id.*

at 108. The FDA has promulgated regulations about the labeling requirements for blended juice drinks. *Id.* at 108-09.

POM sued Coca-Cola, alleging that a Coca-Cola blended-juice product's label violated the Lanham Act. *Id.* at 106. That claim would have been "straightforward enough but for Coca-Cola's contention that…the FDCA…allow[ed] it to use the label in question and in fact preclude[d] the Lanham Act claim." *Id.* at 108. The district court and Ninth Circuit agreed with Coca-Cola. *Id.* at 110-11.

The Supreme Court unanimously reversed, explaining that two principles governed its analysis. *Id.* at 111-12. First, the action was "not a pre-emption case." *Id.* at 111. Unlike in a preemption case, in which "the question is whether state law is pre-empted by" federal law, *POM Wonderful* "concern[ed] the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute." *Id.* Preemption principles do not govern preclusion cases. *Id.* at 111. Second, preclusion cases are "statutory interpretation case[s]," so "[a]nalysis of the statutory text, aided by established principles of interpretation, controls." *Id.* at 112. That doesn't change even though "multiple federal statutes" or agency regulations are at issue. *Id.* Applying these principles, the Court concluded that the FDCA and its regulations did not preclude POM's Lanham Act lawsuit. *Id.* at 106. "Nothing in the text, structure, or history of the FDCA or the Lanham Act shows the congressional purpose or design to forbid these suits." *Id.*

25

**B.   The Text, Structure, and History of the ADA and the FRSA Show that the FRA's Regulations Do Not Preclude Turner's ADA Claims.**

*POM Wonderful*'s text-first approach shines a clear light here. The text, structure, and history of the ADA, the FRSA, and the FRA's regulations all lead to the conclusion that the FRA's regulations do not preclude Turner's ADA suit.

Start with the text. In *POM Wonderful*, the Lanham Act covered POM's claims against Coca-Cola, and nothing in the text of that Act or the FDCA expressly barred those claims. *See* 573 U.S. at 113. So too here. "By its terms, the [ADA] subjects to suit any [covered employer]," *id.*, who "discriminate[s] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a). "This comprehensive imposition of liability extends" to discrimination in the railroad certification process. *POM Wonderful*, 573 U.S. at 113; *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 632-33 (7th Cir. 2020) (reversing grant of summary judgment for Union Pacific in ADA suit involving FRA's hearing-acuity certification regulations). And as in *POM Wonderful*, "[n]o textual provision in [the ADA, FRSA, or the statutes' regulations] discloses a purpose to bar [ADA claims] like" Turner's." 573 U.S. at 113.

The absence of any such provision is significant. In *POM Wonderful*, the absence of any textual provision barring Lanham Act claims was "of special significance" because the FDCA and the Lanham Act had coexisted for decades, and Congress had amended both statutes several

times. *Id.* at 113-14. Had Congress concluded "that Lanham Act suits could interfere with the FDCA," the Court reasoned, "it might well have enacted a provision addressing the issue." *Id.* at 113. But Congress had not done so. *Id.* at 114.

The same reasoning applies here. The ADA and the FRSA have coexisted for decades, with Congress enacting the FRSA in 1970 and the ADA in 1990. *See supra* at 4-6. The FRA's certification requirements have existed during the entire lifespan of the ADA. *See Best Practices*, 80 Fed. Reg. at 73124 (explaining that the FRA issued its certification rules for engineers in 1991). Congress has since amended both the ADA and the FRSA, including in 2008 when it increased both the ADA's disability-discrimination protections *and* the FRSA's whistleblowing protections. *See supra* at 5-9. In the same 2008 amendments to the FRSA, Congress for the first time required train conductors to be certified. Yet Congress did not enact a provision precluding ADA or other federal claims that might bear on the FRA's certification requirements or its dispute-resolution provisions. And Congress knows how to do so: it has enacted *other* provisions in the ADA specifically excluding some railroad and other employees subject to DOT-regulation from coverage under the ADA, 49 U.S.C. § 12114(e). This is "powerful evidence that Congress did not intend" to preclude ADA claims like Turner's. *See POM Wonderful*, 573 U.S. at 113-14 (quoting *Wyeth v. Levine*, 555 U.S. 555, 575 (2009)).

The FRSA's general preemption provision provides additional textual support for this conclusion. In *POM Wonderful*, the FDCA's preemption provision, which forbids only certain *state* laws about beverage misbranding, buttressed the Court's conclusion that the FDCA does not preclude *federal* Lanham Act claims. *See id.* at 114. That reasoning applies here, too. The FRSA's general preemption provision applies only to certain state laws related to railroad safety or security. *See* 49 U.S.C. § 20106. The provision does not preclude federal causes of action, under the ADA or otherwise. *See id.* "By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the [FRSA] to preclude requirements arising from other sources," such as federal laws. 573 U.S. at 114.

The FRSA's whistleblower provision reinforces the conclusion that Congress had no such intent. After receiving testimony from the FRA Administrator in 2007 that railroad companies regularly retaliated against employees who complained of safety concerns, Congress strengthened the FRSA's whistleblower protections a year later to increase the oversight and accountability of railroad companies. *See supra* at 8-9. To accomplish that goal, Congress expressly provided that the amended whistleblower provision *does not preclude* "other safeguards against discrimination…provided by Federal…law," such as the ADA. 49 U.S.C. § 20109(g). Nor does it "diminish the rights, privileges, or remedies of any employee under any Federal…law." *Id.* § 20109(h).

28

These provisions confirm that Congress did not intend to preclude ADA suits like Turner's. The amended whistleblower provision protects complaints about conduct that employees reasonably believe violates "any Federal law, rule or regulation relating to railroad safety." *See id.* § 20109(a)(1). Because the FRA's certification requirements are regulations related to railroad safety, *see* 49 C.F.R. §§ 240.1(b), 242.1(a)-(b), a railroad employee who complains that his company violated one of these regulations during the certification process may have a cause of action in federal court under Section 20109. And because that section does not preclude or diminish that employee's rights under other federal laws, the employee could also bring related claims alleging discrimination in the certification process under the ADA or other federal statutes. Congress, in other words, not only did not intend for the FRSA to preclude ADA claims involving certification decisions. It explicitly contemplated that those claims could be brought.

There are even more textual reasons to conclude that the FRA's regulations do not preclude Turner's ADA claims. First, DOT regulations require railroads (and other entities that receive federal financial assistance) to comply with the ADA to receive that assistance. *See* 49 C.F.R. § 27.19(a). Second, the FRA's certification regulations expressly do not "abridge any additional procedural rights or remedies not inconsistent with this part that are available" under other laws. *See* 49 C.F.R. §§ 240.5(d), 242.5(d).

Now turn to the ADA, which similarly supports the conclusion that the FRA's regulations do not preclude ADA claims. To the contrary, the ADA provides employers with an affirmative defense when a federal law or regulation requires or prohibits a challenged action. 29 C.F.R. § 1630.15(e); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567-78 (1999) (holding that an employer could defend against an ADA claim challenging a job qualification required by a federal regulation by relying on that regulation). The legislative history that the Court relied on in *Albertson's* confirms that federal safety regulations do not bar ADA actions from being considered by a court. That history states that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards to be considered a qualified individual with a disability." *See id.* at 573 (quoting S. Rep. No. 101-116, at 27-28 (1990)) (alteration in original). In other words, employees must satisfy these governmental standards to have a viable ADA claim on the merits, since being a qualified individual with a disability is an element of an ADA plaintiff's prima facie case. *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016).

Adding this all up, every shred of textual evidence supports the conclusion that the FRA's regulations do not preclude Turner's ADA claims. At best, they may provide BNSF with a defense on the merits to be decided by a judge or jury.

Focus now on the structures of the ADA and the FRSA. In *POM Wonderful*, the Court observed that "[w]hen two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." 573 U.S. at 115. That principle applied there because the Lanham Act and the FDCA "complement each other in major respects, for each has its own scope and purpose," and each "impose[s] 'different requirements and protections.'" *Id.* (quoting *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001)).

The same points apply here. Like the Lanham Act and the FDCA, the ADA and FRSA have their own scope and purpose, and each imposes different requirements and protections. "Although both statutes touch on" railroad employment matters, the ADA protects employees from disability discrimination, while the FRSA promotes railroad safety for both the public and railroad employees. *See id.*

These aren't the only ways that the statutes complement one another. In *POM Wonderful*, the Court recognized that the remedial provisions of the Lanham Act and the FDCA were also complementary. "Enforcement of the FDCA and the detailed prescriptions of its implementing regulations is largely committed to the FDA," but the FDA "does not have the same perspective or expertise in assessing market dynamics that day-to-day competitors possess." *Id.* "Lanham Act suits draw upon this market expertise by empowering private parties to sue

31

competitors to protect their interests on a case-by-case basis," providing additional incentives for "manufacturers to behave well." *Id.*

The ADA and the FRSA complement each other in similar ways. Enforcement of the FRA's certification regulations is largely committed to railroads themselves with big-picture oversight from the FRA, but the FRA has no expertise in deciding disability-discrimination claims, nor does it even have the authority to reach those claims when determining whether a railroad correctly denied certification. *See supra* at 15-18. Railroad employees' "awareness of" the disability discrimination they face "may be far more immediate and accurate," and ADA suits permit them to act on that awareness and enforce their rights. *See POM Wonderful*, 573 U.S. at 115. "[C]onsistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection [of railroad employees]," "[a]llowing [ADA] suits takes advantage of synergies among multiple methods of regulation." *Id.* at 115-16.

To disallow those suits "would not only ignore the distinct functional aspects of the [ADA] and the [FRSA] but also would lead to a result that Congress likely did not intend." *Id.* at 116. That was true in *POM Wonderful* because the FDA did not "pursue enforcement measures regarding all objectionable labels." *Id.* Precluding Lanham Act suits therefore would lead to "less effective protection in the food and beverage labeling realm than in many other, less regulated industries." *Id.*

Precluding ADA claims like Turner's would lead to a similar result. To repeat, the FRA does not consider whether a railroad discriminated against an employee based on his disability when refusing to certify him, nor could the FRA remedy such discrimination were the FRA to identify it as playing a role in the railroad's decision. *See supra* at 15-18. The FRA has consistently interpreted its regulations as strictly limiting its decision-making and remedial authority. *See supra* at 17-18; *Reiter v. Cooper*, 507 U.S. 258, 269 (1993) (administrative relief unavailable because agency "ha[d] long interpreted its statute as giving it no power to" provide relief). Disabled railroad employees like Turner who are subject to discriminatory testing regimes have only one remedy: the ADA. It is "unlikely that Congress intended the [FRSA's] protection of health and safety to result in less policing of [disability discrimination in railroad employment] than" in "other, less regulated industries." *See id.*

The implications of the district court's preclusion analysis cannot be overstated. Under the court's analysis, any railroad employee who challenged a railroad's certification decision as discriminatory would be kicked out of court. *See* ROA.161-63. That reasoning is not limited to railroad employees alleging disability discrimination under the ADA; it applies with equal force to those asserting race, religion, age, gender, military or other discrimination under federal employment-discrimination statutes. Nor does the district court's reasoning encompass only color-vision testing. Recall that each railroad's

certification program must contain several components, including skills, knowledge, and operational-performance assessments. *See supra* at 10. Discrimination is just as likely to infect these aspects of the certification process as the color-vision-testing component. That's especially so because each railroad enjoys wide discretion in deciding how to design and conduct these assessments, and because "subjectivity" is an ineliminable part of the assessment process. *See supra* at 10-11; 49 C.F.R. App'x E to Part 240.

These are not mere hypotheticals. Licensing regimes like the FRA's certification process have often been used in discriminatory ways. *See, e.g.*, Paul S. Appelbaum, *Step Up to the Bar: Avoiding Discrimination in Professional Licensure*, 66 *Psychiatric Servs.* 340, 340-42 (April 2015) (describing Department of Justice investigation finding that Louisiana's law-licensing procedures violated the ADA); David E. Bernstein, *Licensing Laws: A Historical Example of the Use of Government Regulatory Power Against African-Americans*, 31 San Diego L. Rev. 89, 89-104 (1994) (discussing "sorry history" of licensing laws being used to exclude blacks from various professions under the guise of a public-health rationale). And railroads have engaged in their fair share of discrimination against employees over the years. *See Norman v. Missouri Pac. R.R.*, 414 F.2d 73, 78-84 (8th Cir. 1969) (permitting Title VII racial-discrimination claim brought by black train porters challenging

railroad's decades'-long practice of classifying them as porters, rather than as brakeman, all of whom were white).

Nor are railroads free of discrimination today. The EEOC and railroad employees have brought several recent suits alleging discrimination in railroads' certification decisions. *See, e.g.*, *EEOC v. Union Pac. R.R. Co.*, No. 23-cv-03030 (D. Minn.) (Union Pacific's color-vision certification testing violates the ADA); *Mills*, 2024 WL 185246, at *1-2 (same); *Walker v. Union Pac. R.R. Co.*, 2023 WL 10354310, at *1 (D. Or. Dec. 18, 2023) (same), *report & recommendation adopted,* 2024 WL 1052678 (D. Or. Mar. 11, 2024); *Vann-Foreman v. Ill. Cent. R.R. Co.*, 2022 WL 180749, at *1-2 (N.D. Ill. Jan. 20, 2022) (railroad racially discriminated against black engineer in violation of Title VII when it refused to recertify her based on her skills test scores).

Contrary to the district court's analysis, there is no evidence that Congress intended to permit railroads to use the discretion afforded by the FRA's certification regulations to discriminate with impunity. But that would be the effect of precluding Turner's claims. The FRA has no more authority to consider or remedy claims of racial or age discrimination than of disability discrimination. Finding discrimination claims like Turner's to be precluded therefore would have sweeping "implications" for railroad employees and federal employment-discrimination law. *See POM Wonderful*, 573 U.S. at 120. It would leave railroad workers who have been unlawfully discriminated against "with

no recourse against their employer and insulat[e] broad categories of potentially [unlawful] conduct from any accountability." *See Madden v. Antonov*, 156 F. Supp. 3d 1011, 1021 (D. Neb. 2015).

For these reasons, courts have roundly rejected arguments like the one that BNSF advances here that the FRA's regulations preclude federal employment-discrimination claims alleging discrimination in the railroad-certification process. *See, e.g.*, *Mills*, 2024 WL 185246, at *5-6, *9-11; *Vann-Foreman*, 2022 WL 180749, at *3-4. This Court should reject it here too. The text, structure, and history of the ADA and the FRSA uniformly support that conclusion.

## C. The District Court Erred in Concluding that the FRA's Regulations Preclude Turner's ADA Claims.

BNSF and the district court each misunderstood what preclusion involves. BNSF conflated it with defenses on the merits, while the district court treated it as akin to preemption. Those errors led the district court to incorrectly conclude that the FRA's regulations preclude Turner's ADA suit.

BNSF's argument transformed over the course of its briefing, but it was confused about the nature of federal preclusion from start to finish. In its opening and reply memoranda, BNSF conflated preclusion with defenses on the merits. *See* ROA.93, 96-97, 134-37. BNSF relied, for instance, on the Supreme Court's decision in *Albertson's* and 29 C.F.R. § 1630.15(e), both of which provide defenses on the merits to ADA claims

involving federal-safety regulations. But in BNSF's view, these defenses "mean the same thing" as preclusion. ROA.135.

After the district court requested supplemental briefing, ROA.145-46, BNSF argued for the first time that this Court's decision in *Williams v. J.B. Hunt Transportation, Inc.*, 826 F.3d 806 (5th Cir. 2016), governed the case. ROA.148. In shifting its reliance to *Williams*, BNSF explained both why it had initially argued for preclusion and why it was now backing away from that argument. ROA.152-53. BNSF had chosen the term "preclusion," it said, as a distillation of the reasoning in *Albertson's*, *Williams*, and other cases involving federal-transportation regulations. *Id.* But realizing that many of these cases did not involve preclusion, BNSF retreated from its preclusion argument, suggesting that the district court decide the case solely on the ground that Turner was not qualified. *Id.* BNSF's about-face shows that preclusion is not appropriate here.

The district court did not take up BNSF's suggestion, instead concluding that the FRA's dispute-resolution regulations preclude Turner's ADA claims. The court reasoned that because Turner challenged BNSF's recertification decision and its field test, his sole recourse was through the FRA's dispute-resolution process, not an ADA lawsuit in federal court. ROA.161-63.

The court reached that conclusion based on a flawed understanding of Turner's complaint and a faulty analytical method. The court first

mischaracterized Turner's complaint as merely "challeng[ing] the sufficiency of BNSF's secondary field test" under the FRA. ROA.161-62. That's not right. It's the test's sufficiency *under the ADA* that Turner challenges. The district court then failed to properly analyze whether Turner's claims were precluded. Rather than asking whether the text of the ADA, FRSA, or their regulations show that Congress intended to bar ADA claims like Turner's, the district court instead considered "whether [the FRA's] dispute-resolution provisions cover the specific facts underpinning Turner's ADA claim." ROA.162. But that is not the relevant question. *POM Wonderful* makes that clear, since there the FDA's regulations about juice labels covered the facts in POM's Lanham Act suit. *See* 573 U.S. at 108-11, 118-19. That was not enough for preclusion.

The fundamental problem with the district court's analysis is that it is geared towards answering whether Turner's claims are *preempted*, not whether they are *precluded*. The FRSA generally preempts state laws when the federal government "prescribes a regulation or issues an order *covering the subject matter* of the State requirement." 49 U.S.C. § 20106(a)(2) (emphasis added). The district court's analysis closely follows this preemption language, concluding that Turner's claims are precluded because, in the district court's view, the FRA's "dispute-resolution provisions *cover the specific facts* underpinning Turner's claim[s]." ROA.162 (emphasis added).

The cases that the court relied on confirm that its analysis was driven by preemption principles. The court drew support from *Weeks v. Union Pacific Railroad Co.*, 2017 WL 1740123 (E.D. Cal. May 4, 2017), and *Peters v. Union Pacific Railroad Co.*, 80 F.3d 257 (8th Cir. 1996). ROA.161-63. *Weeks* and *Peters* are not only out-of-circuit; they are also inapposite, because they concern preemption, not preclusion. In *Peters*, the Eighth Circuit held that the FRSA preempted state conversion claims involving the return of an engineer's certificate. 80 F.3d at 261-62. Similarly, in *Weeks*, the Eastern District of California held that FRA regulations did not preempt the plaintiff's ADA and California state claims. 2017 WL 1740123, at *7-8. Neither *Weeks* nor *Peters* engaged in the demanding textual analysis required for preclusion cases; each instead analyzed the FRSA's general preemption clause, 49 U.S.C. § 20106, and preemption case law. *See Weeks*, 2017 WL 1740123, at *7-8; *Peters*, 80 F.3d at 261-62. But Turner has already explained why that provision, which applies exclusively to state laws, in fact supports the conclusion that Congress did not intend to preclude *federal* laws like the ADA. *See supra* at 28. The district court's preemption-laden analysis was improper and drove it to an incorrect result. *See POM Wonderful*, 573 U.S. at 111-12 (holding that preemption principles do not govern preclusion analysis).

The district court's analysis was flawed for other reasons as well. The court concluded that Turner's claims are precluded "[b]ecause

Turner takes issue with BNSF's decision to deny recertification and its testing criteria," and because "[t]hese decisions 'fit within the express language of the FRA's dispute resolution regulations.'" ROA.161 (quoting *Weeks*, 2017 WL 1740123, at *7). This is wrong. Turner's ADA claims do not fit within the FRA's dispute-resolution regulations. *See supra* at 15-18. The FRA would not be able to consider or remedy Turner's contention that BNSF's color-vision testing process violated *the ADA. See id.* Turner's claims cannot be precluded by a dispute-resolution system that could not consider, much less remedy, his dispute.

The rest of the district court's reasoning is flawed, too. The court concluded without evidence that permitting a challenge under the ADA would undermine the FRSA's purpose of promoting safety and make its dispute-resolution procedures "pointless." ROA.162. Neither point is correct. ADA claims like Turner's do not conflict with the FRA's dispute-resolution procedures because those procedures do not encompass and cannot resolve the kinds of disability-discrimination allegations that Turner makes here. Nor do these ADA claims undermine railroad safety. Railroads have substantial discretion to devise their own certification-testing procedures, including providing company-created field tests to evaluate color vision. *See supra* at 10-15. They can easily exercise that discretion to comply with both the FRA's safety requirements and the ADA's prohibitions against disability discrimination. *See Mills*, 2024 WL 185246, at *6 ("FRA's regulations give railroad companies discretion in

40

choosing *how* to employ a follow-up [color-vision] test. However, this discretion is not carte blanche. It must be exercised within the bounds of other laws, including the ADA."); *id.* at *9.

***

BNSF "asks the Court to elevate the [FRSA] and the [FRA's] regulations over the private cause of action authorized by the [ADA]." *POM Wonderful*, <u>573 U.S. at 120</u>. That is not an invitation this Court may accept. "It is this Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, <u>584 U.S. 497, 502</u> (2018). "When confronted with two Acts of Congress allegedly touching on the same topic, [courts are] not at 'liberty to pick and choose among congressional enactments' and must instead 'strive to give effect to both.'" *Id.* at 510 (citation omitted); *Abdallah v. Mesa Air Grp., Inc.*, <u>83 F.4th 1006, 1017</u> (5th Cir. 2023).

There is no difficulty in doing that here. The ADA and the FRA's certification regulations can "be implemented in full at the same time." *POM Wonderful*, <u>573 U.S. at 118</u>; *cf. Deanda v. Becerra*, <u>96 F.4th 96</u> F.4th 750, 753 (5th Cir. 2024) (holding that federal law did not preempt Texas law because those subject to the laws "can comply with both").

"It is necessary to recognize the implications of [BNSF's and the district court's] arguments for preclusion." *POM Wonderful*, <u>573 U.S. at 120</u>. On their view, disabled employees like Turner are precluded "from

availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source." *Id*. But "[a]n agency may not reorder federal statutory rights without congressional authorization." *Id*.; *see Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 515-16 (2018). There is no evidence that Congress authorized the FRA to do that to the ADA.

The district court erred in concluding that the FRA's regulations preclude Turner's ADA suit.

## III. TURNER HAS PLAUSIBLY ALLEGED THAT HE IS QUALIFIED.

The district court also erred in concluding that Turner is not qualified under the ADA. The court reached that conclusion by incorrectly analogizing this case to others in which employees were not qualified because they did not meet an objective medical standard that the government required those employees to satisfy. But this is not that kind of case. Turner contends that *BNSF's*—not the government's—color-vision testing procedures are discriminatory, and that he meets all other criteria necessary to work as a conductor. That is all he needs to allege to show that he is qualified under the ADA.

**A.  ADA Plaintiffs Are Qualified When Their Employer Uses a Discriminatory Qualification Standard of Its Own Devising to Screen Them Out and They Are Otherwise Qualified to Do Their Job.**

An ADA plaintiff "must show that…he was qualified for the job." *Cannon, Inc.*, 813 F.3d at 590. Being qualified means being able to perform the job's essential functions with or without a reasonable accommodation. 42 U.S.C. § 12111(8).

When an employee challenges an employer's qualification standard, such as a test or certification requirement, as itself discriminatory under the ADA, that employee is qualified so long as he meets all other job-related requirements and can perform his job's essential functions with or without an accommodation. *See, e.g.*, *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 862-64 (9th Cir. 2009); *Bates v. United Parcel Servs.*, 511 F.3d 974, 990-94 (9th Cir. 2007) (en banc). The ADA "does not require that a person meet each of an employer's established 'qualification standards'…to show that he is 'qualified.'" *Bates*, 511 F.3d at 990. "[I]ndeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputably *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.* Were it otherwise, plaintiffs would be categorically unable to challenge any policy, test, or other criterion that screens them out in violation of the ADA.

43

The ADA and its forerunner, the Rehabilitation Act,[4] prohibit that result. More than four decades ago, this Court recognized that just like plaintiffs pressing claims under Title VII, plaintiffs asserting disability-discrimination claims under the Rehabilitation Act must show only that they are "qualified for the position *under all but the challenged criteria*." *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 306 (5th Cir. 1981) (emphasis added); *see Bates*, 511 F.3d at 990 n.6 (explaining that *Prewitt* and *Bates* adopt "the same prima facie case standard"). "The test is whether the handicapped individual who meets all employment criteria except for the challenged discriminatory criterion 'can perform the essential functions of the position in question without endangering the health and safety of the individuals or others.'" *Prewitt*, 662 F.2d at 307. Citing *Prewitt* with approval, Congress endorsed this test when it enacted the ADA. *See* H.R. Rep. 101-485(III), at 42 (1990), *reprinted in* 1990 U.S.C.CA.N. 445, 465; S. Rep. 101-116, at 37 (1989) (stating that the ADA was meant to apply to "a person [who] applies for a job and meets all selection criteria *except one that he or she cannot meet because of a disability*") (emphasis added); *Bates*, 511 F.3d at 990 n.6. The employer can defend its use of the discriminatory qualification standard by showing that it is job-related and consistent with business necessity. 42 U.S.C. §§ 12112(b)(6), 12113(a).

---

[4] The Rehabilitation Act of 1973, as amended, incorporates the standards set forth in the ADA. 29 U.S.C. § 794(d).

By the same token, though, the ADA also embraces the general rule that an employee is *not* qualified when he cannot meet a specific qualification standard that the government requires the employer to impose. *See, e.g.*, 29 C.F.R. § 1630.15(e); *Albertson's*, 527 U.S. at 567-78; *Bates*, 511 F.3d at 992-93.

These two foregoing principles fit together comfortably. House and Senate committee reports understood the ADA to require commercial drivers to be able to pass *DOT* qualification standards to be qualified individuals under the ADA. *See Albertson's*, 527 U.S. at 573-74 (citing S. Rep. No. 101-116, at 27-28; H. Rep. No. 101-485(II), at 57 & (III), at 34). The very same committee reports also understood the ADA to cover those alleging that their *employer's* qualification standard was itself discriminatory. *See Bates*, 511 F.3d at 990 n.6 (discussing committee reports). Employees are not qualified under the ADA, in other words, when they cannot meet the *government's* qualification standard, but they may be qualified when the standard they cannot meet because of their disability is their *employer's*.

**B.** **Turner is Qualified Because the Color-Vision Testing Protocol BNSF Created and Used to Screen Him Out Is Discriminatory and Turner Is Otherwise Qualified to Work as a Conductor.**

This case fits neatly into the rule that an employee may be qualified when he challenges his employer's qualification standard as discriminatory. That rule applies in cases like this where the government

45

establishes broad guidelines for certifying employees, but provides employers with wide discretion to create and implement the challenged certification test.

The Ninth's Circuit *Rohr* opinion illustrates this principle. There, the district court held that Rohr was not qualified because he failed an Occupational Health and Safety Administration ("OSHA") respirator-certification test that his employer administered. 555 F.3d at 855, 858. Recognizing that Rohr argued that his employer's "certification test was itself discriminatory," the Ninth Circuit reversed. *Id.* at 862. In reaching that conclusion, the court rejected the employer's argument that OSHA mandated the content of its respirator-certification test. *Id.* at 862-63. The court explained that "OSHA's regulations were sufficiently broad to allow [Rohr's employer] the discretion to determine how…it would evaluate its employees' ability to use a respirator." *Id.* Given the flexibility that OSHA provided, Rohr's employer could have used an alternative test or provided an accommodation to enable Rohr to complete its test. *Id.*

The District of Idaho's decision in *Mills* provides a blueprint for understanding how this reasoning applies to the precise kind of discriminatory certification test at issue here. Like this case, *Mills* concerns a railroad's refusal to recertify a conductor with more than a decade of experience because he failed the railroad's bespoke color-vision field test. 2024 WL 185246, at *1. Mills alleged, like Turner does here,

that the test violated the ADA. Union Pacific moved for summary judgment, arguing that Mills was not qualified because he failed the railroad's test. *Id.* at *10. The district court denied the motion, recognizing that the FRA's "regulations do not require" Union Pacific's custom-made field test. *Id.* at *6. Those regulations merely "establish a framework for railroad companies to employ," but "[w]ithin this framework, railroad companies have significant discretion in selecting and implementing" field tests of their choosing. *Id.* at *4. Given this discretion, "[i]t would make no sense…to hold that Mills has failed to meet the prerequisites for conducting trains simply because he failed the test he is currently challenging." *Id.* This was particularly true given the evidence that Mills had "a lengthy employment history of passing color-vision field tests and correctly identifying railroad signals." *Id.*

This case is on all fours with *Mills* and *Rohr*. Like the plaintiffs in those cases, Turner can perform the essential functions and satisfies all the job-related requirements of his position, save for the certification test that BNSF designed and administered and that he challenges as discriminatory. *See id.*; *Rohr*, 555 F.3d at 864. Turner could safely work as a conductor despite his color-vision deficiency, never misreading a colored railroad signal in the 15 years he drove a train for BNSF. ROA.7 ¶ 2. Turner also passed BNSF's color-vision field test and was certified by BNSF to work as a conductor every year it tested him until 2020. ROA.9 ¶ 22.

And like the plaintiffs in *Mills* and *Rohr*, Turner alleges that the certification test that BNSF used to disqualify him is itself discriminatory. "This is not a case where an employer merely implemented the medical certification program required by a federal agency." *Rohr*, 555 F.3d at 863. The FRA's regulations did not mandate that BNSF use the color-vision field test it chose; the decision to impose a discriminatory field-testing requirement was BNSF's own. BNSF's test bore little resemblance to what Turner actually experienced on the job or needed to see to work safely. ROA.7 ¶ 3; ROA.19 ¶¶ 23-24; *see* 29 C.F.R. § 1630, App'x § 1630.10(a) (employment tests and other qualification standards may not be used to disqualify disabled employees unless they show that the employees "are actually unable to do the job"). Had BNSF used a test that reflected what Turner needed to see to work as a conductor, he would have passed it. ROA.10 ¶ 28. BNSF also prohibited Turner from wearing chromatic lenses while taking the test, which would have helped him distinguish the colors of the signals displayed during the test. ROA.10 ¶ 25.

Turner has therefore plausibly alleged that he is qualified. He meets all the requirements of being a conductor other than the BNSF-created standard that he challenges as discriminatory. *See Prewitt*, 662 F.2d at 306-07. On top of that, as Turner has explained, BNSF could have accommodated him in ways that would have enabled him to pass its test. *See Rohr*, 555 F.3d at 863 (employee qualified even though failed

mandatory certification test because employer could have modified test); *Colasanti v. City of Portland*, 2023 WL 6850235, at *4 (D. Or. Oct. 17, 2023) (same); *Melendez v. Morrow Cnty. Sch. Dist.*, 2009 WL 4015426, at *21–22 (D. Or. Nov. 19, 2009) (same); 42 U.S.C. § 12111(8), (9)(B) (being qualified means being able to perform the job's essential functions with or without a reasonable accommodation, and modifying testing requirements may be a reasonable accommodation).

Turner is qualified under the ADA.

### C.     The District Court Erred in Concluding that Turner Is Not Qualified.

The district court's conclusion that Turner is not qualified is mistaken. The court incorrectly believed that this case is like *Williams* and others in which employees could not meet a specific governmental qualification standard. But that's not the case here.

*Williams* concerned a DOT regulation prohibiting anyone with a diagnosis of syncope from driving a commercial motor vehicle. 826 F.3d at 808 (citing 49 C.F.R. § 391.41(b)(4), (8)). The regulations also contain a process to resolve disagreements between the company's and the employee's doctors about whether the employee has a disqualifying medical condition. *Id.*; 49 C.F.R. § 391.47. The *Williams* court held that a driver was not qualified under the ADA because his employer had rescinded his DOT certification after he was diagnosed with syncope, and

because he had not sought review under the DOT's process for resolving conflicting medical opinions. *Williams*, 826 F.3d at 808-09, 811-13.

Relying on *Williams*, the district court concluded that Turner is not qualified because BNSF denied him recertification after he failed its field test and because he did not petition the FRA to review that decision. ROA.163-64. But this case is unlike *Williams* for four reasons.

First, *Williams* and similar cases concern specific, substantive DOT-required standards. In each case, the employee was diagnosed with a medical condition based on objective criteria drawn from federal regulations that made him ineligible for his job. *See, e.g.*, *Williams*, 826 F.3d at 808-09; *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 636-37 (8th Cir. 2003). This case is different. The FRA neither sets a specific color-vision standard that employees must meet, nor mandates that railroads use a specific field test to assess whether employees meet that standard. The FRA instead provides railroads with the discretion to decide both how they will evaluate employees and what that evaluation will consist of. Unlike the employer in *Williams*, then, BNSF and other railroads do not face a dilemma of complying with the ADA or a federal regulation when assessing employees' color vision. *See Williams*, 826 F.3d at 811. They can—and must—do both. *See Mills*, 2024 WL 185246, at *6, *9.

Second, the employees in *Williams* and related cases did not challenge the standard they could not meet as discriminatory. Nor could they: these cases all involved objective medical standards imposed by the

government. That's not the case here. Turner contends that *BNSF's* bespoke color-vision field test is itself discriminatory. The FRA's regulations did not require BNSF to make a test that violates the ADA. *BNSF* decided to do that.

Third, unlike the regulations at issue in *Williams* and consistent with the ADA's command that reasonable accommodations may include modifying employment assessments, 42 U.S.C. § 12111(9)(B), the FRA's regulations specifically embrace accommodating employees with a color-vision deficiency. *Williams* involved no such thing. After Williams was diagnosed with a disqualifying medical condition, his employer rescinded his DOT certification, as it was required to do under the DOT's regulations. *See* 826 F.3d at 808-09. Williams, in short, did not fail an employer-created test that could be modified.

Not so here. The FRA's color-vision regulations are all about accommodating color-vision-deficient employees. If an employee fails the initial color-vision test, he is entitled to a retest because the FRA recognizes that he may still be able to drive a train safely. 49 C.F.R. § 242.117(j); *Best Practices*, 80 Fed. Reg. at 73123. How to do that test, as BNSF concedes, is "wholly within the railroad's discretion." ROA.95. That discretion is meant "to allow each railroad...*to consider the unique medical circumstances of each examinee tested.*" *Best Practices*, 80 Fed. Reg. at 73126 (emphasis added). Consistent with this guidance, the FRA encourages railroads to provide individualized tests that "replicate actual

operating conditions that the examinee will encounter." *Id.* at 73127. It also grants "each railroad the discretion" to permit chromatic lenses to be worn during the test. *Id.* at 73125. BNSF could have accommodated Turner by modifying its field test, but it refused to do so. ROA.10 ¶ 25. The ADA requires this (and the FRA regulations permit it), but BNSF refused to consider any such accommodations. In addition, had BNSF properly considered Turner's history of safely doing his job, it would have recertified him notwithstanding his results on BNSF's discriminatory field test. ROA.7 ¶ 3; ROA.10 ¶ 29. The ADA requires this, too (and the FRA's regulations permit it as well). *See* 49 C.F.R. § 242.117(c)(2)(i), (j); 49 C.F.R. App'x B to Part 242.

Fourth, unlike in *Williams*, the FRA's dispute-resolution process would serve no purpose in this case. The *Williams* Court deemed the plaintiff not qualified under the ADA in part because he did not ask the DOT to resolve the conflict in the medical opinions he had received. 826 F.3d at 808-09, 811-13. Although this was not an administrative process that Williams had to exhaust under the ADA, his failure to use that process meant that he was not qualified because the DOT would have been able to use its "expertise" to resolve whether he had a disqualifying medical condition. *See id.* at 810-13.

As in *Williams*, the FRA's dispute-resolution process is not an administrative-exhaustion requirement under the ADA. But that's where the similarities between this case and *Williams* end. The dispute-

resolution processes at issue in *Williams* provide the DOT with the authority to determine "a driver's medical qualifications" by resolving "disagreement[s]" between doctors "concerning the driver's qualifications." *See* 49 C.F.R. 391.47(a), (b)(2) . The DOT, in other words, can conclusively resolve whether the employee is qualified under the ADA based on whether he meets a governmentally imposed medical requirement for his position.

The FRA's regulations, by contrast, do not give the agency the authority to make this sort of substantive judgment. The FRA reviews only whether the railroad's certification decision, based on the testing procedures that the railroad chose to adopt, was correct under the regulations. *See supra* at 15-18. That involves deciding only whether substantial evidence supports the railroad's decision, whether the railroad made a procedural error that caused the employee substantial harm, and whether the railroad correctly interpreted the FRA's certification regulations. 49 C.F.R. § 242.505(h)-(j). The FRA does not have authority to determine whether a railroad used its discretion to design and implement a color-vision field test in a way that violates the ADA. *See supra* at 15-18. Nor could it remedy any such violation, such as by awarding damages or requiring the railroad to provide an ADA-compliant retest. *See id.*

As just one example of the limitations in the FRA's review, consider Turner's claim that BNSF failed to accommodate him by not permitting

him to use chromatic lenses on the field test. Although the FRA allows railroads to let employees use such corrective lenses on field tests, it does not require railroads to do so. Any review by the FRA would therefore affirm this aspect of BNSF's decision to deny Turner recertification because it's not incorrect under the FRA's regulations. But it could be unlawful under the ADA because the ADA requires reasonable accommodations (and the FRA regulations permit them). *Cf. Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 803-04 (1999) (Social Security Disability Insurance ("SSDI") claim of being unable to work and ADA claim of being able to perform one's job "can comfortably exist side by side" because SSDI, unlike ADA, does not consider whether reasonable accommodations are possible). Employees like Turner do not need to use an administrative-dispute process that is not required under the ADA and that cannot provide them relief for their claims of disability discrimination to be qualified under the ADA. *See Reiter*, 507 U.S. at 269 (administrative process did not need to be pursued because agency could not provide relief sought); *cf. All. for Hippocratic Med. v. Food & Drug Admin.*, 2023 WL 2913725, at *16 (5th Cir. Apr. 12, 2023) (exhaustion not required when it would be futile).

      *Williams* does not show that Turner is not qualified.

### D. Federal Regulations Did Not Require BNSF to Use the Color-Vision Field Test that It Used to Screen Out Turner.

The animating assumption in the district court's decision that Turner is not qualified is that Turner did not meet a governmental certification standard. That assumption is wrong because the standard Turner did not meet is a discriminatory one imposed by BNSF, not the government. The ADA's regulations and the Supreme Court's decision in *Albertson's* drive home this point.

The ADA's regulations provide that "[i]t may be a defense" to an ADA claim "that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation)." 29 C.F.R. § 1630.15(e). This defense "may be rebutted by…showing that the Federal standard did not require the discriminatory action, or that there was a nonexclusionary means to comply with the standard that would not conflict with" the ADA. 29 C.F.R. § 1630, App'x § 1630.15(e). Turner can make that showing here. Although the FRA's regulations require BNSF to evaluate conductors' color vision, nothing in the regulations required BNSF to create and implement a test that discriminates against Turner under the ADA. BNSF could have complied with the FRA's regulations without violating the ADA. *See Miller v. Whirlpool Corp.*, 807 F. Supp. 2d 684, 688-89 (N.D. Ohio 2011).

The Supreme Court's *Albertson's* decision reinforces this conclusion. That case concerned DOT regulations requiring commercial truck drivers to have a visual acuity of at least 20/40 in each eye. 527 U.S. at 558-60. Albertson's fired a truck driver because his vision did not meet the federal requirement, and then refused to rehire him after he received a waiver through an experimental program that did not modify the DOT's substantive standard. *Id.* at 558-60, 575-77. The Supreme Court concluded that Albertson's did not violate the ADA. *Id.* at 575-77. Key to that conclusion was the point that "Albertson's was not insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable." *Id.* at 570. Albertson's was instead insisting on the minimum standard set by the government.

BNSF can't say the same here. As *Mills* explains, the FRA "affords railroad companies broad discretion in conducting" secondary color-vision tests. 2024 WL 185246, at *11. With that "discretion," BNSF "created" its own field test, "and used it to test [Turner's] color vision." *Id.* "In other words, *unlike Albertson's*, [BNSF] has insisted upon a job qualification of its own devising"—one that "is not required by federal regulations." *Id.* Because Turner contends that this job qualification is discriminatory and because he otherwise meets the requirements for

being a conductor, he has plausibly alleged that he is qualified under the ADA. *Prewitt*, 662 F.2d at 306-07.

## CONCLUSION

Seeking to elevate its own discretionary decisions over the protections that Congress provided in the ADA, BNSF asks for sweeping immunity from claims like Turner's. BNSF is not entitled to that immunity. Like any other employer subject to the ADA, BNSF must defend its decision to discriminate against Turner in court and on the merits.

The district court's judgment should be reversed.

Dated: May 15, 2024                Respectfully submitted,

                                                 s/ Colin Reeves
                                                 Colin Reeves
                                                   *Counsel of Record*
                                                 APOLLO LAW LLC
                                                 1000 Dean Street
                                                 Suite 101
                                                 Brooklyn, NY 11238
                                                 colin@apollo-law.com
                                                 (646) 363-6763

                                                 Adam W. Hansen
                                                 APOLLO LAW LLC
                                                 333 Washington Avenue North
                                                 Suite 300
                                                 Minneapolis, MN 55401

                                                 *Counsel for Plaintiff-Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 15th day of May, 2024, I caused the foregoing brief to be filed electronically with the Court, where it is available for viewing and downloading from the Court's CM/ECF system, and that such electronic filing automatically generates a Notice of Docket Activity constituting service. I certify that all participants in the case are registered CM/ECF filing users and that service will be accomplished by the CM/ECF system. I further certify that the electronic submission is an exact copy of the paper document.

Dated: May 15, 2024                    s/ Colin Reeves
                                       Colin Reeves

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume requirements of <u>Federal Rule of Appellate Procedure 32(a)(7)(B)</u> and Fifth Circuit Rule 32.3 because this brief contains 12,989 words, as determined by the word-count function of Microsoft Word for Office 365, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u>.

This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and this Court's Rule 32.1 and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

Dated: May 15, 2024                s/ Colin Reeves
                                   Colin Reeves