# No. 24-10031

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Tracy Turner,

Plaintiff - Appellant,

v.

BNSF Railway Company,

Defendant - Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION
CIVIL ACTION NO. 4:23-CV-00681-P
JUDGE MARK T. PITTMAN, PRESIDING

## BRIEF OF APPELLEE
## BNSF RAILWAY COMPANY

Bryan P. Neal
Stephen F. Fink
Holland & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Fax)

ATTORNEYS FOR APPELLEE BNSF RAILWAY COMPANY

## CERTIFICATE OF INTERESTED PERSONS

1.    Tracy Turner v. BNSF Railway Company, No. 24,10031.

2.    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

Plaintiff-Appellant Tracy Turner

Colin Reeves and Adam W. Hansen of Apollo Law LLC, counsel for Turner on appeal

Nicholas D. Thompson and Kathryn Averwater, of Casey Jones Law LLC, counsel for Turner in the district court

Scotty MacLean III, of MacLean Law Firm PC, counsel for Turner in the district court

Defendant-Appellee BNSF Railway Company

BNSF Railway Company, a Delaware corporation, is a wholly owned subsidiary of Burlington Northern Santa Fe, LLC, a Delaware limited liability company. National Indemnity Company, a Nebraska corporation, is the sole member of Burlington Northern Santa Fe, LLC. National Indemnity Company is a subsidiary of Berkshire Hathaway, Inc., a public company

Bryan P. Neal and Stephen F. Fink, of Holland & Knight LLP, counsel for BNSF Railway Company on appeal and in the district court.

s/ Bryan P. Neal
Bryan P. Neal
Attorney of Record for Defendant-Appellee BNSF Railway Company

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument should not be necessary in this case. But given the dramatic exaggerations by Turner and his amicus, the Equal Employment Opportunity Commission ("EEOC"), about the effects of affirming the decision below—which depend entirely on inaccurate statements and premises about both the nature of Turner's claim and the way the Federal Railroad Administration ("FRA") color-vision testing regime operates—BNSF believes that oral argument probably now is needed to assist the Court.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ...................................................... ii

Table of Authorities ................................................................................ v

Issue Presented for Review ..................................................................... 1

Statement of the Case ............................................................................. 2

I.     Factual Background ........................................................................ 2

II.    The Actual Nature Of Turner's Claim ......................................... 3

III.   Supplemental Statutory And Regulatory Background ................. 7

     A.    Overview................................................................................ 7

     B.    The FRA testing process ..................................................... 12

Summary of the Argument ................................................................... 14

Argument............................................................................................... 16

I.     Standard of Review. ...................................................................... 16

II.    The District Court Correctly held that the Specific Cause of
Action Turner Asserted is Precluded by Provisions of the
FRSA and Associated Regulations that make the
Professional Opinion of The FRA's Delegate, BNSF's Medical
Examiner, Conclusive on the Adequacy of Turner's Visual
Acuity Given Turner's Decision not to Seek Agency or
Judicial Review of that Opinion................................................... 17

     A.    "Precluded" is the proper description of the effect that
the FRSA and the Part 242 regulations have on the
specific ADA claim pleaded in Turner's complaint. ............ 17

     B.    Statutory text, context, and structure establish that
Turner's ADA claim may not be used to second-guess
the results of the regulatory process for making
decisions about adequate visual acuity. .............................. 29

          1.    Statutory text alone supplies the answer.................... 31

2.  Statutory context confirms the meaning of statutory text...............................................................39

3.  Statutory structure reinforces text and context..........44

III.  The District Court Also Correctly Held that Turner's ADA Claim Failed on the Merits. ........................................53

IV.  The Court Should Disregard EEOC's *Amicus* Brief......................65

Conclusion ..........................................................................66

Certificate of Compliance with Rule 32(a)............................................69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albertson's, Inc. v. Kirkingburg,*
527 U.S. 555 (1999) .................................................................. *passim*

*Andrews v. Louisville & Nashville R.R.,*
406 U.S. 320 (1972) ............................................................................ 31

*Antidormi v. Nat'l R.R. Passenger Corp.,*
2021 WL 3403733 (N.D.N.Y. Aug. 4, 2021) ........................................ 49

*Atchison, Topeka Santa Fe Ry. Co. v. Buell,*
480 U.S. 557 (1987) ............................................................................ 39

*Bates v. United Parcel Service, Inc.,*
511 F.3d 974 ............................................................................... 57, 59

*Beattie v. Boeing Co.,*
43 F.3d 559 (10th Cir. 1994) ......................................................... 34, 35

*Bostock v. Clayton County,*
590 U.S. 644 (2020) .............................................................................. 9

*Brotherhood of Railroad Trainmen v. Chicago R. & I.R. Co.,*
353 U.S. 30 (1957) .............................................................................. 31

*Brown v. General Services Administration,*
425 U.S. 820 (1976) .................................................................. *passim*

*Brown v. Ill. Cent. R.R.,*
254 F.3d 654 (7th Cir. 2001) .............................................................. 18

*Burton v. Freescale Semiconductor, Inc.,*
798 F.3d 222 (5th Cir. 2015) .............................................................. 11

*Campbell v. Fed. Express Corp.,*
918 F.Supp. 912 (D. Md. 1996) .......................................................... 27

*Carmona v. Southwest Airlines Co.,*
536 F.3d 344 (5th Cir. 2008) ...................................................... 18, 35

*Carpenter v. Mineta,*
432 F.3d 1029 (9th Cir. 2005) ........................................................ 37

*Coffey v. Norfolk S. Ry. Co.,*
23 F.4th 332 (4th Cir. 2022) ..........................................................54

*Collins v. Morgan Stanley Dean Witter,*
224 F.3d 496 (5th Cir. 2000) ............................................................ 3

*Daniels v. Union Pac. R.R.,*
530 F.3d 936 (D.C. Cir. 2008) ........................................................ 37

*Department of the Navy v. Egan,*
484 U.S. 518 (1988) .................................................................. *passim*

*Dooley v. Korean Air Lines Co.,*
524 U.S. 116 (1998) ........................................................................ 22

*EEOC v. Schneider Nat., Inc.,*
481 F.3d 507 (7th Cir. 2007) .......................................................... 41

*EEOC v. Union Pac. R.R.,*
2024 WL 3328718 (D. Minn. July 8, 2024) ................................. 62, 65

*Foreman v. Babcock & Wilcox Co.,*
117 F.3d 800 (5th Cir. 1997) ....................................................... 8, 54

*Harris v. P.A.M. Transp., Inc.,*
339 F.3d 635 (8th Cir. 2003) .......................................................... 27

*Holtzclaw v. DSC Commc'ns Corp.,*
255 F.3d 254 (5th Cir. 2001) .......................................................... 16

*U.S. ex rel. Johnson v. Raytheon Co.,*
93 F.4th 776 (5th Cir. 2024) ................................................. 25, 26, 34

*Lane v. R.A. Sims, Jr.,*
241 F.3d 439 (5th Cir. 2001) ............................................................ 7

*Mills v. Union Pacific R.R.*,
2024 WL 185246 (D. Idaho 2024) ........................................ 61

*Mobil Oil. Corp. v. Higginbotham*,
436 U.S. 618 (1978) .................................................... *passim*

*Morriss v. BNSF Ry. Co.*,
817 F.3d 1104 (8th Cir. 2016), *reh'g and reh'g en banc
denied* (May 19, 2016), *cert. denied*, 137 S. Ct. 256 (2016) ............... 66

*National Horsemen's Benevolent and Protective Ass'n v.
Black*,
107 F.4th 415 (5th Cir. 2024) ........................................... 33

*Odell v. Kalitta Air*,
107 F.4th 523 (6th Cir. 2024) ........................................... 18

*Perez v. Federal Bureau of Investigation*,
71 F.3d 513 (5th Cir. 1995) ............................................. 25

*Peters v. Union Pac. R.R.*,
80 F.3d 257 (8th Cir. 1996) ............................................. 14

*Polk v. Amtrak Nat'l R.R. Passenger Corp.*,
66 F.4th 500 (4th Cir. 2023) ......................................... 18, 48

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) ................................................. 19, 20

*Pritchard v. American Airlines, Inc.*,
2023 WL 9053146 (N.D. Tex. 2023) ................................... 18, 39

*Rohr v. Salt River Project Agricultural Imp. and Power Dist.*,
555 F.3d 850 (9th Cir. 2009) ................................... 59, 60, 61

*Schweiker v. Hogan*,
457 U.S. 569 (1982) .................................................... 16

*Shikles v. Sprint / United Mgmt.*,
426 F.3d 1304 (10th Cir. 2005) ......................................... 66

vii

*Skinner v. Railway Labor Executives' Ass'n*,
    489 U.S. 602 (1989) ................................................................ 39

*Southern Pacific Transp. Co. v. Young*,
    890 F.2d 777 (5th Cir. 1989) ................................................ 35

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) .......................................................... 66

*Tice v. American Airlines, Inc.*,
    288 F. 3d 313 (7th Cir. 2002) ............................................... 18

*Trump v. U.S.*,
    144 S. Ct. 2312 (2024) .......................................................... 17

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) ............................................................... 42

*Williams v. J.B. Hunt Transp., Inc.*,
    826 F.3d 806 (5th Cir. 2016) ..................................... *passim*

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ............................................................... 42

*Zeinali v. Raytheon Co.*,
    636 F.3d 544 (9th Cir. 2011) ................................................ 26

**Statutes**

28 U.S.C. § 2341–51 ..................................................................... 10

28 U.S.C. § 2342(7) ............................................................... 10, 36

42 U.S.C. § 2000e-16 ............................................................ 20, 21

42 U.S.C. § 12102(3)(A) ............................................................. 11

42 U.S.C. § 12112(a) ......................................................... 8, 9, 38

42 U.S.C. § 12112(b)(5)(A) ........................................................... 4

42 U.S.C. § 12112(b)(6) ............................................... *passim*

42 U.S.C. § 12114 ................................................................ 30

42 U.S.C. § 12114(c)(5)(A)–(C) ........................................ 39

42 U.S.C. § 12114(e) .......................................................... 40

42 U.S.C. § 12117(a) .......................................................... 36

42 U.S.C. § 12201(h) ...................................................... 4, 63

45 U.S.C. § 151 *et seq.* ............................................... 18, 30

45 U.S.C. § 152 ................................................................... 45

49 U.S.C. § 12111(8) ............................................................ 8

49 U.S.C. § 12112(b)(6) ...................................................... 6

49 U.S.C. § 20103(a) ...................................................... 7, 33

49 U.S.C. § 20103(c) .................................................. 7, 32, 33

49 U.S.C. § 20106 ................................................................. 7

49 U.S.C. § 20106(a)(1) ..................................................... 36

49 U.S.C. § 20107(a)(2) ................................................. 7, 33

49 U.S.C. § 20109 .............................................................. 44

49 U.S.C. § 20135(b)(1) ......................................... 8, 11, 32, 33

49 U.S.C. § 20163 .......................................................... 45, 46

49 U.S.C. § 20163(b) ..................................................... 10, 33

49 U.S.C. § 31136(a)(3) ..................................................... 32

Pub. L. 102–365, § 5(c)(2), Sept. 3, 1992, 106 Stat. 975 ........................ 10

Pub. L. 110–432, div. A., title IV, 402(a) ................................. 10

## Regulations

29 C.F.R. § 1630.2(m) ............................................................. 9

29 C.F.R. § 1630.2(m) App. ..................................................... 9

29 C.F.R. § 1630.2(m) and App. § 1630.2(m) ........................ 54

29 C.F.R. § 1630.2(q) .......................................................... 9, 57

29 C.F.R. § 1630.15(e) ............................................................ 36

29 C.F.R. § 1910.134(c)(1)(ii) ................................................ 60

29 C.F.R. § pt. 242 App. D(4) ................................................ 64

49 C.F.R. Part 242, "Authority" ............................................ 33

49 C.F.R. § 1.89 ............................................................... 12, 33

49 C.F.R. § 240.121 ................................................................ 12

49 C.F.R. § 240.401(a) ............................................................ 14

49 C.F.R. § 242.1-.407 & Apps. B-D ...................................... 33

49 C.F.R. § 242.1(a) ................................................................ 33

49 C.F.R. § 242.5(d) ................................................................ 48

49 C.F.R. § 242.7 .................................................................... 12

49 C.F.R. § 242.11 .................................................................. 43

49 C.F.R. § 242.105(c) ............................................................ 12

49 C.F.R. § 242.111 ........................................................... 12, 47

49 C.F.R. § 242.117 ........................................... 6, 12, 27, 28

49 C.F.R. § 242.117(a) ........................................................ 12, 47

49 C.F.R. § 242.117(b) ............................................................ 14

49 C.F.R. §§ 242.117(b), (c)(2), (g), (h)(3), (j) & App. D .......................... 12

49 C.F.R. § 242.117(b), (c), (g), (h)(3), (j) .......................................... 13, 54

49 C.F.R. § 242.117(c)(2)(i) & (ii) ........................................................ 14

49 C.F.R. § 242.117(j) .................................................................. 13, 34, 55

49 C.F.R. §§ 242.501-.511 .................................................. 14, 27, 28, 33

49 C.F.R. § 386.11(a) .................................................................... 27, 28

49 C.F.R. § 386.13 ....................................................................... 27, 28

49 C.F.R. § 391.47 ............................................................................ 27

## Other Authorities

Black's Law Dictionary (12th ed. 2024) .................................................. 17

FRA's "Best Practices for Designing Vision Field Tests for
    Locomotive Engineers or Conductors," 80 Fed. Reg. 73122
    (Nov. 24, 2015) ................................................... 41, 42, 63, 64

https://www.regulations.gov/document/FRA-2017-0046-0004
    (visited Aug. 12, 2024) ........................................................ 49

https://www.regulations.gov/document/FRA-2017-0049-0005
    (visited Aug. 12, 2024) ........................................................ 49

https://www.regulations.gov/document/FRA-2018-0085-0004
    (visited Aug. 12, 2024) ........................................................ 49

# ISSUE PRESENTED FOR REVIEW

Can a regulated railroad employee who has failed an initial federally required color-vision certification test, and complains only of alleged defects in the process by which the railroad reached a decision not to override that failure under the narrow standard for doing so under the governing regulations, use the Americans with Disabilities Act ("ADA")—rather than an applicable agency review process—to challenge a railroad's failure to issue him a certification to perform safety-sensitive work as a conductor or engineer?

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

BNSF generally accepts the basic factual statement in Turner's brief but objects to certain embellishments that go beyond the non-conclusory pleadings:

- The suggestion that Turner failed his initial color-vision test *because* it is "very sensitive to color-vision deficiency." Turner Brf., 20. Although irrelevant because the test was an FRA-approved test, that asserted fact is not in the record. It comes from a summary-judgment order in another jurisdiction—and one that is not persuasive for reasons explained in greater detail below.

- The statement that the secondary field test Turner took was "much harder than what Turner experienced when working as a conductor." *Id.* Turner pleaded it was *different*, not that it was "much harder."

- The assertion that BNSF based its "decision solely on Turner's flawed color-vision test results," referring to the secondary test results. *Id.* A railroad necessarily also relies on the failure of the initial mandatory test when making a non-certification decision.

2

## II.    THE ACTUAL NATURE OF TURNER'S CLAIM

Given the grim warnings from both Turner and EEOC about the consequences for employment-discrimination law in the railroad industry of this Court affirming the district court's judgment, Turner Brf., 3–4, 33–34; EEOC Brf., 10, 17—and their repeated uses of the conclusory term "discriminatory" in describing Turner's claim and others they say the district court's ruling would bar—it is important to be clear about exactly what kind of discrimination Turner pleaded and did not plead.

"Like one in twelve men, Turner suffers from a genetic anomaly that causes him to be color-vision deficient." ROA.9 (¶19). He does not plead that his color-vision deficiency is an actual disability. He does not even plead that it is an impairment. He does not plead that it substantially limits any major life activity. In fact, he argued the opposite. ROA.121. Setting aside any conclusory pleadings then, he raised only a "regarded-as" disability discrimination claim.[1] As such, despite pleading

---

[1] That also is the only theory he asserted in his EEOC Charge, which is in the record and may be considered by the Court. ROA.107-09; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 493 (5th Cir. 2000).

that BNSF discriminated "when it failed to accommodate him" he necessarily does not plead a viable claim under the ADA's reasonable-accommodation provision, 42 U.S.C. § 12112(b)(5)(A). The duty to reasonably accommodate does not extend to "regarded-as" "disabilities." 42 U.S.C. § 12201(h). Finally, and contrary to Turner's and EEOC's arguments and assumptions on appeal, Turner does not plead any form of animus, bias, prejudice, or hostility by BNSF toward persons who are color-vision deficient. ROA.6–13.

Turning to substance, the only provision of the ADA that Turner pleads that BNSF violated is section 12112(b)(6), which defines as "discrimination" "using qualification standards, employment tests, or other selection criteria that screen out…an individual with a disability." *See* ROA.11 (¶36). The sole "qualification standard" Turner pleads is that "[t]he FRA requires that railroads assess whether their trainmen have the visual acuity necessary to recognize and distinguish colored railroad signals, ROA.8 (¶9), which determines whether the employee can be "certified" or receive a "license" to work. ROA.8–10 (¶¶14, 15, 29). And the only employment test Turner challenges is a 2020 "field test," ROA.10 (¶23), which he failed. ROA.10 (¶26).

As for that field test, Turner pleads only that it contravened various FRA requirements and guidelines. He says it "violated" a requirement in an FRA "Best Practices" document that "the test offered by a railroad must be a valid, reliable, and comparable test," ROA.10 (¶24), because it allegedly "did not mirror what he must see in the field" and because BNSF "prohibited Turner from wearing monochromatic lenses on the test." ROA.10 (¶¶23, 25). Separately Turner pleads that BNSF failed, as required by the FRA, to give adequate weight to his "history of safely doing his job and the other pertinent evidence demonstrating his ability to safely do his job." ROA.10 (¶29); *see also* ROA.123. All of Turner's objections to BNSF's decision not to recertify him, in other words, challenge BNSF's alleged non-compliance with the FRA's evaluation requirements and the consequent *correctness* of BNSF's medical examiner's professional judgment that Turner lacked the visual acuity to safely perform the job.

Turner's ADA complaint pleads, therefore, only definitional "discrimination" against a person with a definitional "disability." In *substance* what he pleads is that BNSF administered an evaluation process that ran afoul of regulatory standards and led BNSF's medical examiner

to arrive at an incorrect professional opinion. That claim, presented as "screen-out" "discrimination" under ADA section 12112(b)(6), would require a jury to decide just one question as to liability:

> Did BNSF's medical examiner incorrectly determine that Turner failed to meet the visual-acuity certification requirements contained in 49 C.F.R. § 242.117 when it declined to recertify him as a conductor? In answering this question you should consider whether BNSF's medical examiner followed the Federal Railroad Administration's regulations and guidance applicable to the certification process.

> Answer Yes or No: _____

That's so because it's undisputed that BNSF would not recertify Turner only because its medical examiner did not provide the required "screen-in" medical opinion about Turner's visual acuity despite his failure on a standardized test prescribed by the FRA. And Turner's and EEOC's suggestions to the contrary notwithstanding, Turner Brf. 3, 5–6, 44; EEOC Brf. 16, it is far from clear how a railroad could rely on the "direct threat" standard or "business necessity" defense if the jury answered the single liability question "Yes."

The district court thus described Turner's actual claim accurately: in form an ADA action in substance simply a challenge to whether

BNSF's decision not to recertify "was correct" under the FRA's regulations and "Best Practices" ROA.161–62.

## III.  SUPPLEMENTAL STATUTORY AND REGULATORY BACKGROUND

The opening briefs of Turner and EEOC do not state adequately the relevant statutory and regulatory provisions and, moreover, do not accurately describe the FRA process for color-vision testing and certification.

### A.    Overview

The Federal Railroad Safety Act ("FRSA"), enacted in 1970, the purpose of which "is to promote safety in every area of railroad operations," "authorizes the Secretary of Transportation to prescribe regulations and issue orders for every area of railroad safety…and provides that [l]aws, regulations, and orders related to railroad safety *shall be nationally uniform to the extent practicable.*" *Lane v. R.A. Sims, Jr.*, 241 F.3d 439, 442 (5th Cir. 2001) (quoting 49 U.S.C. §§ 20103(a) and 20106) (cleaned up). The Act directs the Secretary to "consider existing relevant safety information and standards," 49 U.S.C. § 20103(c), and allows the Secretary to "delegate to a…qualified person the inspection, examination, and testing of railroad…persons." *Id*. § 20107(a)(2).

Eighteen years after enacting the FRSA Congress passed the Rail Safety Improvement Act of 1988. It added a provision to the FRSA charging the Secretary of Transportation to "establish a program *requiring* the licensing or certification of any operator of a locomotive, including any locomotive engineer." (emphasis added). It specified that "the program established by the Secretary…(A) *shall* be implemented through *review and approval* of each railroad['s] operator *qualification standards*…" (emphasis added). Those provisions are now found in 49 U.S.C. § 20135(b)(1) ("shall be carried out through review and approval of each railroad carrier's operator qualification standards").

Two years later Congress enacted the ADA, which among other things forbids an employer to "discriminate" in employment against "a *qualified individual* on the basis of disability." 42 U.S.C. § 12112(a). "Qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires…." *Id.* § 12111(8).

"Qualified" also includes any required licensing. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n.14 (5th Cir. 1997) (whether an

employee is "qualified" is a two-step inquiry: (1) does the employee possess the requisite "skills, education, certification or experience necessary for the job," and (2) is the employee able to perform the essential functions of the job?); 29 C.F.R. § 1630.2(m) (same); *see also* 29 C.F.R. § 1630.2(m) App. (EEOC recognizing the licensing requirement as part of longstanding caselaw under the Rehabilitation Act on which the ADA is based; "[t]he first step in determining whether an accountant who is paraplegic is qualified for a certified public accountant (CPA) position is to examine the individual's credentials to determine whether the individual is a licensed CPA"). EEOC regulations also define "qualification standards," as "requirements *established by a covered entity* as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q) (emphasis added).

The actions the ADA prohibits include discrimination as commonly understood under other federal employment-discrimination statutes: intentionally treating a person worse than similarly situated persons because of a protected characteristic. *Id.* § 12112(a); *see Bostock v. Clayton County*, 590 U.S. 644, 677 (2020). But the ADA also specially defines certain conduct, regardless of its motive, as "discrimination." One example

9

of such "definitional" "discrimination" is "using qualification stand-ards…that screen out…an individual with a disability." 42 U.S.C. § 12112(b)(6).

Two years after ADA's enactment Congress amended the Administrative Orders Review Act of 1950, 28 U.S.C. § 2341–51 ("Hobbs Act"), to give courts of appeals "exclusive jurisdiction" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" all "final actions" of the Secretary of Transportation related to railroad safety, including actions related to the certification of locomotive engineers (and later, conductors). Pub. L. 102–365, § 5(c)(2), Sept. 3, 1992, 106 Stat. 975 (adding what is now 28 U.S.C. § 2342(7)).

Then, as part of the Rail Safety Improvement Act of 2008, Congress charged the Secretary to "prescribe regulations to establish a program requiring the certification of train conductors" and suggested that the Secretary consider the FRSA's requirements governing certification of engineers. Pub. L. 110–432, div. A., title IV, 402(a), adding 49 U.S.C. § 20163(b). The first of those requirements, as noted earlier, states that the program established "shall be carried out through *review and approval*

of each *railroad carrier's* operator *qualification standards*." 49 U.S.C. §

20135(b)(1) (emphasis added).

In the same year, Congress amended the ADA by way of the Americans with Disabilities Amendments Act of 2008, which changed the definition of "disability," and expanded the range of persons with potential claims under the law. It did so by re-defining a "regarded as" disability:

> "(A) An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."

42 U.S.C. § 12102(3)(A). Persons claiming a covered disability under the new definition could deny any actual disability or even an actual impairment and allege only that they were "subjected to an action" because of the actor's incorrect perception of an impairment. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015). As explained above, that is the only kind of "disability" Turner pleaded.

### B.    The FRA testing process

The Secretary of Transportation delegated their railway safety authority to the Federal Railroad Administrator. 49 C.F.R. § 1.89. FRA regulations set out the standards for vision and hearing testing necessary for certification of engineers and conductors. *Id.* §§ 240.121 (engineers), 242.117 (conductors). Turner was a conductor. ROA.39 (¶3), ROA.52.

Once effective,[2] the regulations mandated that BNSF periodically test Turner's color perception using a multi-step testing framework. 49 C.F.R. §§ 242.117(b), (c)(2), (g), (h)(3), (j) & App. D. Failure to comply with the regulation subjects the railroad itself and its employees to civil and criminal penalties as well as other adverse consequences *Id.* §§ 242.117(a) & 242.111. The regulations apply to and govern individual employees like Turner, not just railroads. 49 C.F.R. § 242.7 ("Person").

The applicable color-vision standard under the regulations is the ability to distinguish colors of railroad signals as demonstrated by one of several scientific tests listed in Appendix D to the regulations. 49 C.F.R.

---

[2] Contrary to Turner's suggestion, testing did not become applicable to him until a three-year window following 2012. *See* 49 C.F.R. § 242.105(c).

§ 242.117(h)(3). When an employee fails a mandated test, the employee is considered as "not meeting the [applicable] thresholds" and thus presumptively *not* entitled to a certification absent an exception. 49 C.F.R. § 242.117(b), (c), (g), (h)(3), (j).

The exception, and such an employee's only opportunity to overcome their failure and become qualified, is through retesting and further evaluation. 49 C.F.R. § 242.117(j). That secondary process is, contrary to Turner's and EEOC's descriptions, subject to various requirements set out in that subsection and in Appendix D. Moreover, the ultimate standard for overcoming a failure on a mandated test is this: "*If*, after consultation with a railroad officer, the medical examiner concludes that, despite not meeting the threshold(s) in paragraphs (h) [vision] and (i) [hearing] of this section, the person has the ability to safely perform as a conductor, the person may be certified as a conductor…." *Id.* (emphasis added). Thus, an employee who has failed the primary, FRA-required test can receive a certification "[i]f"—and only if—the medical examiner concludes in his or her professional opinion that the employee can nevertheless work safely. *Id.*

Once the post-failure evaluation process is concluded, the medical examiner must document his or her professional opinion that, having failed the initial test, the employee can or cannot nevertheless be certified *Id*. § 242.117(c)(2)(i) & (ii). In the latter case, the employee may not be certified to work. *Id*. § 242.117(b).

The employee may, however, appeal. "Any person who has been…denied recertification…and believes that a railroad incorrectly determined that he or she failed to meet the qualification requirements of this regulation…may petition the FRA to review the railroad's decision" to the Operating Crew Review Board ("OCRB"). *Id*. (citing 49 C.F.R. § 240.401(a)); *see id*. §§ 242.501–.511; *Peters v. Union Pac. R.R.*, 80 F.3d 257, 261 (8th Cir. 1996) (discussing review process).

## SUMMARY OF THE ARGUMENT

"[W]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999). This case is an example.

It presents the question whether Congress entrusted certain decisions critical to the safety of the American public and workers to doctors

knowledgeable about railroad safety exercising delegated, guided, administratively and judicially reviewable, and personally and occupationally accountable professional judgment or to judges and layperson juries deciding safety-critical issues based on presentations by lawyers and competing testimony of opinion witnesses who, at least on one side, have neither a stake in nor accountability for the accuracy of their hired opinions.

Federal courts at every level, as noted in the district-court's decision, ROA.161–162 (and cases cited in those cases), have answered the question posed in this case the same, predictable way (with the possible exception of one recent outlier district court decision that Turner cites). What courts have not agreed on is the right word or phrase to explain the answer, with "limit application," exhaustion-of-administrative remedies (jurisdictional and prudential), preemption, preclusion, and exclusive remedy the leading contenders. The district court here got right both the answer and the explanatory terminology ("preclusion").

It also correctly and alternatively addressed the matter as one of whether Turner could satisfy the "qualified" element of his ADA claim. On that issue, it is undisputed that Turner failed the initial government

mandated color-vision test. That failure rendered him unqualified with only the possibility of overcoming the failure through a retesting process that had to convince the medical examiner he was nevertheless safe. He did not do so. And although he complains about the medical-examiner's process, he does not allege any illicit motive, only that the examiner failed to comply with applicable FRA regulations and guidance. Those are matters he could have but did not pursue through an administrative appeal.

The district court correctly entered judgment for BNSF. This Court should affirm on either or both of the grounds the district court relied on.

## ARGUMENT

### I.    STANDARD OF REVIEW.

The Court's review is *de novo*. Turner Brf., 23. Moreover, the Court may affirm on any ground supported by the record, "even if it is different from that relied on by the district court." *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *see also Schweiker v. Hogan*, 457 U.S. 569, 585 (1982) (appellee may rely upon any matter appearing in the record to support the judgment).

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE SPECIFIC CAUSE OF ACTION TURNER ASSERTED IS PRECLUDED BY PROVISIONS OF THE FRSA AND ASSOCIATED REGULATIONS THAT MAKE THE PROFESSIONAL OPINION OF THE FRA'S DELEGATE, BNSF'S MEDICAL EXAMINER, CONCLUSIVE ON THE ADEQUACY OF TURNER'S VISUAL ACUITY GIVEN TURNER'S DECISION NOT TO SEEK AGENCY OR JUDICIAL REVIEW OF THAT OPINION.

### A. "Precluded" is the proper description of the effect that the FRSA and the Part 242 regulations have on the specific ADA claim pleaded in Turner's complaint.

Unlike "preempt," the verb "preclude" has no specifically legal content. It is not a legal term of art. Black's Law Dictionary defines "preclude" using simply its ordinary meaning: "To prevent or make impossible; to rule out beforehand by necessary consequence." Black's Law Dictionary, 1426 (12th ed. 2024); *cf. id.*, 1427 ("Preemption"; *def.* 5, "*Constitutional law*. The principle (derived from the Supremacy Clause) that a federal law can supersede or supplant any inconsistent state law or regulation.); *see Trump v. U.S.*, 144 S. Ct. 2312, 2327 (2024) (Constitution may grant the Executive authority that is "conclusive and preclusive.").

BNSF argued below that Congress's decision in the FRSA, implemented by the FRA's regulations, to make a railroad medical examiner's professional opinion the final word (absent agency then judicial review) on whether an employee has sufficient visual acuity to safely perform as

17

a railroad conductor despite the employee's failure on FRA-designated scientific tests of visual acuity most closely resembled, in its legal effect, Congress's decision in the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, to give arbitrators with the National Railroad Adjustment Board the final word on the interpretation of railroad industry collective bargaining agreements. ROA.97, 135, 150–53. Courts in those cases have held that claims under federal law are "precluded"—ruled out beforehand by necessary consequence—if they depend for their resolution on a question assigned by Congress exclusively to such non-judicial decisionmakers. *See, e.g., Odell v. Kalitta Air*, 107 F.4th 523, 529–32, 533–34 (6th Cir. 2024); *Polk v. Amtrak Nat'l R.R. Passenger Corp.,* 66 F.4th 500, 504–07 (4th Cir. 2023); *Tice v. American Airlines, Inc.*, 288 F. 3d 313, 315–19 (7th Cir. 2002); *Brown v. Ill. Cent. R.R.*, 254 F.3d 654, 668 (7th Cir. 2001); *see also Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 349 & n.21 (5th Cir. 2008); *Pritchard v. American Airlines, Inc.*, 2023 WL 9053146, at *4–7 (N.D. Tex. 2023).

"Precluded" thus seemed the apt word semantically for the result BNSF urged in the district court, as well as being the word used by courts in RLA cases. There federal law did not "supplant" or "supersede" another

law but simply prevented any legal claim based on the other law if the claim depended for its resolution on an issue assigned by Congress, for reasons it deemed sufficient, exclusively to a non-judicial decisionmaker.

Turner and EEOC challenge the district's court's adoption of BNSF's suggested terminology with extended discussions of *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014), which received a solitary "*see generally*" citation in BNSF's briefing below, barely a mention in Turner's briefing, ROA.97, 124, and accordingly no discussion by the district court. Neither Turner nor EEOC address the RLA analogy BNSF advanced. Thus, neither engages with the district court's preclusion analysis on its own terms.

Had they done so, they would have discovered that the analyses in those decisions are quite similar to the *Pom Wonderful* analysis. With this difference. The argument in *Pom Wonderful* more closely resembled a traditional claim of preemption. Coca-Cola, the defendant, contended essentially that the regulatory authority of the Federal Trade Commission to protect public health and safety so occupied the field of trade descriptions as to imply Congressional intent to foreclose use of Lanham Act, designed to protect competition, in trade-description cases. 573 U.S.

at 110–11 Thus, although the Court distinguished federal-law preemption of state law and preclusion of another federal law, *id.*, 111–12, its analysis focused on issues commonly considered in preemption cases. *Id.*, 112–21.

The RLA cases—which *Pom Wonderful* does not mention much less overrule—while drawing on considerations also relevant to preemption, focus specifically on whether Congress meant for a non-judicial decisionmaker designated by a federal law to have *exclusive* decisionmaking authority with respect to the relevant topic. The cases are about *who* decides. That is the issue here.

Moreover, RLA decisions are not the only cases that deal with the kind of preclusion in which one federal law prevents a claim under another federal law. In *Brown v. General Services Administration*, 425 U.S. 820 (1976), the Supreme Court held that the federal-employee provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, are the "exclusive remedy" for federal employees with claims of workplace discrimination, barring claims under various otherwise applicable federal statutes. *See Brown*, 425 U.S. at 828 n.10. Despite "Congress [having]

simply failed explicitly to describe [§2000e–16's] position in the constellation of antidiscrimination law," *id.*, 825, and arguably contrary legislative history, *compare id.*, 828, 834 *with id.*, 838, the Supreme Court held that given "[t]the balance, completeness, and structural integrity of [section 2000e–16]" and the "careful blend of administrative and judicial enforcement powers" "it would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Id.*, 832–33. The Court observed:

> Under the petitioner's theory, by perverse operation of a type of Gresham's law, [section 2000e–16], with its rigorous administrative exhaustion requirements and time limitations, would be driven out of currency were immediate access to the courts under other, less demanding statutes permissible. The crucial administrative role that each agency…was given by Congress in the eradication of employment discrimination would be eliminated "by the simple expedient of putting a different label on [the] pleadings."

*Id.*, 833. Using the language of preemption, *Brown* supported its conclusion by citing a series of decisions where it had held that "a precisely drawn, detailed statute pre-empts more general remedies." *Id.*, 834. Each of those cases involved claims asserted under other federal statutes. *Id.*, 834–35. The Court held that what it called "the established principle" of those cases "leads unerringly to the conclusion that [section 2000e–

16]…provides the exclusive judicial remedy for claims of discrimination in federal employment." *Id.*, 835.

Two years later the Supreme Court applied a similar principle in *Mobil Oil. Corp. v. Higginbotham*, 436 U.S. 618 (1978). The question was whether the federal Death on the High Seas Act ("DOHSA"), which allows recovery only for "pecuniary loss," precludes a claim for "loss of society" damages under other federal law, specifically general maritime law. As in *Brown*, the statutory text does not answer the question expressly. But the Court answered "yes":

> The [DOHSA]…announces Congress' considered judgment on such issues as the beneficiaries, the limitations period, contributory negligence, survival, and damages….The Act does not address every issue of wrongful death law…but when it does speak directly to a question, the courts are not free to "supplement" Congress' answer so thoroughly *that the Act becomes meaningless.*

436 U.S. at 625 (cleaned up); *see also Dooley v. Korean Air Lines Co.*, 524 U.S. 116 (1998) (DOHSA precludes claims under federal general maritime law for survival damages).

*Brown* and *Mobil Oil* differ from the RLA cases, and this one, in that Title VII and DOHSA are remedial; they create substantive individual rights as well as providing a mechanism to enforce those rights. As

discussed later, the RLA is not primarily a remedial statute nor is the FRSA as a whole. And the provisions of the FRSA relevant to this action are not remedial. They are *licensing* provisions. So an even closer analogy for this case is offered by *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and later decisions applying it.

*Egan* involved whether the federal Merit Systems Protection Board has authority to review a federal personnel action that requires the Board to consider the merits of a security-clearance decision made by the Navy. The Court answered "no." It reasoned that the presumption in favor of review of federal employment actions "runs aground when it encounters concerns of national security…where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Egan*, 484 U.S. at 527. As in *Brown* and *Mobil Oil*, no statute expressly barred review in another forum of a federal agency's security-clearance decisions. As there, *Egan* found that fact not dispositive. *Id*. It likewise relied instead on other factors. One is the importance of the sub-ject-matter: national security. A second is the nature of the required de-cision and thus the appropriate decisionmakers:

23

> A clearance…is…an attempt to predict…possible future be-havior and to assess whether…[the employee] might compro-mise sensitive information. It may be based…upon past or present conduct, but it also may be based upon concerns com-pletely unrelated to conduct…Predictive judgment of this kind must be made by those with the necessary expertise in protecting classified information…[and] the protection of clas-sified information must be committed to the broad discretion of the agency responsible…[I]t is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confi-dence. Nor can such a body determine what constitutes an ac-ceptable margin of error in assessing the potential risk.

*Id.*, 528–29. A third consideration was accountability: "an agency head who must bear the responsibility for the protection of classified infor-mation…should have the final say in deciding whether to repose his trust in an employee who has access to such information." *Id.*, 529. The Court next pronounced itself "fortified in our conclusion when we consider gen-erally the statute's express language along with the structure of the stat-utory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.*, 530 (cleaned up). After reviewing the statutory text, the Court noted that allowing the Board to revisit secu-rity-clearance decisions by the relevant agency would interfere with the

goals of the security-clearance process because of the different decisional

standards and burdens of proof:

> [S]ecurity-clearance determinations should err, if they must,
> on the side of denials. Placing the burden of proof on the gov-
> ernment to support the denial by a preponderance of the evi-
> dence would inevitably shift this emphasis and involve the
> Board in second-guessing the agency's national-security de-
> terminations. We consider it extremely unlikely that Con-
> gress intended such a result....

*Id.*, 531–32.

This Court has followed the Supreme Court's lead, and expanded

its reasoning, with respect to the kind of federal preclusion found here by

the district court. In *Perez v. Federal Bureau of Investigation*, 71 F.3d 513

(5th Cir. 1995), the Court applied *Egan* to bar Title VII claims that de-

pend on the correctness of a security-clearance decision:

> Because the court would have to examine the legitimacy...of
> the FBI's proffered reasons for revoking the employee's secu-
> rity clearance, any Title VII challenge to the revocation would
> of necessity require some judicial scrutiny of the merits of the
> revocation decision.

*Id.*, 514–15.

*Perez* involved a Title VII claim against the federal agency employer

that made the security-clearance decision. In *U.S. ex rel. Johnson v. Ray-*

*theon Co.*, 93 F.4th 776 (5th Cir. 2024), this Court applied *Egan* to bar a

federal False Claims Act retaliation claim against a private employer.

Agreeing with a Ninth Circuit decision noting that "in employment-dis-

crimination suits against private employers, courts can generally avoid

examining the merits of the government's security clearance decision,"

*id.*, 787 (citing *Zeinali v. Raytheon Co.*, 636 F.3d 544, 550–51 (9th Cir.

2011)), the Court held that:

> [i]f a plaintiff's arguments question the merits of a govern-
> ment agency's security clearance decision, *Egan and Perez*'s
> concern over a court second-guessing the Executive Branch's
> exclusive discretion to control information bearing on national
> security is just as relevant in a case against a private em-
> ployer….

*Id.* Because Johnson's claims "'would of necessity require some judicial

scrutiny of the merits of the [security-clearance] revocation decision," the

Court decided that "*Egan* precludes review of the false reporting claims

because their resolution would necessarily implicate the merits of

the…security clearance revocation." *Id.*, 789.

The district court cited *Williams v. J.B. Hunt Transp., Inc.*, 826

F.3d 806 (5th Cir. 2016). ROA.163–64. *Williams* dealt not with the FRSA

and the FRA regulations but with two other federal transportation safety

statutes, and a different set of federal regulations, including those of the

Federal Motor Carrier Safety Administration. All relate to transportation safety and involve Department of Transportation subagencies. The Federal Motor Carrier Safety Administration ("FMCSA") regulation, 49 C.F.R. § 391.47, governs medical qualifications of commercial vehicle drivers while the FRA regulation involved here, 49 C.F.R. § 242.117, governs medical qualifications of railroad conductors. Both sets of regulations provide procedures for agency review of qualification decisions leading to final agency action reviewable under the Administrative Procedure Act. *Compare* 49 C.F.R. §§ 386.11(a) & 386.13 *with id.* §§ 242.501–.511.

*Williams* notes that neither the ADA or any other statute, nor the regulations at issue there, required the plaintiff to exhaust the administrative dispute-resolution process as a predicate to bringing an action under the ADA. 826 F.3d at 810. But the Court observed that:

> [C]ourts have found it prudent to impose an exhaustion requirement because of the DOT's greater competence in determining when its safety regulations are met. *See, e.g., Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 637–39 (8th Cir. 2003); *Campbell v. Fed. Express Corp.*, 918 F.Supp. 912, 916–21 (D. Md. 1996).

*Id.* The Court noted that it "has not yet had occasion to determine whether to impose this exhaustion requirement." *Id.* Exhaustion of remedies traditionally refers to remedies required by the statute under which the claim is brought. The charge-filing requirement for Title VII and the ADA is an example. Another is the administrative dispute-resolution processes in the FMCSA and FRA safety regulations, which are a required predicate for judicial review of final agency actions under those regulations. 49 C.F.R. §§ 386.11(a) & 386.13; *id.* §§ 242.117 & 242.501–.511. So the "prudential" exhaustion requirement imposed by other courts amounted in *substance* to a holding that failure to use the dispute-resolution procedures in the FMCSA regulations precluded a claim under the ADA.

In any case, when this Court in *Williams* reached the merits it held, albeit without using the word "preclude," that a plaintiff who had been denied certification but had "never sought review under" the administrative dispute-resolution process provided in the FMCSA regulations "failed to establish that he was qualified for the job in question—an essential element of his ADA claim." 826 F.3d at 812. *Williams* thus holds that in the singular circumstances presented by the interaction between

federal transportation-safety law governing operator medical qualifications and the ADA, failure to use the administrative dispute-resolution process in the federal safety regulations bars a claim under the ADA as a matter of law. *Williams* applies here, just as the district court ruled. ROA.163–64.

### B. Statutory text, context, and structure establish that Turner's ADA claim may not be used to second-guess the results of the regulatory process for making decisions about adequate visual acuity.

Turner argues, citing *Pom Wonderful*, "'Nothing in the text, history, or structure of the [ADA] or the [FRSA] shows the congressional purpose or design to forbid' ADA lawsuits like Turner's." Turner Brf., 22. To the contrary, the text, context (including historical context), and structure of the FRSA, the text and history of the ADA, the text of the FRA's regulations, and the text of the Hobbs Act—plus other considerations also drawn from the RLA and security-clearance preclusion cases—establish decisively that Congress meant that the federally delegated, directed and supervised, reviewable, and accountable professional judgment of each railroad carrier's medical examiner is the final authority (absent agency

or judicial review) on the visual acuity of engineers and conductors working for the examiner's railroad.

The FRSA provisions requiring certification of engineers and conductors, and the resulting FRA regulations, do not expressly prevent (preclude) claims under state or other federal laws that require second-guessing of a railroad medical examiner's professional opinion about an employee's visual acuity. Nor does the ADA include an express exception limited to federal transportation-safety operator-licensing requirements.[3] But neither does the RLA expressly forbid claims under state or other federal laws that require interpretation of a railroad collective-bargaining agreement. *See* 45 U.S.C. § 151 *et seq*. The federal-employee provision of Title VII found preclusive in *Brown* likewise was not expressly made exclusive by Congress. The same with DOHSA in *Mobil Oil*. Nor did any federal statute expressly preclude judicial review of the security-

---

[3] The ADA does address transportation employees expressly in one section, covering drug-testing. 42 U.S.C. § 12114. Turner argues that shows Congress could have excepted transportation workers (or just railroad employees) from the ADA generally and chose not to. Turner Brf., 27. FRSA preclusion of claims *like Turner's* that challenge medical fitness decisions for certification does not depend on the ADA not *otherwise* applying to railroad workers, as the district court noted. ROA.162.

clearance decisions in *Egan*. The absence of an express preclusion provision therefore does not end, but merely sets the stage for, preclusion analysis.[4]

### 1.    Statutory text alone supplies the answer.

The text of the FRSA, together with that of the Hobbs Act, which *does* contain express exclusivity language, straightforwardly provide that railroad medical examiners are the final and exclusive authority, absent a request by the employee for FRA and later court-of-appeals review, on visual qualification standards for their railroads. Although the statutory and regulatory scheme governing motor-carrier-operator safety discussed in *Williams* is, as noted, similar to the scheme governing railroad engineers and conductors, there are crucial differences.

---

[4] The first RLA preclusion decision from the Supreme Court relied on legislative history, as was customary at the time. *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 322 (1972) (quoting *Brotherhood of Railroad Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 39 (1957)). But *Andrews* also used "exhaustion of administrative remedies," "in its broader sense," to describe what later courts would characterize as RLA preclusion. *Id.*, 325.

First, the FRSA, unlike the enabling statutes for the FMCSA, requires the Secretary of Transportation, when formulating safety standards, to "consider existing relevant safety information and standards" 49 U.S.C. § 20103(c), and, specifically with respect to conductor certification, the regulations "shall be carried out through review and approval of *each railroad carrier's operator qualification standards*." 49 U.S.C. § 20135(b)(1) (emphasis added). No similar statutory direction was given to the FMCSA.

Second, and even more important, with respect to motor-carrier operators the statute directs the Secretary to:

> ensure that…the periodic physical examinations required of such operators are performed by medical examiners who have received training in physical and mental examination standards….

49 U.S.C. § 31136(a)(3).

As in *Williams*, that means *any* doctor with the necessary training is eligible to act as a medical examiner for purposes of qualifying motor-carrier operators. The FRSA takes a different approach. The express delegations of authority discussed earlier that run from Congress through agencies and then to railroad medical examiners *mandate* the role played

by BNSF's medical examiner. *See* 49 U.S.C. §§ 20103(a) & (c), 20107(a)(2), 20135(b)(1) and 20163(b); 49 C.F.R. Part 242, "Authority" (listing authorizing statutes and regulation); 49 C.F.R. §§ 1.89, 242.1(a) ("purpose"), 242.1(b) ("minimum Federal safety standards" do not "restrict a railroad from adopting and enforcing additional and more stringent requirements consistent with this part"), 242.109(a)(2), 242.117(c)(2) & (j). Moreover, the FRA, doubtless partly in order to satisfy legal requirements for delegations of government authority to private entities, *see National Horsemen's Benevolent and Protective Ass'n v. Black*, 107 F.4th 415, 419 (5th Cir. 2024), but also consistent with the statutory direction to focus on existing railroad-carrier qualification standards, promulgated regulations establishing detailed rules and guidelines for the medical opinions required of railroad medical examiners, 49 C.F.R. § 242.1–.407 & Apps. B–D, along with an elaborate, three-tiered process for direct agency review, and ultimately judicial review, of those medical opinions. *Id*. §§ 242.501–.511.

Most directly applicable to Turner's claim, the Administrator made certification of a conductor who failed an FRA-mandated standardized color-vision test depend on whether, "after consultation with a railroad

officer, the [railroad] medical examiner concludes that, despite not meeting the thresholds [set by the regulations], the person has the ability to perform as a conductor…." 49 C.F.R. § 242.117(j); *cf. Albertson's*, 527 U.S. at 570–78 (waiver program did not override failure to satisfy mandatory testing standard).

In *Johnson*, this Court noted the same delegation issue in the context of *Egan* security-clearance decisions, citing *Beattie v. Boeing Co.*, 43 F.3d 559, 566 (10th Cir. 1994), as a case where "the Air Force delegated its authority to make security clearance decisions to a private contractor." 93 F.4th at 787 n.6. In *Beattie* the court was required to decide whether a form of government security-clearance decision covered by *Egan* remained unreviewable governmental action when the challenged decision had been made by a private entity to whom responsibility for the decision had been delegated by the Air Force. The Tenth Circuit said "yes":

> We see no compelling reason to treat the security clearance decision by Boeing differently than the similar decision made by the Air Force. Both decisions represent the exercise of authority delegated by the Executive Branch and are entitled to appropriate deference by the federal courts….

*Id.*, 566. In *Beattie* the Air Force delegated its security clearance authority to Boeing by contract. *Id.* Here the delegation of authority to BNSF's medical examiner to determine Turner's visual acuity comes, by way of sub-delegations, directly from Congress in the FRSA. Unlike in *Beattie*, then, deferring in this case is not discretionary. *See Southern Pacific Transp. Co. v. Young*, 890 F.2d 777, 779–80 (5th Cir. 1989).[5] Barring unconstitutionality, courts must respect and enforce Congress's private-delegation decisions.

It follows that Turner's choice to not invoke the FRA's dispute-resolution procedures caused BNSF's medical examiner's professional medical judgment to become—in keeping with the statutory delegations of authority—not action by BNSF but instead unreviewable final action of the Federal Railroad Administrator and thus of the Secretary of Transportation. After deliberately avoiding government review of a decision

---

[5] The RLA cases, including this Court's decision in *Carmona* and, under a related statutory scheme in *Southern Pacific*, treat preclusion as jurisdictional. BNSF takes no position on whether, under the more recent, limited view of what is jurisdictional, FRSA preclusion as argued here by BNSF is jurisdictional or a defense. In this case nothing turns on that point.

made by the private entity (BNSF's medical examiner) to which the government delegated initial decisionmaking authority, Turner cannot turn around and treat the initial decision as private rather than governmental.[6] That is where the Hobbs Act comes into play.

The Hobbs Act gives courts of appeals "exclusive jurisdiction" to "determine the validity of" all "final actions" of the Secretary of Transportation related to railroad safety, including actions related to the certification of locomotive engineers (and later, conductors). 28 U.S.C. § 2342(7). ADA claims are asserted in a civil action in district court. 42 U.S.C. § 12117(a). Although appeals of judgments in such actions go to circuit courts, the standard of review differs. The express direction in the FRSA that railroad safety standards be "nationally uniform to the extent practicable," 49 U.S.C. § 20106(a)(1), also cuts strongly against review of conductor licensing decisions by judges and juries in district courts. Thus,

---

[6] As a final *government* action, an unreviewed decision of a railroad medical examiner falls directly within the holding of *Albertson's*—federal law prohibits allowing uncertified individuals to work as conductors. *See also* 29 C.F.R. § 1630.15(e) ("[i]t may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation…").

the "exclusive jurisdiction" granted to courts of appeal by the Hobbs Act also precludes review in the district courts, no matter what the label attached to the claim, of the merits of a final action by the Secretary of Transportation related to railroad safety, including a decision delegated by the Secretary to a railroad's medical examiner. *See*, *e.g.*, *Daniels v. Union Pac. R.R.*, 530 F.3d 936, 940–44 (D.C. Cir. 2008); *Carpenter v. Mineta*, 432 F.3d 1029, 1032 (9th Cir. 2005).

Unlike, then, the situation in *Williams*, and most closely resembling the Supreme Court's reasoning in *Mobil Oil*, in the FRSA Congress has by express text precluded claims under the ADA that, like Turner's, are a direct challenge to the correctness of the decision delegated to railroad medical examiners about whether to "screen in" conductors otherwise disqualified for certification by their failure of an FRA-prescribed color-vision test. Congress having spoken on the matter, the courts are not free to "improve" on Congress's handiwork. *Mobil Oil*, 436 U.S. at 625.

Finally, unlike the federal statutes or laws under which claims were held precluded in the RLA cases and in *Brown*, *Mobil Oil*, and *Egan*, including employment-discrimination laws other than the ADA, *the*

*ADA's text* confirms the conclusion drawn from that of the FRSA and the Hobbs Act regarding the exclusivity of railroad medical-examiner judgment about visual qualifications. The ADA protects only "qualified individuals." 42 U.S.C. § 12112(a). As the legislative history cited in *Albertson's*, 527 U.S. at 574, shows, Congress understood that the authority it had granted to federal agencies to oversee the licensing of motor-carrier operators and railroad engineers and conductors would result in some persons with disabilities not being "qualified" for those jobs. As this Court recognized, that is what the Supreme Court *meant* in the sentence from *Albertson's* stating that Congress "recognized that federal safety rules would limit application of the ADA as a matter of law." *See Williams*, 826 F.3d at 811.

The express words of the FRSA, the Hobbs Act, and the ADA therefore alone establish beyond reasonable dispute that decisions of railroad medical examiners about the visual acuity of conductors employed by the railroad cannot be second-guessed using the ADA.

Even if there were any doubt, deductions from statutory context and structure "lead unerringly," Brown, 425 U.S. at 835, to the same conclusion.

### 2.    Statutory context confirms the meaning of statutory text.

Start with context—the statute's historical setting and subject-matter. Public safety may not reach the level of importance of the broader subject of national security that informed *Egan*, but it's not far behind. As BNSF's partial listing earlier demonstrates, Congress has legislated about *rail* safety specifically for many years. The courts likewise have long recognized the importance of operator physical and mental qualifications to rail safety, and the serious consequences of lapses. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 627–28 (1989). The critical role played by rail transportation in the national economy was the driving force both for enactment of the RLA and for the Supreme Court's conclusion that RLA arbitrators were meant to be the exclusive interpreters of railroad industry collective bargaining agreements. *See Atchison, Topeka Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987); *Pritchard*, 2023 WL 9053146, * 4. It's no coincidence, in other words, that the RLA-preclusion decisions offer a persuasive analogy for the analysis of this case. And text from the ADA itself reinforces the ranking of transportation safety on a par with national security. *See* 42 U.S.C. §

12114(c)(5)(A)–(C) (with respect to use of illegal drugs, allowing three agencies to establish special rules for employees "in sensitive positions," the Department of Defense, the Nuclear Regulatory Commission, and the Secretary of Transportation.); *id.* § 12114(e) (limiting application of the ADA to drug-testing of employees of "entities subject to the jurisdiction of the Department of Transportation").

Next consider the nature of the decision involved here. *Egan* identified four characteristics in addition to the importance of the subject-matter that point to exclusivity. The security-clearance decision is "predictive," requires specialized expertise, depends on "broad discretion," and is made by a person accountable for the consequences of a mistake. *Egan*, 484 U.S. at 528–29. Each of those characteristics applies to the decision Turner challenges.

The decision is predictive. A railroad medical examiner does not give controlling weight to an employee's past performance or conduct when making a decision about visual acuity. The entire point is to forecast whether the employee still has and will likely continue to have during the three-year certification window the visual acuity necessary to perform the job safely given working conditions on that railroad.

40

The decision Turner challenges requires specialized expertise. Just as *Egan* explains that the necessary expertise for security-clearance decisions is of two kinds, so it is for visual-acuity decisions about conductors. Medical expertise is of course required to assess what tools and methods best measure vision. But practical, institutional expertise is also required to decide, in *Egan*'s words, "what constitutes an acceptable margin of error in assessing the potential risk." *Id*. Not all railroads are the same with respect to the visual demands working conditions place on conductors. *See* "Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors," 80 Fed. Reg. 73122, 73123–24 (Nov. 24, 2015). The decisionmaker must therefore be familiar not just with railroading generally but also with the array of factors specific to their railroad—signals, staffing, schedules, equipment, supervision, and a host of others—that affect how much visual acuity is needed to perform safely.

The decision Turner challenges depends on discretion. Besides medical judgments and railroad-specific knowledge, "what constitutes an acceptable margin of error," per *Egan*, also implicates a judgment simply about how much risk a person or a business enterprise is prepared to take within legal constraints. *Cf. EEOC v. Schneider Nat., Inc.*, 481 F.3d 507,

511 (7th Cir. 2007) (discussing risk-assessment latitude under the ADA). The word "discretion" along with others like it such as "latitude" and "leeway" appear in Turner's brief more than fifty times. Turner and EEOC use it as a scare word, as virtually synonymous with "freedom to discriminate," invoking apparently the longstanding principle in discrimination cases that "arbitrary," "unregulated," or "unchecked" discretion can be a mechanism for unlawful discrimination. *See, e.g.*, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988); *Yick Wo v. Hopkins*, 118 U.S. 356, 370–73 (1886). That principle has no place here. First, unchecked discretion may allow discrimination driven by animus or prejudice. *See Watson*, 487 U.S. at 990. But Turner did not plead that kind of discrimination. Second, the discretion here is the opposite of unchecked or unregulated; the minimum standards, guidelines, best practices, and three-tier dispute resolution process set out in the regulations strictly limit and control the medical examiner's medical judgment. Not only that, the "Best Practices" expressly acknowledge the possibility of bias or prejudice affecting the tools used by a medical examiner, deviations from which may be addressed through the agency review process. "Best Practices," 80 Fed. Reg. at 73125, 73128 ("the testing officer must administer the

test without any bias or prejudice"; "*Implement Procedures To Address Bias Accusations…*[requiring a witness] [and the] railroad should provide the medical examiner with the authority to void any test in which the examinee or another witness makes a substantial showing that bias or prejudice may have led to a test failure and, in such a situation, request that a new test be conducted with a different testing officer."). Turner's, and EEOC's, talismanic invocation of "discretion" supports rather than undermines the correctness of the district court's decision.

Finally, the decision challenged by Turner rests with persons accountable for its correctness and consequences. Security-clearance decisions are properly left to "an agency head who must bear the responsibility for the protection of classified information." *Egan*, 484 U.S. at 529. In the FRSA Congress assigned responsibility for conductor-certification decisions to the Secretary of Transportation (with authority to delegate it to private entities), who delegated it to the FRA, which assigned initial decisionmaking to railroad medical examiners. Medical examiners are subject to civil and even criminal penalties for violating their obligations under the regulations, 49 C.F.R. § 242.11, and they risk their jobs, repu-

tation, and professional standing, not to mention their individual conscience, by making incorrect decisions, especially one that contributes to a catastrophic outcome. The Federal Railroad Administrator must answer to the Secretary of Transportation, who along with the Administrator must answer to the President, Congress, and the American public. Under the ADA, by contrast, judges, juries, and hired opinion witnesses have, aside from their individual conscience, at best a reputational stake in whether they correctly or incorrectly reject, or penalize with awards of damages and other relief, a decision made by a railroad's medical examiner.

### 3.  Statutory structure reinforces text and context.

The structure of both the FRSA and the ADA also reinforces the textual and contextual meaning. The relevant provisions of the FRSA and the Part 242 regulations are not "remedial."[7] No more than the RLA,

---

[7] Turner and EEOC point to one irrelevant exception, FRSA section 20109, 49 U.S.C. § 20109. Section 20109 is an employee-protection provision that creates substantive rights and a procedural remedy. It contains a "No Preemption" provision that includes federal as well as state law. But it begins, "Nothing in *this section*…." 49 U.S.C. § 20109 (emphasis added). That merely highlights the absence of a similar provision covering any of the *other* sections of the FRSA, including the ones relevant to BNSF's argument.

or the statutes and regulations related to security clearances, are they intended primarily to establish and protect individual rights. The RLA, although declaring the right of railroad employees to "organize and bargain collectively through representatives of their own choosing," 45 U.S.C. § 152, Fourth, mainly imposes duties on railroads and railroad employees and unions to use specified processes to resolve disputes about rights created privately in collective bargaining agreements. *Id*. § 152, First.

49 U.S.C. § 20163 creates no substantive rights at all. It's a *licensing* provision, and the Part 242 regulations, provide standards, guidance, and a detailed decisionmaking process for the grant or denial of a certification. The adjudicatory procedures provided are intended, as perhaps required by the demands of due process, to safeguard the accuracy and fairness of the licensing decision, not as a "remedy" for the denial of substantive rights created by the statute itself. That's why Turner's arguments that the FRSA does not provide a "remedy" equivalent to ADA, Turner Brf. 15–18, 33, and that the FRSA dispute-resolution process is "voluntary," *id*., 15, are beside the point. The entire goal and purpose of

section 20163 is to license only persons who can work on the nation's railroads safely.

What the Supreme Court in *Brown* called "complementary administrative and judicial…mechanisms," 425 U.S. at 831, is also part of the structure of the FRSA and the Part 242 regulations. From that structure *Brown* deduced that Congress could not have meant "by perverse operation of a type of Gresham's law" to allow its handiwork to be "driven out of currency were immediate access to the courts under other, less demanding statutes permissible." *Id.*, 833. *Mobil Oil* made the same point. 436 U.S. at 625 ("courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless.") That reasoning directly supports the district court's rejection of Turner's attempt to use the ADA as an alternative to the FRA's dispute-resolution process. ROA.162.

The Part 242 process puts the burden on the employee to prove that the certification decision was incorrect; the decisionmakers are experts whose mission is railroad safety; and success means only eligibility for certification as a conductor. The ADA on the other hand places the burden on the employer to prove that a qualification standard that screens out a person with a disability is a business necessity, 42 U.S.C. §

12112(b)(6);[8] the decisionmakers are nonexpert judges and jurors whose focus is a statute aimed at equal employment opportunities for persons with disabilities; and a successful plaintiff can obtain injunctive relief, actual and punitive damages, and attorney's fees. No rational employee would use the FRA process if a claim under the ADA were available.

Turner points out that the FRA disclaims authority to order a railroad to put an employee back to work as a conductor. Turner Brf., 17–18. That limitation on authority follows from section 20163's character as a licensing provision. But a finding by the FRA that a railroad medical examiner made a flawed decision about an employee's visual acuity is far from toothless. As noted, violations of the regulations subject railroads and their staff to both civil and criminal penalties, among other consequences. 49 C.F.R. §§ 242.117(a) & 242.111. The regulations expressly state, moreover, that they do not

---

[8] The proper focus is on the defense because the "screening out" will always be undisputed. The entire raison d'être of the Part 242 standards and procedures is "screening" to determine whether persons have sufficient visual acuity to perform the duties of a conductor safely. As explained elsewhere, however, the screening Turner complains of is a failure to screen him "in" after the FRA mandatory initial test screened him out.

abridge any additional *procedural* rights or remedies, not inconsistent with this part, that are available to the employee under a collective bargaining agreement, the Railway Labor Act, or (with respect to employees at will) at common law with respect to removal from service or other adverse action taken as a consequence of this part.

49 C.F.R. § 242.5(d) (emphasis added). The ADA is not mentioned, no doubt because its *substantive* provisions are "inconsistent with this part." But a complaint to the FRA or a grievance under the collective bargaining agreement (and subject to the RLA) are procedural remedies by which a railroad could be compelled to act in conformance with a final decision of the Part 242 dispute-resolution process, even if the railroad did not comply voluntarily as most surely would. *Cf. Polk*, 66 F.4th at 507 ("Preclusion of a Title VII suit need not be the end of the story. Employees can still hold their carrier accountable for discriminatory conduct. The RLA charts the path to do so through arbitration.").

Moreover, the FRA administrative process *does* allow the agency to review and address the only type of "discrimination" Turner alleges—claimed failures to follow the FRA-testing process. Turner and EEOC ignore relevant OCRB decisions BNSF cited below doing just that.

ROA.136[9]; *see also Antidormi v. Nat'l R.R. Passenger Corp.*, 2021 WL 3403733, *2 (N.D.N.Y. Aug. 4, 2021) (discussing OCRB decision remanding railroad determination allegedly reached in violation of applicable regulations). They claim the OCRB lacks authority to address "discrimination" only by using that conclusory term to suggest a different type of "discrimination" claim than is actually at issue. This is not a case, for example, where an employee alleges that a medical examiner held a racial or gender bias and required all persons of a certain race or gender to take a more difficult test. Even then, as discussed earlier, the OCRB plainly has authority to address that kind of "discrimination" as well.

---

[9] The FRA decisions are publicly available at www.regulations.gov but are difficult to search. BNSF provides links to three sample rulings that show the FRA process routinely deals with both minor and serious allegations about alleged flaws in the secondary testing process:

> https://www.regulations.gov/document/FRA-2017-0046-0004 (visited Aug. 12, 2024);
> https://www.regulations.gov/document/FRA-2018-0085-0004 (visited Aug. 12, 2024);
> https://www.regulations.gov/document/FRA-2017-0049-0005 (visited Aug. 12, 2024).

As noted, Turner and EEOC place principal reliance[10] on the Supreme Court's decision in *Pom Wonderful*. Even if that decision were viewed, incorrectly, as establishing a new universal federal preclusion analysis, the FRSA and its associated regulations more than satisfy its requirements as to Turner's ADA claim. Turner and EEOC characterize the alleged *Pom Wonderful* test as whether the two *federal statutes* "irreconcilably conflict" or can be "harmonized." But that pitches the issue at far too high a level of generality. As the district court emphasized, ROA.162, BNSF is *not* arguing that the FRSA prevents *the entire ADA* from applying to it or to the railroad industry. It is the nature of Turner's claim, which Turner and EEOC gloss over, that matters. The question, in *Pom Wonderful* terms, is limited to whether the provisions of the FRSA

---

[10] Turner's point that railroads, like other kinds of employers, are sometimes charged with and even found liable for employment discrimination, Turner Brf., 35, is the kind of argument *ad hominem* from which an inference can reasonably be drawn that meaningful legal arguments are scarce. Falling in the same category is Turner's and EEOC's observations, Turner Br., 9, 28-29; EEOC Brf., 3, 12, that the FRSA contains an anti-retaliation provision and related comments. Turner isn't claiming retaliation in violation of that provision.

and the Part 242 regulations governing *who decides* about safety certification of conductors "conflict" with or can be "harmonized" with the ADA's provisions prohibiting "discrimination" defined to include the use of qualification standards that screen out persons with disabilities and create a civil action for damages and other relief to enforce the prohibition. They do conflict and they cannot be harmonized.

In fact, the Supreme Court in *Albertson's* has already done all of the *Pom Wonderful* work for this case. What the *Albertson's* Court referred to in saying "federal safety rules would limit application of the ADA as a matter of law," 527 U.S. at 573, is that the authority of federal safety agencies to establish who is "qualified" for certain transportation jobs means that persons found unqualified have no claim under the ADA, which protects only qualified individuals with a disability. More broadly, for a claim like Turner's the FRSA and Part 242 regulations conflict and cannot be harmonized with the ADA on at least five levels: (1) principal purpose (public safety under the FRSA vs. expanded employment opportunities for persons with disabilities under the ADA), (2) specific decisionmaker about visual acuity (railroad and agency experts under the FRSA vs. judge and jury under the ADA), (3) burden of proof (on employee

51

under the FRSA vs. on the railroad under the ADA), (4) decisionmaking standard ("correct" under FRSA vs. "business necessity" under the ADA), and (5) consequences (determination of eligibility under the FRSA vs. monetary and other relief under the ADA). Congress could not have meant for a railroad medical examiner, delegated by federal law the obligation to determine whether an employee has sufficient visual acuity to perform safely as a conductor, to risk—by prioritizing safety of the public and fellow employees as the FRSA requires—subjecting their employer to ADA liability assessed after-the-fact by a judge and jury. *Cf. Egan*, 484 U.S. at 531 ("[S]ecurity-clearance determinations should err, if they must, on the side of denials. Placing the burden of proof on the government to support the denial by a preponderance of the evidence would inevitably shift this emphasis….").

Turner argues that BNSF misunderstands preclusion and thus changed its position in the district court. Turner Brf., 36. BNSF disagrees. In response to the district court's request for supplemental briefing BNSF offered the most straightforward path to the correct result tied to precedent from this Court—*Williams*. BNSF never abandoned its reliance on RLA preclusion analysis. The district court obviously understood

that, because its decision held Turner's claim precluded and cited the RLA cases. ROA.161. A court of appeals, where decisions are precedential, is the right place for the deeper analysis of FRSA preclusion that BNSF lays out here.

BNSF has always argued that the FRSA and its associated Part 242 regulations preclude the specific kind of ADA claim asserted in Turner's complaint. The district court's judgment agreeing with BNSF's argument should be affirmed.

## III.   THE DISTRICT COURT ALSO CORRECTLY HELD THAT TURNER'S ADA CLAIM FAILED ON THE MERITS.

BNSF also argued below that Turner's claim failed for another reason, separate from preclusion: in pure ADA-only terms, Turner cannot show that he is "qualified" because his pleading establishes that he failed to hold a required certification. Notably, that is the approach to this type of a claim that Justice Thomas preferred in *Albertson's*. *See* 527 U.S. at 579–80 (Thomas, J., concurring). It independently supports affirmance.

Although separate, many of the relevant principles on this separate analysis flow from points BNSF makes above. In particular, being a

"qualified individual" is an element of an ADA claim, and being "qualified" encompasses not just ability to perform essential functions but also holding any required licenses. *Foreman*, 117 F.3d at 810 & n.14; 29 C.F.R. § 1630.2(m) and App. § 1630.2(m).

Courts routinely hold that a plaintiff who fails to meet mandatory medical standards is not qualified for any employment subject to those standards. Those cases show that employers may follow a federal agency's regulatory framework without violating the ADA. *See, e.g., Albertson's*, 527 U.S. at 573; *Williams*, 826 F.3d at 810; *see also Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022); *Bey v. City of New York*, 999 F.3d 157 161–62, 168 (2d Cir. 2021); *McNelis v. Penn. Power & Light Co.*, 867 F.3d 411, 416–18 (3rd Cir. 2017).

With that backdrop, the analysis is easy. Turner agrees that he failed his initial, FRA-mandated test. Turner Brf., 20. Under the correct understanding of the FRA certification process—as opposed to the one offered by Turner and EEOC that glosses over this problem—that meant Turner was presumptively *not* entitled to a certification, 49 C.F.R. § 242.117(b), (c), (g), (h)(3), & (j). As discussed earlier, his only opportunity to overcome that lack of qualification was to satisfy the exception process

in § 242.117(j). But Turner and EEOC overlook that the ultimate standard for doing so is that medical examiner must *actually conclude* that despite failing the mandatory FRA test the employee can safely work as a conductor. *Id.*

Turner admits that did not happen. Turner Brf. 34. He does not contend that the medical examiner concluded he could work safely but BNSF nevertheless denied him a certification. He does not contend he actually passed the initial test and should have been certified for that reason. Thus, this is a straightforward case where an employee did not satisfy a federally mandated certification standard—either passing the initial test or convincing the medical examiner that he was nevertheless safe. Turner, therefore cannot be a "qualified individual" under the ADA.

Turner's approach seeks to avoid the problem by arguing about what he says the medical examiner *should* have done that he thinks *should* have led to him satisfying the standard.  But the standard is not one open to those arguments. It is not a direct-threat standard, for example, where medical disagreements are commonly litigated. The standard here is not whether the employee can safely work; it is whether the em-

ployee either passed the initial test or, if not, *convinced the medical examiner he or she was safe to work*. Compare Turner Brf., 13 (misstating the standard as "so long as sufficient evidence shows that he can safely do the job"). Turner cannot wish the standard into one that benefits him.

Turner's approach is flawed even beyond that basic problem. First, as the district court held, under *Williams*, Turner's various complaints about BNSF's medical examiner allegedly not following the FRA process are ones he should have presented to the assigned decisionmaker for those complaints, the FRA. His failure to do so in itself renders him unqualified as a matter of law. ROA.163–64.

Second, Turner's and EEOC's arguments disregard the true nature of the FRA certification process. They characterize the vision-certification requirements as simply a "broad guideline[] for certifying employees" but providing employers with "wide discretion to create and implement the challenged certification test." *E.g.*, Turner Brf. 45–46. Similar statements permeate their briefs. They fail to (1) recognize that an employee who does not pass the mandatory initial test is unqualified absent an exception; (2) incorrectly treat the issue of that one exception as the rel-

evant qualification standard; and (3) fail to recognize the ultimate exception standard described above—that *the medical examiner must conclude* that despite failing to meet the mandatory thresholds "the person has the ability to safely perform as a conductor."

Using that mistaken approach allows them to make their "qualification standard" arguments, relying on the caselaw addressing that term. They cite *Bates v. United Parcel Service, Inc.*, 511 F.3d 974. 990 (9th Cir. 2007) (en banc), to claim that when a plaintiff challenges a qualification standard as facially discriminatory the plaintiff need not show that he or she satisfies that very qualification standard to be qualified. The problem is, even assuming *Bates* is an accurate statement of the law in the Fifth Circuit, what they challenge here is *not* an ADA "qualification standard." Again, "qualification standards" are "the personal and professional attributes...*established by a covered entity* as requirements." 29 C.F.R. § 1630.2(q) (emphasis added). *Bates* involved a qualification standard because it addressed a requirement imposed entirely by the employer. By contrast, an externally imposed requirement such as a legally mandated certification that a conductor have the ability to distinguish colors of railroad signals as demonstrated by passing a specified test—is

not a "qualification standard," and does not have to be justified by the employer under *Albertson's*.

Turner and EEOC want to ignore the problem first by ignoring that Turner's failure of the initial mandatory test rendered him unqualified and focusing only on the process involved in deciding whether to override Turner's his otherwise disqualifying failure of his initial color-vision test. The latter is a "screen in" decision, not a "screen out" decision. It thus is not within 42 U.S.C. § 12112(b)(6) addressing "selection criteria" that "screen out" individuals with a disability and require employers to satisfy the job-related-and-consistent-with-business-necessity standard. Here, the employee is already disqualified—screened out—by the initial FRA-mandated test. The rest of the evaluation, including in this case the field test, is the process involved in determining whether the medical examiner arrives at a medical conclusion that the disqualification can be overridden.

Beyond not applying as a "qualification standard," as a pure textual matter, it also would not make sense to treat that exception process as a qualification standard. Because *everyone* taking a field test or other secondary test will have already failed the initial test all could claim to have

a disability. If the secondary test could be challenged as a "screen out" test anyone who failed the secondary test—the universe of which will always be employees could claim to be disabled or they would not be taking the secondary test—could mount a § 12112(b)(6) challenge to failing the test. That is so even if they did not claim, as Turner erroneously does, that the railroad failed to properly conduct the secondary testing.

That approach would render meaningless the FRA's initial test requirement. Requiring that the employer justify the FRA-required screen-in testing process as a business necessity is inconsistent with *Albertson's*. It also changes the applicable standard secondary testing process from one allowing an exception only if the medical examiner actually reaches a conclusion that the employee can safely perform despite not passing the FRA-mandated initial test to one where the employer has to justify the physician not reaching that conclusion. That is not the law.

Turner's and EEOC's reliance on *Rohr v. Salt River Project Agricultural Imp. and Power Dist.*, 555 F.3d 850 (9th Cir. 2009), Turner Brf. 46; EEOC Brf. 26, is equally faulty. *Rohr*, like *Bates*, involved an actual employer-imposed qualification standard. Although it *stemmed from* a government requirement it was vastly different from the FRA-certification

59

process. OSHA required the employer to establish and maintain a written respiratory protection program that had to include medical evaluations. That was it. *See Rohr*, 555 F.3d at 862–63 ("OSHA's regulations do not specify the content of such medical evaluations, how often the evaluations should be conducted, the appropriate tests for determining whether an employee should be certified, or any blood-pressure requirements [the medical issue with Rohr].); 29 C.F.R. § 1910.134(c)(1)(ii) (program must include "[m]edical evaluations of employees required to use respirators."). The employer handles everything else. That is a far cry from the situation here where the agency requires a particular test (or one of several specified tests), failure of that test renders the employee unqualified, and there is a regulatory exception process tied to the medical examiner arriving at a particular medical conclusion.

*Rohr* thus *is* helpful because it highlights again the importance of Turner's and EEOC's misdescription of the FRA process throughout their briefs. They *want* the FRA process to be similarly general and one of free-wielding discretion. If the FRA mandated only that railroads have a program that required "[m]edical evaluations of employees required to [distinguish colors as part of train operations]" and said nothing more, then

Turner and EEOC might have a point. Like *Rohr*, everything about that medical evaluation would be up to the employer. But that is the fictionalized approach they seek to present, not reality.

Two other decisions warrant a brief mention. Turner and EEOC rely heavily on *Mills v. Union Pacific R.R.*, 2024 WL 185246 (D. Idaho 2024), issued after the district-court decision here. The court relied on opinion testimony offered by retained doctors criticizing a color-vision test devised and used by Union Pacific to find a fact issue about the correctness of Union Pacific's assessment of Mills. *Id.*, * 8–13. At most that decision reflects simply a situation where a plaintiff convinced an out-of-circuit district court to follow the mistaken approach Turner advocates here. To the extent it even addressed the specific arguments BNSF makes, it suffers from the same flaws present in Turner's and EEOC's arguments.[11]

---

[11] The *Mills* court also was not presented with nor did it decide whether the claim before it was precluded by the FRSA. On that point, though, it illustrates the outcome that other courts, including the district court here, have concluded that Congress meant to avoid when enacting transportation safety statutes.

The Court also should similarly reject the likely reliance that will come in Turner's reply brief on the recent decision in *EEOC v. Union Pac. R.R.*, 2024 WL 3328718 (D. Minn. July 8, 2024), where EEOC has asserted ADA claims arising from the color-vision testing process. The district court denied the defendant's motion to dismiss. It dealt with the qualified issue in only a cursory fashion: because EEOC alleged that the secondary testing and reconsideration process was flawed it had stated a valid claim. *Id.*, *6. That court accepted, without discussion or recognition of the applicable standard for overcoming a failure of an initial test or any of the other substantive issues addressed in the parties' briefs here, that a plaintiff can challenge under the ADA the alleged unreliability of a secondary test.

In addition to misunderstanding the FRA process and qualification standards, Turner and EEOC both mention numerous times the concept of accommodating Turner, principally by allowing him to wear chromatic lenses during the field testing. As BNSF explained earlier, however, this is a regarded-as disability case only: Turner did not allege (and even denied) any limitation resulting from his color vision issue, and his EEOC

charge raised only a regarded-as claim. As such, there is no reasonable accommodation issue in this case. 42 U.S.C. § 12201(h).

Substantively, the argument about chromatic lenses is seriously flawed. It also is incomplete given that Turner and EEOC do not tell the Court what the FRA has said on the subject.[12] But the Court need not address it because accommodation issues are not relevant and, in any event, the chromatic lens issue is just another complaint by Turner of BNSF's alleged failures to follow the secondary testing process set out in the regulations. Similarly, the Court need not address Turner's other erroneous complaints about the specifics of the secondary test.[13]

---

[12] The very FRA "Best Practices" document he relies on repeatedly calls out chromatic lenses as ineffective, notes they are subject to an FDA warning, cautions railroads to be "conservative," says railroads should either disallow them or be aware of their limitations, and—regardless of the testing context—says that conductors cannot use them *while actually performing the job*. *Best Practices*, 80 Fed. Reg. at 73125. With those warnings, why would any railroad allow chromatic lenses for a secondary test?

[13] An example are the various complaints that the field test did not "replicate" what Turner had to see at work. That is an ADA concept generally, but it overlooks the regulatory regime. The FRA mandated initial tests are all tests that do not replicate the actual job duties but instead test for abilities needed while performing those duties. Moreover, even as to the secondary testing that Turner and EEOC focus on, the FRA allows multiple types of secondary tests that plainly do not have to match the job or

To close, BNSF again goes back to the actual standard for granting an exception to an employee who has failed the initial mandated testing. Although Turner and EEOC complain about the decision the medical examiner here reached and the process (field testing) by which he reached it, nothing in the regulations or the ADA suggests that the ADA can be used to force a medical examiner to reach a "professional opinion" that the medical examiner did not hold. The standard is whether the medical examiner arrived at a professional opinion that the employee was safe despite having failed the baseline FRA-required test for certification.

Considering potential ADA injunctive relief illustrates the problem vividly. Would a court order the examiner to hold a professional opinion he or she does not hold? Would a court order the examiner to issue a certificate despite the examiner not holding the required opinion? Or would a court order the railroad to allow an employee to work despite not

---

job conditions, such as an ophthalmologic referral or a scientific test. 29 C.F.R. § pt. 242 App. D(4); *see also Best Practices*, 80 Fed. Reg. at 73124-73125(discussing various types of secondary tests allowed and, as to field tests, requiring only that they "reasonably match" working conditions, but also permitting testing on the ground or on a locomotive, moving or not).

having the certificate? None of those options is conceivable. Nor would it work for a court to enjoin a railroad to reassess the employee with a new secondary test, which is exactly what the OCRB might do. That would place the court, rather than the medical examiner or the FRA, in the position of micromanaging what is a valid and reliable test.

The district court's alternative ground for entering judgment for BNSF also is correct and the Court should affirm.

## IV.   THE COURT SHOULD DISREGARD EEOC'S *AMICUS* BRIEF.

EEOC's amicus brief supporting Turner is highly duplicative of Turner's brief and thus likely is unhelpful to the Court. Being duplicative, it also suffers from the same flaws as Turner's arguments.

Beyond those problems, there is an overriding reason the Court should disregard—and certainly provide no deference to—the agency's brief: it represents a litigation position by EEOC's litigation unit, not a reasoned decision by agency policymakers. Although the agency curiously did not inform the Court of this fact, as mentioned above, it is the plaintiff in a pending lawsuit against another railroad asserting ADA claims arising from the color-vision testing process. *See EEOC v. Union Pac. R.R.*, 2024 WL 3328718 (D. Minn. July 8, 2024).

EEOC's position here, thus is no more than a litigation position that courts generally reject. *See, e.g.*, *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1111 n.4 (8th Cir. 2016), *reh'g and reh'g en banc denied* (May 19, 2016), *cert. denied*, 137 S. Ct. 256 (2016) (rejecting EEOC's litigation position offered through an amicus brief); *Shikles v. Sprint/United Mgmt.*, 426 F.3d 1304, 1316 (10th Cir. 2005) (rejecting EEOC amicus brief for several reasons including that it was not "subjected to any sort of public scrutiny"); *see also Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1571 (2024) ("Deference to what is nothing more than an agency's convenient litigating position is entirely inappropriate.") (internal quotations omitted). For that reason and substantively, the Court should disregard EEOC's brief or reject the arguments on their merits.

## CONCLUSION

The able district judge analyzed the issues in this case correctly and reached the right conclusions. This is not an area where a plaintiff can use the ADA to mount challenges to disagreements about whether a highly regulated employer correctly followed a regimented agency mandated testing process. Such claims fail for all of the reasons addressed by

the district court and as further explained above. The Court should affirm the judgment of the district court.

Dated: August 19, 2024.

Respectfully submitted,

s/ Bryan P. Neal
Bryan P. Neal
Stephen F. Fink
Holland & Knight LLP
One Arts Plaza
1722 Routh Street
Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Fax)
Email: bryan.neal@hklaw.com

Attorneys for Appellee
BNSF Railway Company

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. The brief complies with the type-volume limitations of Fed. R. App. P. 32 because, excluding the parts of the document exempted by Rule 32(f), this brief contains 12,960 words.

2. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook font, 14 point.

s/Bryan P. Neal
Bryan P. Neal
Attorney for Respondent
BNSF Railway Company