No. 24-10031

———————————————

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————

TRACY TURNER,

      *Plaintiff-Appellant,*

   v.

BNSF RAILWAY COMPANY,

      *Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Texas, Fort Worth Division
(Case No. 4:23-cv-681)
The Honorable Mark T. Pittman

———————————

## APPELLANT'S REPLY BRIEF

———————————

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Colin Reeves
  *Counsel of Record*
APOLLO LAW LLC
1000 Dean Street
Suite 101
Brooklyn, NY 11238
colin@apollo-law.com
(646) 363-6763

*Counsel for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................. 1

BACKGROUND .................................................................. 2

I.   TURNER PLEADS THREE TEXTBOOK ADA CLAIMS ............... 2

II.  BNSF DISQUALIFIED TURNER BECAUSE HE FAILED
     BNSF'S DISCRIMINATORY COLOR-VISION FIELD TEST ........ 5

ARGUMENT ...................................................................... 7

I.   THE FRSA AND ITS REGULATIONS DO NOT PRECLUDE
     TURNER'S ADA CLAIMS ................................................ 7

     A.   Turner's ADA Claims Are Not Precluded ............................ 7

     B.   BNSF's Arguments for Preclusion Fail ................................ 10

          (1)   BNSF's preclusion arguments are brand-new ............. 10

          (2)   BNSF's attempts to distinguish *POM Wonderful*
                are forfeited and unpersuasive ...................................... 11

          (3)   BNSF's textual argument fails ...................................... 12

          (4)   The subject matter and nature of BNSF's
                certification decision do not support finding
                Turner's claims precluded ............................................ 17

          (5)   Turner's lawsuit presents no safety concerns ............. 19

          (6)   The FRA's dispute-resolution regulations do not
                preclude Turner's claims .............................................. 20

II.  TURNER HAS PLAUSIBLY ALLEGED THAT HE IS
     QUALIFIED ................................................................ 21

CONCLUSION ................................................................... 28

CERTIFICATE OF SERVICE ..................................................

i

CERTIFICATE OF COMPLIANCE ...........................................................

# TABLE OF AUTHORITIES

## CASES

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ................................................................27-28

*Bates v. United Parcel Servs.,*
    511 F.3d 974 (9th Cir. 2007) (en banc) ...........................................22

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .........................................................................3

*Bosarge v. Miss. Bureau of Narcotics.,*
    796 F.3d 435 (5th Cir. 2015) ...........................................................7

*Bostock v. Clayton Cnty.,*
    590 U.S. 644 (2020) .........................................................................4

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) .......................................................................14

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) .......................................................................19

*Carpenter v. Mineta,*
    432 F.3d 1029 (9th Cir. 2005) ...............................................18, 20-21

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ...................................................................17-19

*EEOC v. Union Pac. R.R. Co.,*
    2024 WL 3328718 (D. Minn. July 8, 2024)...........................4, 23-24

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) .......................................................................15

*Garcia v. Orta,*
    47 F.4th 343 (5th Cir. 2022)...........................................................10

*Gonzales v. City of New Braunfels,*
 176 F.3d 834 (5th Cir. 1999) .......................................................... 22

*Kapche v. City of San Antonio,*
 176 F.3d 840 (5th Cir. 1999) .......................................................... 22

*Mills v. Union Pac. R.R. Co.,*
 2024 WL 185246 (D. Idaho Jan. 16, 2024) ..... 3, 5-6, 8, 19, 23-25, 27

*Mlsna v. Union Pac. R.R. Co.,*
 975 F.3d 629 (7th Cir. 2020) ............................................................ 3

*Murray v. UBS Secs., LLC,*
 144 S. Ct. 445 (2024) ........................................................................ 4

*Nall v. BNSF Ry. Co.,*
 917 F.3d 335 (5th Cir. 2019) .......................................................... 18

*Perez v. F.B.I.,*
 71 F.3d 513 (5th Cir. 1995) ............................................................ 18

*POM Wonderful LLC v. Coca-Cola Co.,*
 573 U.S. 102 (2014) ................................................... 7-12, 14-15, 20

*Prewitt v. U.S. Postal Serv.,*
 662 F.2d 292 (5th Cir. 1981) ..................................................... 22-23

*Reiter v. Cooper,*
 507 U.S. 258 (1993) ........................................................................ 28

*Rohr v. Salt River Project Agric. Improvement & Power Dist.,*
 555 F.3d 850 (9th Cir. 2009) .......................................... 22-23, 25-27

*Robinson v. Midland Cnty.,*
 80 F.4th 704 (5th Cir. 2023) ............................................................ 3

*Rollins v. Home Depot USA*,
     8 F.4th 393 (5th Cir. 2021)..........................................................2, 10

*Sanders v. Union Pac. R.R. Co.*,
     108 F.4th 1055 (8th Cir. 2024)....................................................4, 18

*Shambaugh & Son, L.P. v. Steadfast Ins. Co.*,
     91 F.4th 364 (5th Cir. 2024)..............................................................2

*Toy v. Holder*,
     714 F.3d 881 (5th Cir. 2013) ............................................................18

*United States ex rel. Johnson v. Raytheon Co.*,
     93 F.4th 776 (5th Cir. 2024)........................................................17-18

*Vann-Foreman v. Ill. Cent. R.R. Co.*,
     2022 WL 180749 (N.D. Ill. Jan. 20, 2022) ...................................8-9

*Walker v. Union Pac. R.R. Co.*,
     2023 WL 10354310 (D. Or. Dec. 18, 2023) ....................................24

*Whitman v. Am. Trucking Ass'ns, Inc.*,
     531 U.S. 457 (2001) ........................................................................15

*Williams v. J.B. Hunt Transp., Inc.*,
     826 F.3d 806 (5th Cir. 2016) ..........................................................27

*Wyeth v. Levine*,
     555 U.S. 555 (2009) ..........................................................................8

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 2342.......................................................................... 16

29 C.F.R. § 1630, App'x § 1630.10.............................................. 26

29 C.F.R. § 1630.15................................................... 15, 20, 24

42 U.S.C. § 1981a ............................................................. 9

42 U.S.C. § 2000e-5 .......................................................... 9

42 U.S.C. § 12101 ............................................................. 9

42 U.S.C. § 12111 ............................................................ 22

42 U.S.C. § 12112 ........................................ 2, 4, 15, 19, 25-26

42 U.S.C. § 12113 ........................................................... 19

42 U.S.C. § 12114 ............................................................. 8

42 U.S.C. § 12117 ............................................................. 9

49 C.F.R. Part 242 App'x D ....................................... 5-6, 24

49 C.F.R. § 242.5 .......................................................... 8, 17

49 C.F.R. § 242.117 ................................................. 5-6, 24

49 C.F.R. § 242.501 ........................................................ 18

49 C.F.R. § 242.503 ........................................................ 18

49 C.F.R. § 242.505 ................................................... 18, 20

49 C.F.R. § 242.507 ................................................... 16, 18

49 C.F.R. § 242.509 ............................................... 16, 18, 20

49 C.F.R. § 242.511 ................................................... 16, 18

49 U.S.C. § 102 ............................................................. 14

49 U.S.C. § 103 ............................................................. 14

49 U.S.C. § 20101.................................................................9

49 U.S.C. § 20106.................................................................8

49 U.S.C. § 20109.................................................................8

49 U.S.C. § 20114...............................................................16

## OTHER AUTHORITIES

*Best Practices for Designing Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73122 (Nov. 24, 2015)......................................24

Decision Concerning National Passenger Railroad Corporation's Denial of Mr. B. M. Peltz's Conductor Certification (Nov. 9, 2016), https://www.regulations.gov/document/FRA-2015-0090-0004 ...............21

Decision Concerning Union Pacific Railroad Company's Denial of Mr. G.D. Marlow's Conductor Certification (Jan. 17, 2018), https://www.regulations.gov/document/FRA-2017-0049-0005 ...............21

*Guidance Explaining the Federal Railroad Administration's Dispute Resolution Procedures for Locomotive Engineer and Conductor Certification FAQs* (Feb. 24, 2022), https://railroads.dot.gov/elibrary/guidance-explaining-federal-railroad-administrations-dispute-resolution-procedures...........................17, 20-21

## **INTRODUCTION**

For all the journeying into the depths of the Americans with Disabilities Act ("ADA") and Federal Railroad Safety Act ("FRSA") that this case requires, resolution of this appeal is straightforward. The text and structure of the ADA and FRSA show that the Federal Railroad Administration's ("FRA") regulations do not preclude Tracy Turner's ADA claims. And Turner is qualified because he satisfies all the requirements of being a conductor other than passing the BNSF color-vision field test that he challenges as discriminatory.

BNSF's response does not meet these issues head on. Nor does BNSF stick with the arguments it made in the district court. BNSF instead argues that Turner brings a single pseudo-ADA claim contending only that BNSF violated the FRA's regulations; asserts that the relevant qualification standard is not BNSF's bespoke color-vision field test; and makes textual and contextual arguments that imply that BNSF has the sole authority to decide when the ADA applies to it.

The Court should not be fooled. BNSF's arguments are forfeited and badly wrong. Turner brings three textbook ADA claims centering on BNSF's discriminatory color-vision field test. And needless to say, BNSF does not have the power to decide that the ADA does not apply here.

Turner is qualified under the ADA, and his claims are not precluded. The district court's judgment should be reversed.

1

# BACKGROUND

## I.    TURNER PLEADS THREE TEXTBOOK ADA CLAIMS.

Hoping to narrow this Court's field of vision, BNSF construes Turner's complaint in strained and implausible ways. According to BNSF, Turner alleges a single ADA claim under 42 U.S.C. § 12112(b)(6) premised exclusively on a regarded-as theory of disability and on the contention that BNSF violated only the FRA, not the ADA. This creative interpretation of Turner's complaint is both forfeited and wrong.

To start, BNSF's points are forfeited; BNSF did not brief or ask for judgment on them below. *Rollins v. Home Depot USA*, 8 F.4th 393, 397-98 (5th Cir. 2021). BNSF argued only that Turner's lawsuit was precluded and that he was not qualified under the ADA. ROA.96. Had BNSF presented the scope-of-the-claim issues it tries to raise here, Turner could have sought to amend his complaint. But obviously he cannot do that on appeal. Deciding these points now would unfairly prejudice Turner. *See Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 371 (5th Cir. 2024).

BNSF's arguments fail on the merits in any event. Homing in on a single statement in which Turner says that BNSF's field test violated FRA guidelines, BNSF Br. at 5 (citing ROA.10 ¶ 24), BNSF contends that Turner alleges *only* that BNSF violated the FRA's requirements. BNSF tries to cast everything else in Turner's complaint as throat-clearing and surplusage. But that's a non-starter: this Court must construe the

complaint in Turner's favor, not BNSF's. *Robinson v. Midland Cnty.*, 80 F.4th 704, 709 (5th Cir. 2023). And Turner's complaint gives BNSF more than "fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

As a starting point, Turner's allegation that BNSF's field test violated FRA guidelines does not undermine his ADA claims. A failure to comply with a regulation supports an ADA claim in all kinds of ways. *See Mills v. Union Pac. R.R. Co.*, 2024 WL 185246, at *5-6 (D. Idaho Jan. 16, 2024) (compliance with FRA's color-vision field test guidelines relevant to business-necessity defense); *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 634-37 (7th Cir. 2020) (FRA's certification and hearing regulations relevant to essential-function and reasonable-accommodation analyses).

But more fundamentally, BNSF's core contention—that Turner accuses it only of violating FRA regulations—is wrong. Turner's complaint raises several ADA claims. It begins by detailing the FRA's color-vision testing framework. ROA.6, 8-9 ¶¶ 1, 9-15. It then explains that BNSF refused to recertify Turner after he failed "a [BNSF] field test that did not replicate what he must actually see to be able to safely do his job." ROA.7, 10 ¶¶ 3, 23. That, as Turner explained, violated the *ADA*: "Using tests that do not replicate what employees must actually see to justify discriminating against them on the basis of their color vision…is exactly the type of discrimination that is prohibited by [the]…ADA."

ROA.7 ¶ 4. Turner then enumerated the provisions of the ADA that BNSF violated and expanded on his theories of disability discrimination. ROA.10-12 ¶¶ 23-43. Turner's claims fall squarely within the ADA. *EEOC v. Union Pac. R.R. Co.*, 2024 WL 3328718, at *2, *6 (D. Minn. July 8, 2024) (complaint plausibly pleaded ADA claims based on nearly identical allegations about railroad's field test).

And Turner's complaint raises three theories of liability, not one. First, Turner made a claim under 42 U.S.C. § 12112(b)(6), alleging that BNSF's field test screened him out because of his color-vision disability. ROA.7, 11 ¶¶ 4, 36, 39. Next, he pleaded a claim for failure to accommodate based on BNSF's refusal to modify its field test. ROA.10-11 ¶¶ 25, 28, 37, 40. Last, he stated a disparate-treatment claim, alleging that "BNSF discriminated against Turner on the basis of disability when it refused to recertify and effectively terminated him." ROA.11 ¶ 38.[1]

BNSF's contention that Turner asserts only a regarded-as theory of disability also fails. Turner alleges that his color-vision deficiency is a disability in all three ways contemplated by the ADA (that is, Turner is actually disabled, has a record of a disability, and was regarded as disabled). ROA.9-11 ¶¶ 19-20, 31-34.

---

[1] BNSF suggests that Turner's disparate-treatment claim cannot succeed because Turner did not allege animus or prejudice. BNSF Br. at 4, 16, 42. But no such showing is required at trial, let alone under the Rules' liberal pleading standards. *See Murray v. UBS Secs., LLC*, 144 S. Ct. 445, 453 (2024); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 658, 663 (2020); *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1062 (8th Cir. 2024).

## II. BNSF DISQUALIFIED TURNER BECAUSE HE FAILED BNSF'S DISCRIMINATORY COLOR-VISION FIELD TEST.

BNSF tries to narrow this Court's field of vision in a second way, by ignoring the field test BNSF used to disqualify Turner. This attempt fails, too. The central question in this case is whether this test was discriminatory under the ADA.

To remind the Court: railroad carriers must test and certify that their conductors have adequate color vision to work safely. Turner Br. at 11-15; 49 C.F.R. § 242.117(c), (g), (j); *Id.* Part 242 App'x D. The evaluation begins with a scientific test. 49 C.F.R Part 242 App'x D(2). A conductor who passes that test is recertified. *Mills*, 2024 WL 185246, at *1; 49 C.F.R. § 242.117(c). An employee who fails the initial test is "entitled to one retest." 49 C.F.R. § 242.117(j). Although "the federal regulations *do not* prescribe a follow-up test" that railroads must use, BNSF and other railroads typically use a field test of their own creation. *Mills,* 2024 WL 1855246, at *4; 49 C.F.R. Part 242 App'x D(4) (explaining various testing methods that may be used); ROA.7 ¶ 3. Employees who pass this field test may also be certified. 49 C.F.R. § 242.117(j).

Although BNSF's discriminatory field test has been front and center from the beginning of the case, BNSF now tries to shift the Court's focus away from it. BNSF contends that an employee who fails the initial color-vision test "is unqualified absent an exception." BNSF Br. at 56. And according to BNSF, the relevant exception is not whether the employee passes BNSF's field test. It's just whether BNSF's medical

5

examiner concludes that the employee can do the job safely. *Id.* at 56-57. This depiction distorts the FRA's testing framework, mischaracterizes Turner's allegations, and contradicts BNSF's own statements.

Begin with the FRA's testing regime. Employees are not unqualified if they fail the first test. They are qualified if they pass this test *or* if they prove to the medical examiner's satisfaction that they can do their job safely, which they may demonstrate by passing a secondary test. 49 C.F.R. § 242.117(g), (j); 49 C.F.R. Part 242 App'x D(4); *Mills*, 2024 WL 185246, at *1 ("If a conductor passes the field test, he or she is likewise recertified.").

Now consider Turner's allegations. Contrary to BNSF's telling, this case has always been about the discriminatory field test BNSF used to disqualify Turner. ROA.7, 9-10 ¶¶ 3-4, 22-30. Turner alleges that BNSF certified him when he passed BNSF-administered field tests every three years. ROA.7, 9 §§ 2, 22. But that changed when Turner failed BNSF's field test in 2020. Based on that failure, BNSF refused to recertify Turner and effectively terminated him. ROA.7, 9-10 ¶¶ 3, 22-23, 26-27. Turner claims that had BNSF used an ADA-compliant test, Turner would have passed it and been recertified. ROA.10 ¶ 28.

BNSF's own statements in this litigation show that it disqualified Turner because he failed BNSF's field test. BNSF admitted this in its answer: Turner "failed the color vision field test *which resulted in the denial of his conductor certification*." ROA.39, 41 ¶¶ 3, 27 (emphasis

added); *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015) (defendant's answer may be considered when evaluating motion for judgment on the pleadings). Similarly, when BNSF moved for judgment on the pleadings, it explained that "BNSF disqualified Turner from employment…because he failed…the retesting." ROA.95 ("Turner's complaint demonstrates that he…is complaining about the retest, or secondary test.").

The upshot: Turner challenges BNSF's field test as discriminatory under the ADA. And had BNSF offered a non-discriminatory test, Turner would have passed it and would still be working.

## **ARGUMENT**

## I. **THE FRSA AND ITS REGULATIONS DO NOT PRECLUDE TURNER'S ADA CLAIMS.**

The text, structure, and history of the ADA and the FRSA show that the FRA's regulations do not preclude Turner's ADA claims. *See* Turner Br. at 24-42; *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111-21 (2014) (preclusion analysis requires examining the laws' text, structure, and history). The district court erred in concluding otherwise.

### A.    **Turner's ADA Claims Are Not Precluded.**

Start with the text. BNSF concedes that no textual provision in either the ADA or the FRSA expressly precludes Turner's ADA claims. BNSF Br. at 30. To the contrary, the FRSA explicitly *permits* claims arising under the ADA and other federal anti-discrimination statutes.

*See* 49 U.S.C. § 20109(g)-(h); Turner Br. at 28-29. The FRSA expressly preempts only some state-law claims. 49 U.S.C. § 20106. It does not preclude federal causes of action. *Id.* "By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the [FRSA] to preclude requirements arising from other sources," such as the ADA. *POM Wonderful*, 573 U.S. at 114.

For its part, the ADA bars railroad employees from bringing *other* kinds of disability-discrimination claims, but not claims like Turner's. 42 U.S.C. § 12114(e). And though the ADA and FRSA have been on the books for decades, Congress has never enacted a provision barring claims of the sort that Turner brings here. Turner Br. at 4-9, 26-27. The absence of any such provision is "powerful evidence that Congress did not intend" to preclude them. *POM Wonderful*, 573 U.S. at 113-14 (quoting *Wyeth v. Levine*, 555 U.S. 555, 575 (2009)). Were that not enough, the FRA's certification regulations—the very regulations that BNSF contends ousts Turner's ADA claims—*permit* railroad employees to bring lawsuits outside of the FRA's administrative-review process based on their employer's certification decisions. 49 C.F.R. § 242.5.

With textual evidence like this, the Court can safely conclude that Congress did not intend the FRSA to preclude Turner's claims. *See* Turner Br. at 26-30; *Mills*, 2024 WL 185246, at *11 (rejecting railroad's argument that employee had to take up issue of railroad's color-vision field test "with the FRA"); *Vann-Foreman v. Ill. Cent. R.R. Co.*, 2022 WL

8

180749, at *3-4 (N.D. Ill. Jan. 20, 2022) (FRSA and FRA regulations did not preclude Title VII lawsuit based on discrimination in certification process).

The ADA's and FRSA's complementary scopes, purposes, and remedial schemes reinforce the conclusion that Turner's claims are not precluded. *See POM Wonderful*, 573 U.S. at 115-16; Turner Br. at 31-33. The FRSA's purpose is to promote railroad safety, while the ADA protects employees from disability discrimination. 49 U.S.C. § 20101; 42 U.S.C. § 12101(b)(1). The statutes provide distinct enforcement schemes to accomplish these goals. The ADA permits the federal government and individuals to bring lawsuits in federal court seeking damages, back pay, and equitable relief. 42 U.S.C. §§ 12117(a), 2000e-5(f)-(g), 1981a. The FRSA, by contrast, leaves enforcement of the FRA's certification regulations largely to the railroads themselves with limited oversight from the FRA.

These enforcement schemes are complementary. The FRA cannot reach or remedy claims that a railroad committed disability discrimination against an employee during the certification process. Turner Br. at 15-18; *infra* at 20-21. That is where the ADA comes in. "A holding that the [FRSA] precludes [ADA] claims challenging [disability discrimination in the FRA certification process] would not only ignore the distinct functional aspects of the [ADA and FRSA] but also would lead to a result that Congress likely did not intend," since it would leave disabled

9

employees like Turner with no way to challenge disability discrimination. *POM Wonderful*, 573 U.S. 115-16.

## B.     BNSF's Arguments for Preclusion Fail.

BNSF does not meaningfully engage with Turner's argument against preclusion. Nor does it defend the district court's reasoning. BNSF instead pivots away from the district court's analysis and BNSF's positions below to present a series of fatally flawed new arguments. Each is meritless.

### (1)     BNSF's preclusion arguments are brand-new.

Before the district court, BNSF advanced a handful of shifting arguments asserting that Turner's claims were precluded by the FRA's dispute-resolution regulations. ROA.96-101, 134-39, 147-53; Turner Br. at 36-37. Relying almost exclusively on brand-new textual and contextual arguments, BNSF changes its tack once again on appeal. Crucially, BNSF now says little about the FRA's dispute-resolution process, contending for the first time that Turner's claims are precluded because BNSF's medical examiner has the final say, unconstrained by the ADA, on whether an employee has sufficient color-vision proficiency. This medical-officer-finality argument was never made below. Because BNSF forfeited its right to raise the argument, this Court should not consider it. *Rollins*, 8 F.4th at 397-99; *Garcia v. Orta*, 47 F.4th 343, 348-49 (5th Cir. 2022).

### (2)    BNSF's attempts to distinguish *POM Wonderful* are forfeited and unpersuasive.

BNSF begins with a failed attempt to delineate two supposed types of preclusion. To hear BNSF tell it, on one side, are preemption-like cases, such as *POM Wonderful*, in which one federal law supersedes another. BNSF Br. at 17-20. On the other, are cases "in which one federal law prevents a claim under another federal law." *Id.* at 20. BNSF suggests that this case falls into the second category.

But once again, BNSF forfeited this argument by failing to raise it below. And here, too, BNSF's argument is wrong on the merits.

Forfeiture first. BNSF did not make its two-branches-of-preclusion argument in the district court. In fact, BNSF argued the opposite. It analyzed *POM Wonderful* and other cases that it considered to be about preclusion together, contending that "[e]ach refers to the same phenomenon." ROA.97, 135. And using the language of preemption, BNSF described this phenomenon as "conflict preclusion," in which "one federal law override[s] another." ROA.135, 153.

Merits second. *POM Wonderful* refutes BNSF's suggestion that there are two separate flavors of preclusion. *POM Wonderful* speaks of preclusion in the same prevent-a-claim terms that BNSF now does on appeal. 573 U.S. at 106 ("forbid…suits"), 113 ("forbids or limits claims"); 117 ("foreclose private enforcement of other federal statutes"). And it instructs courts not to engage in the kind of "complex categorization" of preclusion that BNSF indulges in. *Id.* at 111-12.

The close similarities between this case and *POM Wonderful* negate BNSF's attempt to drive a wedge between them. *POM Wonderful* concerned whether a federal statute "designed primarily to protect the health and safety of the public at large," and regulations promulgated under that statute, prevented a private cause of action under another statute. *Id.* at 107-09, 115. Same here. The defendant and the lower courts argued that they did because the agency's regulations spoke directly to the issues that formed the basis of the plaintiff's lawsuit, permitted the defendant's conduct, and were the exclusive means of ensuring compliance. *Id.* at 108, 110-11, 113-14. Same here. But that didn't warrant finding preclusion because "[n]othing in the text, history, or structure of [the statutes] shows the congressional purpose or design to forbid these suits." *Id.* at 106. Same here. The Court's analytical framework in *POM Wonderful* controls this case.

### (3)   BNSF's textual argument fails.

BNSF next mounts a complex textual argument essentially contending that the authority Congress vested in the Secretary of Transportation to enforce the FRSA somehow gives BNSF's medical examiner the power to make color-vision-acuity decisions unconstrained by the ADA. This grandiose argument has three central premises.

(1)   The FRSA and FRA delegate authority to railroad medical examiners to make conductor-certification decisions. BNSF Br. at 32-34.

(2)     This delegation means "that Turner's choice to not invoke the FRA's dispute-resolution procedures caused BNSF's medical examiner's" judgment on Turner's visual acuity "to become…not action by BNSF but instead unreviewable final action of the Federal Railroad Administrator and thus of the Secretary of Transportation." *Id.* at 35-36.

(3)     Under the Hobbs Act, courts of appeal have exclusive jurisdiction to review final actions of the Secretary of Transportation. *Id.* at 36-37.

From these premises, BNSF concludes that Turner's claims are precluded because its medical examiner's decision is final and may not be challenged under the ADA. *Id.* at 31, 37-38.

BNSF's argument is not even superficially plausible. As Turner just explained, it's entirely new and forfeited. Not just that, its premises are wrong or irrelevant (often both). And *even if the Court accepts* BNSF's premises, BNSF's ultimate conclusion that Turner's claims are precluded does not follow. BNSF does not have the authority to decide whether the ADA applies to its actions.

The central problem is that BNSF assumes what it must show: that its medical examiner has the final word on Turner's color-vision acuity *under the ADA*. But BNSF provides not a lick of evidence to support that conclusion. BNSF does nothing more than presuppose the legality of its own discrimination.

Take, for instance, BNSF's claim that its medical examiner is delegated the power to make FRA certification decisions. Even if one accepts this, BNSF's argument requires this power to bring with it the

13

authority to enforce the ADA. Without that authority, medical examiners' decisions about visual acuity cannot set a ceiling on what the ADA requires, but that is essentially what BNSF argues they do. *See POM Wonderful*, 573 U.S. at 118-20.

BNSF does not have this power. The delegated authority BNSF enjoys (assuming it has any) extends no further than what the FRA could grant examiners under the FRSA and its regulations. The agency could not delegate power to dictate the terms of the ADA because neither the Secretary of Transportation nor the FRA "ha[s] authority to enforce the" ADA. *POM Wonderful*, 573 U.S. at 120; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); 49 U.S.C. §§ 102, 103(g)-(h) (specifying the duties, powers, and limitations of the FRA). The FRSA and the FRA's regulations "do[] not discuss or even cite the [ADA]," nor does BNSF suggest that either the Secretary of Transportation or the FRA "consider[s] the full scope of interests the [ADA] protects" when enforcing the FRSA. *POM Wonderful*, 573 U.S. at 118-21.

In truth, BNSF's argument amounts to an astonishing assertion of power—one that Congress would not confer carelessly. BNSF, a covered employer under the ADA, contends that *it alone* has the final, unreviewable authority to decide what the ADA requires of it. And more: this extraordinary authority, BNSF tells the Court, was granted under a different statute and regulatory regime by way of a kind of "triple bank shot" of delegations from Congress to the Secretary of Transportation, to

14

the FRA, to the railroad. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 515 (2018). "[J]ust stating the theory" shows how implausible it is. *Id.* Congress "does not…hide elephants in mouseholes." *Id.* (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)). Nor may "[a]n agency reorder federal statutory rights without congressional authorization." *POM Wonderful*, 573 U.S. at 120. Still less may a regulated entity subject to that statute do so. BNSF has no such authorization here.

BNSF mounts only one threadbare textual argument involving the ADA itself. But nothing in the ADA supports preclusion here.

BNSF points to the "qualified individual" language of 42 U.S.C. § 12112(a) and legislative history suggesting that Congress understood that some people would not be qualified under the ADA if they could not meet federal safety standards. BNSF Br. at 37-38. But these citations don't do the trick for BNSF. Neither the ADA nor its legislative history shows that Congress intended to *preclude* application of the ADA to claims involving discretionary railroad certification decisions, much less to claims like Turner's asserting that Turner *could* show that he was qualified had BNSF not declared him ineligible using a discriminatory standard of its own creation. BNSF's citations demonstrate a far more modest point: that people must be qualified to be protected under the ADA; and that whether someone meets a federal safety standard may be relevant to determining that. *See* 29 C.F.R. § 1630.15(e).

BNSF next contends that because the decision to make color-vision assessments was delegated to its medical examiner, not appealing BNSF's determination to the FRA makes BNSF's decision final agency action subject to review only under the Hobbs Act.

This conclusion does not follow. BNSF's medical examiner's determination is not a final action under the FRA or the Hobbs Act. True, the FRSA commits review of "a final action of the Secretary of Transportation" to "the appropriate court of appeals," "as provided in" the Hobbs Act. 49 U.S.C. § 20114(c); 28 U.S.C. § 2342(7). But nowhere does the Hobbs Act, FRSA, or FRA regulations say that *a railroad's* certification decision is final agency action (or even agency action at all). *See* 49 C.F.R. §§ 242.507(c), 242.509(u)(4), 242.511(e) (providing that each decision by the *FRA* during the administrative-review process constitutes final agency action). Turner's ADA claims do not fall within the ambit of the Hobbs Act.

BNSF's argument suffers from even more fundamental problems. It again presupposes what it must prove: that BNSF's medical examiner's decision is final *for the ADA*. There is no reason to conclude that's the case. Even if BNSF's medical examiner's certification decision were final for purposes of the Hobbs Act, it would be final only with respect to the FRA certification process. It would not foreclose bringing claims under the ADA because, again, neither the FRA nor BNSF has the authority to enforce that statute. Nor may the FRA address allegations of disability

discrimination in the agency's dispute-resolution process. The FRA's regulations and administrative guidance confirm that the FRA's dispute-resolution process does not bar claims, like Turner's that depend on issues the FRA is not "empowered to" decide. *Guidance Explaining the Federal Railroad Administration's Dispute Resolution Procedures for Locomotive Engineer and Conductor Certification FAQs* ("*Conductor Certification FAQs*") (Feb. 24, 2022), at 7, https://railroads.dot.gov/elibrary/guidance-explaining-federal-railroad-administrations-dispute-resolution-procedures (providing that such claims "must be resolved under dispute resolution mechanisms that do not directly involve [the] FRA"); 49 C.F.R. § 242.5(d).

> **(4) The subject matter and nature of BNSF's certification decision do not support finding Turner's claims precluded.**

Out of luck on the text of either statute, BNSF strains to analogize this dispute to cases where the Constitution commits national-security decisions to the Executive Branch. BNSF Br. at 23-26, 39-44 (citing *Dep't of Navy v. Egan*, 484 U.S. 518 (1988)). This argument is forfeited because BNSF did not make it below; and it is wholly inapplicable in any event.

*Egan* and its progeny forbid courts and administrative bodies from reviewing the merits of security-clearance decisions. *United States ex rel. Johnson v. Raytheon Co.*, 93 F.4th 776, 785-86 (5th Cir. 2024). BNSF contends that rail safety is almost as important as national security, so (says BNSF) courts should not review railroad medical-examiner

decisions either. But *Egan* barred review of security-clearance decisions because the *Constitution* textually commits those decisions to *the Executive Branch*, making any judicial review a violation of separation-of-powers principles. *Egan*, 484 U.S. at 527; *Perez v. F.B.I.*, 71 F.3d 513, 514-15 (5th Cir. 1995). There is nothing remotely like that here. *See Toy v. Holder*, 714 F.3d 881, 884-85 (5th Cir. 2013) (refusing to extend *Egan* "beyond security clearances"). This Court should decline BNSF's invitation to invoke its non-existent executive authority.

*Egan* is distinguishable for other reasons, too. "*Egan*…explained that security clearance decisions were not subject to review because of their unusually 'predictive' nature in assessing a person's potential to compromise sensitive information and the decisions' grounding in specialized expertise that could not be reasonably reviewed by non-experts." *Johnson*, 93 F.4th at 785 (quoting *Egan*, 484 U.S. at 528-29). Railroad color-vision certification decisions are not similar. They are not mere "judgment call[s]," *Egan*, 484 U.S. at 529; they are based on whether a person passes a test. And crucially, unlike in *Egan*, the decisions *are* subject to review, both by the FRA and by courts. 49 C.F.R. § 242.501-11; *Carpenter v. Mineta*, 432 F.3d 1029, 1032 (9th Cir. 2005). So too are railroad medical examiners' decisions reviewable—and often found wanting—under the ADA. *See Nall v. BNSF Ry. Co.*, 917 F.3d 335, 346 (5th Cir. 2019); *Sanders*, 108 F.4th at 1059-62. And unlike Executive-Branch decisions involving national security, courts owe these decisions

18

no deference under the ADA. *Egan*, 108 U.S. at 529-30; *Bragdon v. Abbott*, 524 U.S. 624, 649-50 (1998).

### (5) Turner's lawsuit presents no safety concerns.

Turning to policy arguments, BNSF and its amicus claim that permitting Turner's lawsuit supposedly "would have grave implications for the safety of the rail network." Association of American Railroads Br. at 3-4. This worry is unfounded. Turner Br. 40-41.

There is plenty of play in the joints of the ADA and the FRA regulations to allow railroads to meet their obligations under both laws. Railroads have the discretion to devise their own certification-testing procedures, including by providing company-created field tests to evaluate color vision. Turner Br. at 9-15; *infra* at 24-25. BNSF provides no reason to believe that it could not exercise that discretion by modifying its field test to comply with both the FRA's safety requirements and the ADA's prohibitions against disability discrimination. *See Mills*, 2024 WL 185246, at *6, *9 (explaining that railroads must exercise this discretion in a way that complies with the ADA). The ADA grants BNSF all the tools it needs to do this. The ADA shields employers from liability when an accommodation poses an undue hardship, a challenged qualification standard is a business necessity, or an employee is a direct safety threat. 42 U.S.C. §§ 12112(b)(5)(A), (b)(6) & 12113(a)-(b). Employers may also avoid liability by proving that a federal law or regulation requires or

prohibits a challenged action. 29 C.F.R. § 1630.15(e). Turner's lawsuit will not negatively affect railroad safety.

In short, the text and structure of the statutes show that there will be no "difficulty in fully enforcing each statute according to its terms," *POM Wonderful*, 573 U.S. at 118, protecting disabled workers and ensuring railroad safety alike.

### (6) The FRA's dispute-resolution regulations do not preclude Turner's claims.

BNSF argued below that Turner's claims were precluded because they fell within the FRA's dispute-resolution regulations. ROA.96-101, 134-39, 147-53. BNSF largely backs away from that argument on appeal. It's not hard to see why. Turner's ADA claims could not be reached or remedied through the FRA's dispute-resolution process, so they cannot be precluded by it.

As Turner explained in his principal brief, the regulations strictly limit the FRA's scope of review and remedial authority. Turner Br. at 15-18. The FRA decides only whether a railroad's recertification denial was incorrect under the regulations. 49 C.F.R. §§ 242.505(k), 242.509(q). It does "not otherwise consider the propriety of a railroad's decision." 49 C.F.R. § 242.505(k); *Conductor Certification FAQs*, at 7. And "no remedial relief is available in this limited dispute resolution proceeding." *Carpenter*, 432 F.3d at 1031-35 (affirming FRA decision that it lacked authority to order retesting or certification through the administrative

process). An employee seeking to vindicate other legal rights must use "dispute resolution mechanisms that do not directly involve FRA." *Conductor Certification FAQs*, at 7. That's what Turner is doing here.

The FRA therefore could not consider or remedy Turner's allegations that BNSF committed disability discrimination. The FRA has explicitly said so, explaining in a color-vision appeal decision that "[*i*]*ssues of discrimination or of disparate treatment are outside of the Board's authority to review.*" Decision Concerning National Passenger Railroad Corporation's Denial of Mr. B. M. Peltz's Conductor Certification (Nov. 9, 2016), at 2, 4, https://www.regulations.gov/document/FRA-2015-0090-0004 (emphasis added). Similarly, the FRA cannot consider whether the railroad provided a reasonable accommodation, such as permitting chromatic lenses to be worn for the field test—the precise issue Turner raises here. *See* Decision Concerning Union Pacific Railroad Company's Denial of Mr. G.D. Marlow's Conductor Certification (Jan. 17, 2018), at 3, https://www.regulations.gov/document/FRA-2017-0049-0005 (cited in BNSF Br. at 49 n.9); ROA.10-11 ¶¶ 25, 40; Turner Br. at 53-54.

The text and structure of the ADA, FRSA, and FRA regulations show that Turner's ADA claims are not precluded.

## II. TURNER HAS PLAUSIBLY ALLEGED THAT HE IS QUALIFIED.

To adequately state his claims, Turner must plausibly allege that

21

he is qualified for his job, which requires showing that he can perform the job's essential functions with or without a reasonable accommodation. 42 U.S.C. § 12111(8). Turner easily meets this standard.

"As a general rule, an employer may develop and use qualification standards or other selection criteria" to determine job eligibility. *Kapche v. City of San Antonio*, 176 F.3d 840, 842-43 (5th Cir. 1999). But the ADA "does not require that a person meet each of an employer's established 'qualification standards'…to show that he is 'qualified.'" *Bates v. United Parcel Serv.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc). "[I]ndeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputably *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.*

So, when an employee challenges an employer's qualification standard as itself discriminatory under the ADA, that employee is qualified so long as he meets all other job-related requirements and can perform his job's essential functions with or without an accommodation. *See, e.g.*, *id.* at 990-94; *Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 (5th Cir. 1999); *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 306-07 (5th Cir. 1981). This rule applies in cases like this one where the government establishes broad guidelines for certifying employees, but provides employers with discretion to create and implement the challenged certification test. *See Rohr v. Salt River Project Agric. Imp. & Power Dist.*,

555 F.3d 850, 862-64 (9th Cir. 2009).

Applying this rule shows why Turner is qualified. Turner meets all the requirements of being a conductor other than the BNSF-created standard that he challenges as discriminatory. Turner could safely work as a conductor despite his color-vision deficiency, never misreading a colored railroad signal in the 15 years he drove a train for BNSF. ROA.7 ¶ 2. Turner also passed BNSF's color-vision field test and was certified by BNSF to work as a conductor every year it tested him until 2020. ROA.7, 9 ¶¶ 2-3, 22. Nothing about Turner's vision had changed since he started working at BNSF. ROA.7, 9 ¶¶ 3, 20. The only thing that was different was that BNSF now required Turner to pass a field test of its own creation that was disconnected from the actual demands of Turner's job. ROA.7, 10 ¶¶ 3-4, 23, 28. Because Turner challenges that test as discriminatory under the ADA, and because he can perform the essential functions and satisfy all the other job-related requirements of his position, he has plausibly alleged that he is qualified. *See Prewitt*, 662 F.2d at 306-07.

Three recent decisions analyzing the same issue reinforce this conclusion. Like Turner, the railroad employees in these cases were qualified under the ADA because they had years of experience successfully performing their job duties and were denied recertification based on their company's flawed color-vision field test. *See Mills*, 2024 WL 185246, at *9-10; *EEOC v. Union Pac. R.R. Co.*, 2024 WL 3328718,

at \*5-6; *Walker v. Union Pac. R.R. Co.*, 2023 WL 10354310, at \*8-12 (D. Or. Dec. 18, 2023), *report & recommendation adopted,* 2024 WL 1052678 (D. Or. Mar. 11, 2024). And just like Turner, that was all they needed to allege to be qualified under the ADA.

BNSF insists that Turner is not qualified because (says BNSF) Turner did not meet a mandatory medical standard required by federal law. Call this the government-made-me-do-it defense. No doubt this is a viable defense in some cases. *See* 29 C.F.R. 1630.15(e); BNSF Br. at 54 (citing cases). But it isn't here. This is not a case where the government imposed a specific substantive medical standard that employees must meet. The "closest thing" to that here is the first-round scientific color-vision test. *Mills*, 2024 WL 185246, at \*6; 49 C.F.R Part 240 App'x D(2). But the analogy ends there: railroads may certify conductors so long as they have adequate color-vision "ability to safely perform" their job duties, and conductors who fail the initial color-vision test prove this by passing a follow-up test. 49 C.F.R. § 242.117(j). The FRA leaves the selection of this follow-up test to the discretion of each railroad. 49 C.F.R. Part 242 App'x D(4); *Best Practices for Designing Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73122, 73124 (Nov. 24, 2015); Turner Br. at 9-15. BNSF concedes this: "the regulations do not describe how a railroad must conduct a field test. Instead, the regulations clearly provide that it is *wholly within the railroad's discretion* to conduct the field test in a manner of its choosing." ROA.95 (emphasis added).

With that discretion, BNSF designed and used a field test to bar Turner from working as a conductor. The government did not make BNSF use that test or require the test to have a specific form or content. BNSF made these choices itself. *Mills*, 2024 WL 185246, at *11; *Rohr*, 555 F.3d at 862-64.

BNSF tries to dodge this obvious point, contending that employees who fail the initial color-vision test are "unqualified absent an exception," and that the exception is just whether BNSF's medical examiner concludes that they can do the job safely. BNSF Br. at 54-57. But the FRA's regulations, Turner's complaint, and BNSF's own statements disprove this. *See supra* at 5-7. Employees who fail the initial color-vision test are not disqualified. They are entitled to a re-test, and they demonstrate that they have adequate color vision to do the job safely by passing this test. *Id.* BNSF recertifies them when they pass and refuses to do so when they fail. *Id.*

These points are also fatal to BNSF's argument that its decision not to recertify Turner after he failed its field test is a "screen in" decision and thus falls outside of 42 U.S.C. § 12112(b)(6). BNSF Br. at 58. This argument, too, turns on BNSF's assertion that employees who fail the initial test are disqualified. To repeat: that's incorrect. Employees are recertified when they pass BNSF's field test, and barred from working, or *screened out*, when they fail it. Indeed, BNSF *admits* that the color-

25

vision testing process screens out employees, acknowledging that the "'screening out' will always be undisputed." BNSF Br. at 46-47 & n.8.

BNSF's screen-in argument fails for other reasons, too. First, it would swallow § 12112(b)(6) whole because *any* employer could claim that a qualification standard that screened out the disabled was meant to screen them in. But the ADA applies to employment tests even when they only "unintentionally screen out" disabled employees. 29 C.F.R. § 1630, App'x § 1630.10(a). Second, even if BNSF's argument were correct, it would not affect whether Turner is *qualified*. It would apply only to Turner's claim under § 12112(b)(6), not his claims for disparate treatment or failure to accommodate.

Returning to its government-made-me-do-it defense, BNSF attempts to distinguish *Rohr*, a case in which the Ninth Circuit held that an employee who challenged his employer's discretionary respirator certification test as "itself discriminatory" could be qualified under the ADA. 555 F.3d at 862-64. But there is no meaningful difference between this case and *Rohr*. Like BNSF, Rohr's employer asserted that its certification test was "mandated by" federal regulations. *Id.* at 862. That argument failed because the regulations did "not specify the content," "requirements," or "appropriate tests for determining whether an employee should be certified." *Id.* at 862-63.

The same is true here. "This is not a case where an employer merely implemented the medical certification program required by a federal

agency." *Id.* at 863. The "regulations were sufficiently broad to allow [BNSF] the discretion to determine how…it would evaluate its employees' [color-vision] ability." *Id.* BNSF has admitted as much. ROA.95; *supra* at 24. That discretion includes accommodating employees or modifying the field test. Turner Br. at 51-52; *see Rohr*, 555 F.3d at 862-64. Unlike the employers in the cases BNSF cites, BNSF Br. at 54, then, railroads face no dilemma in complying with the ADA or a federal regulation. They can—and must—do both. *Mills*, 2024 WL 185246, at *6, *9.

Finally, BNSF cursorily defends the district court's conclusion that Turner is not qualified because he did not appeal BNSF's recertification decision to the FRA. BNSF Br. at 56; ROA.163-64 (citing *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 812-13 (5th Cir. 2016)). But that reasoning has no purchase here. *See* Turner Br. at 49-54. The administrative process that the plaintiff in *Williams* failed to use empowered the agency to conclusively resolve whether he had a specific medical condition that the federal government required him not to have in order to work as a commercial driver. 826 F.3d at 808-09, 812-13. This case is different. Turner is challenging a discretionary *BNSF* test as itself discriminatory under the ADA, and the FRA could not address or remedy those infirmities. Turner Br. at 15-18, 53-54; *supra* at 20-21. Railroad employees like Turner do not need to go on a pointless suicide mission in front of the FRA to preserve their ADA claims in federal court. *Cf. Axon*

*Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (administrative-review scheme can be bypassed when it cannot "reach[] the claim in question"); *Reiter v. Cooper*, 507 U.S. 258, 269 (1993) (administrative process did not need to be pursued because agency could not provide relief sought).

Turner has plausibly alleged that he is qualified.

## <u>CONCLUSION</u>

The district court's judgment should be reversed.


Dated: September 20, 2024    Respectfully submitted,

s/ Colin Reeves
Colin Reeves
APOLLO LAW LLC
1000 Dean Street
Suite 101
Brooklyn, NY 11238
colin@apollo-law.com
(646) 363-6763

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of September, 2024, I caused the foregoing brief to be filed electronically with the Court, where it is available for viewing and downloading from the Court's CM/ECF system, and that such electronic filing automatically generates a Notice of Docket Activity constituting service. I certify that all participants in the case are registered CM/ECF filing users and that service will be accomplished by the CM/ECF system. I further certify that the electronic submission is an exact copy of the paper document.

Dated: September 20, 2024           s/ Colin Reeves
                                    Colin Reeves

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.3 because this brief contains 6,497 words, as determined by the word-count function of Microsoft Word for Office 365, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and this Court's Rule 32.1 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

Dated: September 20, 2024          s/ Colin Reeves
                                   Colin Reeves